**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

| | |
|---|---|
| BRIANNA MCCARTY, | ) |
| | ) Case No. 22-cv-5751 |
| Plaintiff, | ) |
| | ) |
| vs. | ) |
| | ) **JURY TRIAL DEMANDED** |
| | ) |
| THE VILLAGE OF LAKEMOOR, et al., and | ) |
| | ) |
| Defendants. | ) |

## DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT

NOW COMES Defendants, VILLAGE OF LAKEMOOR AND CHIEF DAVID GODLEWSKI, in his individual and official capacity, by and through their attorneys, PETERSON, JOHNSON & MURRAY - CHICAGO, LLC, and move this Honorable Court to Dismiss Plaintiff's First Amended Complaint ("FAC"), states as follows:

### Introduction

Plaintiff Brianna (Tedesco) McCarty ("Plaintiff") filed her multi-count FAC on January 19, 2023, after being granted leave by this Court. Just as with the initial complaint filed on October 19, 2022, this iteration alleges the same claims including: violations of the Americans with Disability Act ("ADA") Discrimination (Count I), Title VII Sexual Discrimination and Harassment Claim (Count II), Due Process violation pursuant to 42 U.S.C. § 1983 (Count III), Intentional Infliction of Emotional Distress (Count IV), and Sex Discrimination and Hostile Work Environment pursuant to the Illinois Human Rights Act (Count V). Again, Defendants do not take dispute that Plaintiff was involved in a car accident during a traffic stop or involved in an incident with a suspect who drew a gun upon her, but Plaintiff, in the face of a Rule 11 safe harbor letter dated January 9, 2023 and the required accompanying motion for sanctions, persists on taking completely incompatible legal and factual positions in two separate legal proceedings. Even the proposed amended complaint (Doc No. 10-1)

1

contained the allegation that "After being terminated, Plaintiff filed an application with the Pension Board seeking an award of disability." (Doc. No. 10-1, para. 134). That allegation has been changed to state, "Recognizing that she was going to be terminated, Plaintiff filed an application with the Pension Board seeking an award of disability." (First Am. Comp., Doc. No. 13, para. 134). Plaintiff trying to imply that she filed for a duty disability pension, after training a civilian employee in July of 2019. *Id.* at paras. 132-134. However, the record from Plaintiff's Disability Pension Proceeding, including her testimony therein, is that she filed for a duty disability pension on April 15, 2019. (Ex. 2, Pension Board Decision and Order, p. 4, para. 9).

Even after pointing out the misrepresentations and omissions to Plaintiff's counsel, the FAC still omits any substantive reference to 1) the fact that she was awarded a full-duty disability pension during a public proceeding before the pension board[1], 2) that she testified that she could not perform the essential job functions of a police officer during that proceeding in order to obtain the full-duty disability pension, 3) that the Village provided every benefit to Plaintiff as required by law, 4) that Plaintiff testified, under oath, she was not aware of any permanent, full-time light duty positions within the department, and 5) that approximately one month before the filing of this lawsuit, Plaintiff submitted a Physician's Certification of Disability signed by her physician on September 20, 2022. Plaintiff has removed the request to be returned to employment as a police officer, which is a tacit admission that this cause of action and the receipt of a duty disability pension based upon the inability to perform the essential duties of a police officer, are inconsistent legal positions.

It still remains unclear why Plaintiff would omit the fact that she filed an application for a duty disability pension in April 2019, instead of accepting the accommodations offered by the Village and as requested by her doctor, and omit the fact that she testified under oath that she could not

---

[1] Plaintiff alleges that she was awarded a "disability benefit" (Doc. No. 13., para. 135), but fails to disclose that she was awarded a full duty-disability pension as a result of her testimony to the Pension Board stating she could not perform the essential job functions of a police officer. (Ex. 1, Transcript of Public Proceeding, In the Matter of the Disability Application of Brianna Tedesco, March 17, 2021, p. 32).

perform the essential job functions or make any reference to her physician's recent certification of disability. Plaintiff previously misrepresented to this Court that she can fully perform the essential job functions of a police officer and has taken a completely contrary position before another tribunal, but has now modified that allegation to state that she can "perform her job duties with a reasonable accommodation." (Doc. No. 13, para. 7). As such, she should be judicially estopped from taking a contrary position in this case i.e., that she can perform the essential job functions with a reasonable accommodation because she has and continues to maintain she is permanently disabled from performing those job duties.

Even if this Court does not determine that Plaintiff is judicially estopped from taking a position contrary to her testimony and doctor's submissions in the Pension Board proceeding, Plaintiff, based upon her doctor's September 2022 certification, cannot perform the essential job functions of a police officer, which sounds the death knell for her ADA claim.

Additionally, Plaintiff's Section 1983 and state law Intentional Infliction of Emotional distress claims are barred by the statute of limitations. Plaintiff may argue that there is a continuing violation, but the case law is clear that Plaintiff's claims accrued upon her termination. As such those counts are untimely and must be dismissed.

Lastly, Plaintiff's Charge of Discrimination filed with the Equal Employment Opportunity Commission ("EEOC") and the Illinois Department of Human Rights ("IDHR") mention nothing about retaliation or a hostile work environment, nor does the Charge mention any malfeasance by the Chief of Police. Additionally, Plaintiff indicated that the discrimination occurred on August 6, 2019 when she was discharged and that this was not a continuing violation. Even the Charge of Discrimination does not check the box for "Continuing Action". (Ex. 3, Charge of Discrimination). As such, the Chief of Police is not a proper party, as she did not exhaust her administrative remedies with respect to him, and this Charge of Discrimination demonstrates that all of the counts, with the exception of Count I and Count V are barred by the statute of limitations. For the following reasons,

3

dismissal of Plaintiff's lawsuit in its entirety is warranted.

## Legal Standard

When ruling on a motion to dismiss pursuant to Rule 12(b)(6), the court accepts as true the well-pled facts of the Complaint, and draws all reasonable inferences in favor of the plaintiff. *Perkins v. Silverstein*, 939 F.2d 463, 466 (7th Cir. 1991). The purpose of a Rule 12(b)(6) motion is to test the sufficiency of the Complaint, not its merits. *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990). In order to withstand a motion to dismiss, the Complaint must describe the claim in sufficient detail to give the defendant fair notice of the claim and the grounds upon which the claim is based. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555, 127 S. Ct. 1955, 1964 (2007) (*quoting Conley v. Gibson*, 355 U.S. 41, 47, 78 S. Ct. 99 (1957)). Additionally, the Complaint must plausibly suggest plaintiff's right to relief beyond a speculative level. See *Brooks v. Ross*, 578 F.3d 574 (7th Cir. 2009); *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937, 1950 (2009), *citing Twombly*, 550 U.S. at 554-55. A complaint does not satisfy the pleading requirements if it tenders "naked assertions" that do not contain "further factual enhancement." *Ashcroft*, 129 S. Ct. at 1949, *quoting Twombly*, 550 U.S. at 557. In order to survive dismissal, a complaint must assert sufficient facts to state a claim that is "plausible on its face;" which requires "more than a sheer possibility" that a defendant has acted improperly. *Id.*

## Facts

Defendants incorporate the allegations in the FAC and the exhibits attached to the same (Doc. No. 13). Additionally, pursuant to Federal Rule of Civil Procedure 10(c), Defendants incorporate and attach hereto documents referenced in the Complaint. See, *Phillips v. Prudential Ins. Co. of America*, 714 F.3d 1017, 1019-20 (7th Cir. 2013)("In conducting our review, we must consider not only the complaint itself, but also . . . documents that are critical to the complaint and referred to in it, and information that is subject to proper judicial notice.") (internal citations and quotation marks omitted).

## **Argument**

I.     Plaintiff's ADA claims are barred by Judicial Estoppel.

Although for the purposes of a Rule 12(b)(6) motion to dismiss, the movant must accept the allegations as true, this court can take judicial notice of the related Pension Board hearings, and thereby, Plaintiff's testimony and the submissions therein as a public proceeding. Plaintiff did not reference her statements or the evidence adduced during that proceeding or her award of a full-duty disability pension in the Complaint, and for good reason. Notably, she claims that she filed for the duty disability pension *after* she trained a civilian employee in 2019 because she recognized that she was going to be terminated. (Doc. No. 13, paras. 132-134). Plaintiff's allegations are demonstrably false because she filed for a duty disability on April 15, 2019 (Ex. 1, Transcript of Public Proceeding, In the Matter of the Disability Application of Brianna Tedesco, March 17, 2021, p. 39) and was fired on August 6, 2019, during her probationary period. (Doc. No. 13, paras. 132-134). Setting aside the factual misrepresentations, Plaintiff is now taking a position contrary to her position and sworn testimony in the pension proceeding.

Before this Court, Plaintiff has again taken a position completely at odds with her testimony, submissions, and position in the pension matter as evidenced by her allegations in the FAC. Indeed, if she had testified that she was able to perform the essential job functions of a police officer before the pension board with an accommodation, then she would not have received duty disability pension award, nor the payments and related benefits she has received since her employment with the department was terminated. Second, her submissions to the Pension Board make it clear that she would not and could not return to the Village to be a police officer under any circumstances, as was stated by her doctor. Plaintiff continues to maintain that she is disabled and unable to return to work before the pension board - just weeks before filing this lawsuit, she submitted additional documentation to the Pension Board in support of her position that she remains disabled, unable to perform the job of Patrol Officer, and eligible for pension benefits. Setting aside violations of Fed.

Rule of Civ. Proc. 11(b) and ethical obligations of candor with the Court, Plaintiff has taken an opposite factual and legal position before the Pension Board for economic gain and succeeded in that endeavor. Thus, Plaintiff should now be estopped from taking a contrary and incompatible position in this matter for potential future financial gain.

The doctrine of judicial estoppel prohibits a litigant from the type of action being perpetrated by Plaintiff in the case at bar. "Judicial estoppel is a doctrine of discretion that is intended to protect the integrity of the judicial process." *See Juza v. Wells Fargo Bank, N.A.,* 794 F. App'x 529, 535 (7th Cir. 2020); *see also New Hampshire v. Maine,* 532 U.S. 742, 749 (2001) (noting that "courts have uniformly recognized that its purpose is 'to protect the integrity of the judicial process'") (citation omitted); *Ladd v. ITT Corp.,* 148 F.3d 753, 756 (7th Cir. 1998) ("[T]he purpose of the doctrine . . . is to reduce fraud in the legal process by forcing a modicum of consistency on a repeating litigant. . . ."); *In re Cassidy,* 892 F.2d 637, 641 (7th Cir. 1990) ("Judicial estoppel is a doctrine designed to prevent the perversion of the judicial process."); 18B Charles Alan Wright *et al., Fed. Practice & Procedure* § 4477 (2d ed. 2020). The doctrine "prevent[s] litigants from 'playing fast and loose with the courts,'" *In re Cassidy,* 892 F.2d at 641 (citation omitted).

Distilled to its essence, "[t]he doctrine of judicial estoppel prevents litigants from manipulating the judicial system by prevailing in different cases or phases of a case by adopting inconsistent positions." *Spaine v. Community Contacts, Inc.,* 756 F.3d 542, 547 (7th Cir. 2014). It has long been held that "A litigant is forbidden to obtain a victory on one ground and then repudiate that ground in a different case in order to win a second victory." *Chaveriat v. Williams Pipe Line Co.,* 11 F.3d 1420, 1427 (7th Cir. 1993); *see also Williams v. Hainje,* 375 F. App'x 625, 627 (7th Cir. 2010) ("Broadly speaking, judicial estoppel precludes a party from abandoning positions after they have prevailed on them in earlier litigation.").

Plaintiff has testified under oath that she could no longer perform the essential job functions of a police officer, which in part was the basis for the award of the duty disability pension. See Ex. 1, p. 32. Under oath, Ms. (Tedesco) McCarty testified as follows:

> Q. Okay. At some point or another, do you believe you can be a Police Officer in full and unrestricted duty today?
> A. I don't.
> Q. Can you explain to the Board why not?
> A. With my triggers, I don't know that I could safely be a Police Officer, and effectively feel like I would put my partners at risk, and I would put the community at risk.
> Q. You submitted an application that's included in the packet as Exhibit 1; is that right?
> A. Yes.

*Id.*

Based upon the testimony of Plaintiff, the physicians' reports, and documents put into evidence, the Pension Board noted the following facts, in awarding the duty disability pension to Plaintiff:

> 70) ***On April 2, 2019, Dr. Kroll provided a progress report to the Department Chief.*** Dr. Kroll stated that Applicant had participated in thirteen (13) individual therapy sessions and one (1) group session with an additional group session scheduled for April 12, 2019. Dr. Kroll noted that Applicant had been compliant and motivated to return to work but that she was still experiencing significant symptoms of anxiety and PTSD. ***Applicant remained on light duty.*** (Bd. Ex. #3, R 36).
>
> 71) ***On April 29, 2019, Applicant emailed Dr. Kroll stating that she believed it in her best interest not to return to unrestricted duty at that time.*** Applicant outlined her reasoning in detail: she stated that the continuation of her fear, anxiety, and PTSD from the officer involved shooting made the effective performance of her job as a patrol officer impossible. Applicant informed Dr. Kroll and the Department Chief that she would be applying for disability. (Bd. Ex. #3, R 32).

(Ex. 2, Decision and Order, p. 13)(emphasis added).

Plaintiff has not sought to be reinstated to full active duty before the pension board. Instead, Plaintiff has recently certified her continued inability to perform her job to the pension board and she continues to collect pension payments, consistent with her arguments in the Pension Board matter,

but inapposite to what she has asserted in this action. This case is precisely the reason Judicial Estoppel exists. Not only did Plaintiff fail to mention her duty disability pension testimony in her filings before this Court, instead, she alleged that she was able to perform the essential job functions of a police officer with a reasonable accommodation. (Doc. No. 13, para. 7). However, her physician certified that she was unable to go out after sunset, unable to approach cars, and lacked confidence to carry a firearm and ammunition, and her own testimony before the pension board mentions similar issues and triggers. (Ex. 4, Physician's Certificate of Disability). Nothing happened from September 20, 2022, the most recent date of Plaintiff's pension board certification, and the filing of this lawsuit (or the FAC) to alter the facts asserted in the pension matter. Plaintiff has taken no affirmative steps with the pension board to be reinstated to her prior position. Thus, Plaintiff should be estopped from asserting an ADA claim, seeking reinstatement, or asserting any facts or arguments inconsistent with her position in the Pension Board proceeding. As a result, Count I of Plaintiff's Complaint should be dismissed with prejudice.

Similarly, Count II of the Complaint brings a claim for Title VII Sexual Discrimination. Although that count is defective because Plaintiff never brought a harassment complaint to the EEOC, Plaintiff now alleges that similarly situated male officers were put on light duty for years. (Doc. No. 13, para. 131). Again, Plaintiff took a contrary position in the pension board proceeding. As memorialized in the Decision & Order, she testified to the following:

> 52)    Applicant is not aware of any permanent, full-time light duty positions within the Department. She had a light duty position, but she was told that it was temporary and would not be allowed to continue. No permanent, full-time light duty position was ever offered. (Tr. p. 37, 57).
> 53)    Applicant testified that she requested to be able to work only during the daytime hours but that the Department denied this request. (Tr. p. 57).

(Ex. 2, Pension Board Decision & Order, p. 10).

Now Plaintiff wants to assert that there were light duty positions of similarly situated officers, in a conclusory manner, without any description of the factors. Regardless, to avoid a

light duty position, Plaintiff testified that there was nothing available. Plaintiff should be estopped from arguing that she was treated differently than similarly situated male counterparts because she took a different position before the pension board. Therefore, Count II of Plaintiff's Complaint should be dismissed.

II.  Plaintiff's ADA claims fail as a matter of law.

Assuming *arguendo* that this Court determines that Plaintiff is not judicially estopped, the Pension Board proceeding makes it clear that Plaintiff was on light duty, per the requested accommodations. Plaintiff has also provided evidence that further accommodation requests were accepted and approved by the Chief of Police and Village, but that it was Plaintiff who then rejected her own physician's accommodation request. Further, Plaintiff's testimony in the pension board proceeding and recent Physician's Certification of Disability make it abundantly clear that she could not, and still cannot, fulfill her essential job duties as required under the ADA. Thus, it is difficult to fathom how she can assert any ADA claim under this set of circumstances. The law makes it clear that she cannot. For the following reasons, Plaintiff's claims predicated upon the ADA should be dismissed with prejudice.

a.  ADA Discrimination.

Plaintiff's legal theory related to her ADA claims is the equivalent of putting a square peg in a round whole. The Complaint states that Plaintiff can perform the essential job functions, with a reasonable accommodation although she maintains that she cannot perform the essential job functions in her pension proceeding. Second, she testified that it was dangerous for her, her co-workers and the public for her to be on the street in an emergency situation. Third, the most ironic part of this ADA discrimination claim is that the Village wanted Plaintiff to return to work with an accommodation, approved all accommodation requests even to the detriment of typical operations, but Plaintiff did not and does not want to return to work. See, Doc. No. 13, para. 138 and Exhibit M to the Village's

Response to the Charge of Discrimination.[2] The exhibit that attached to the Village's Response clearly demonstrates that the Village and Chief approved and were making all accommodations recommended by Dr. Kroll as of April 15, 2019, including working during the day shift. *Id.* When the Chief approved and offered the accommodation, Plaintiff rejected the accommodation and asked for a disability pension application. *Id.* These allegations, the documents incorporated by reference and the pension board evidence, render Plaintiff's ADA discrimination claim frivolous.

> The ADA states:
>
> No covered entity shall discriminate against a qualified individual with a disability because *of* the disability of such an individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

42 U.S.C. § 12112. (Emphasis added).

The ADA does not, however, erect an impenetrable barrier around the disabled employee, preventing the employer from taking any employment actions vis-a-vis the employee. The ADA prohibits discrimination against "a qualified individual with a disability because of the disability." 42 U.S.C. § 12112(a). The Act defines a "qualified individual with a disability" as "an individual with a disability who, *with or without reasonable accommodation*, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8)(emphasis added). Pursuant to the controlling case law, a plaintiff has the burden of proving that he is "qualified" to perform the essential functions of the job he holds or seeks, *with or without reasonable accommodation. See Best v. Shell Oil Co.,* 107 F.3d 544, 547-48 (7th Cir. 1997); *Weiler v. Household Fin. Corp.,* 101 F.3d 519, 524 (7th Cir. 1996); *DeLuca v. Winer Indus., Inc.,* 53 F.3d 793, 797 (7th Cir. 1995).

---

[2] Paragraph 138 of Plaintiff's FAC references page 5 of the Village's Response to the Charge of Discrimination. Exhibit M to the Village's Response was not attached, but is attached hereto as Exhibit 5. By operation FRCP 10(c), the Village's Response and copy of the exhibits supporting the response are incorporated into the FAC.

Plaintiff's ADA Discrimination is devoid of substance and merit. Plaintiff, by her own duty disability application, sworn testimony before the Pension Board during a public hearing and September 2022 Physician's certification, cannot establish that she is a "qualified individual" under the ADA. Plaintiff is not disabled from the major life activity of working. While Plaintiff previously testified she could not perform the essential functions of the specific position of Patrol Officer either with or without accommodation. Yet, Plaintiff now alleges she can perform the essential functions of her positions as a sworn police officer with a reasonable accommodation. Doc. No. 13, para. 7. However, the Decision and Order from the Pension Board, which granted the full-duty disability pension to Plaintiff and the Physician's Certification foreclose the applicability of the ADA in any form because she cannot establish the threshold issue of being a qualified individual.

Plaintiff has alleged accommodations were initially provided by the Village, but then later rejected. However, this allegation is refuted by the Decision and Order by the Pension Board. During that hearing evidence was adduced and made part of the decision, that Plaintiff told her Physician that she was going to apply for a disability pension instead of accepting the accommodations from the Village or returning to full duty. (Ex. 2, Decision & Order, para. 70-71). The FAC omits reference to this Pension Board proceeding, the evidence and testimony adduced during that proceeding. It is clear that Plaintiff and her counsel have made a conscious decision to hide material information from another public proceeding in order to foster some narrative that Defendants simply fired Plaintiff and deprived her of her career as a police officer. This could not be further from the truth and the public record eviscerates any such narrative. Plaintiff cannot perform the essential job functions of a police officer per the testimony elicited during the pension board proceedings and in her doctor's September 2022 certification and, she has, herself, admittedly maintained that she cannot perform the essential job functions of a police officer. Thus, Plaintiff is not a qualified individual under the Americans with Disability Act and Count I fails as a matter of law. With these facts, Plaintiff's ongoing receipt of a full-duty disability pension, and the Decision & Order from the Pension Board it is

incomprehensible how Plaintiff can allege Defendants violation the ADA, when she chose to seek a duty disability pension instead of returning to work. Nonetheless, the testimony and order from the Pension Board public proceeding render the ADA Discrimination a legal nullity and therefore, this Court should dismiss the ADA Discrimination claims in Count I.

III.     Plaintiff's claims are barred by the statute of limitations.

Plaintiff was terminated from her employment with the Village of Lakemoor on August 6, 2019. (Ex. 5, EEOC Charge of Discrimination). The significance of the Charge of Discrimination is that Plaintiff knew her claims accrued upon her termination. However, unlike her Title VII, ADA, and IDHR claim, Plaintiff had to file her Section 1983 claim (Count III) within two years of her termination i.e., August 6, 2021. Similarly, her state law claim for IIED is untimely. For the reasons set forth in this section, Counts III and IV of Plaintiff's Complaint should be dismissed with prejudice.

A.     Plaintiff's Section 1983 Due Process claims were filed after the applicable statute of limitations.

Based upon the Charge of Discrimination and the Complaint, Plaintiff was terminated during her probationary period as a Police Officer by the Village of Lakemoor on August 6, 2019. In Illinois, the statute of limitations period for § 1983 claims is two years, 735 ILCS 5/13-202; *Jenkins v. Vill. of Maywood*, 506 F.3d 622, 623 (7th Cir. 2007), and the claim accrues "when the plaintiff knows or should know that his or her constitutional rights have been violated," *Hileman v. Maze*, 367 F.3d 694, 696 (7th Cir.2004) (*quoting Kelly v. City of Chicago*, 4 F.3d 509, 511 (7th Cir. 1993)). We use a two-step test to determine the accrual date: (1) we identify the injury and (2) we determine when the plaintiff could have sued for that injury. *Hileman*, 367 F.3d at 696.

In this case, Plaintiff was not prohibited from suing for a Section 1983 Equal Protection claim. The Seventh Circuit has held that the date of the unlawful employment practice is when a "final, ultimate, [and] non-tentative" decision was made for which the employee receives unequivocal notice. *Flannery v. Recording Indus. Ass'n of Am.*, 354 F.3d 632, 637 (7th Cir. 2004); *Smith v.*

12

*Potter,* 445 F.3d 1000, 1007 (7th Cir. 2006). Here, Plaintiff knew that the adverse employment action was, at the latest, August 6, 2019, which is the date she included on her Charge of Discrimination. Thus, Plaintiff had two years to file a Section 1983 action against Defendants, which she failed to do. Thus, her Section 1983 claim is untimely and Count III should be dismissed with prejudice.

B. <u>Plaintiff's state law Intentional Infliction of Emotional Distress claims are barred by the Tort Immunity Act.</u>

Plaintiff has brought an Intentional Infliction of Emotional Distress ("IIED") claim (Count IV), against the Chief of Police. Setting aside the lack of any allegations that rise to the level of extreme and outrageous conduct on the part of the Chief (nor any allegations that are remotely factual), Plaintiff's claims are barred by the one-year statute of limitations in Local Government and Governmental Employee Act ("Tort Immunity Act"). 745 ILCS 10/8-101. There are no allegations of any conduct by the Chief of Police against the Plaintiff after her termination on August 6, 2019. Any state law claim stemming from her employment, outside of the claims before the IDHR, had to be filed by August 6, 2020. Here, Plaintiff did not file her lawsuit until October 19, 2022, therefore, the IIED claim is barred by the applicable statute of limitations and Count IV should be dismissed with prejudice.

IV. <u>Plaintiff failed to exhaust her administrative remedies regarding a hostile work environment.</u>

In this case, Plaintiff brings suit for Title VII Sexual Discrimination and Harassment Claim (Count II) and Sex Discrimination and Hostile Work Environment pursuant to the Illinois Human Rights Act (Count V). Notably, the Charge of Discrimination did not contain reference to any harassment, hostile work environment, nor did it mention any personal conduct of the Chief of Police. Thus, Plaintiff should be precluded from raising claims that should have been brought to the EEOC and IDHR.

"Before bringing a civil lawsuit, a plaintiff alleging Title VII or ADA violations must first exhaust his administrative remedies by filing charges with the EEOC and receiving a right to sue

13

letter. *Chaidez v. Ford Motor Co.*, 937 F.3d 998, 1004 (7th Cir. 2019) (Title VII); *Riley v. City of Kokomo*, 909 F.3d 182, 189 (7th Cir. 2018) (ADA). After receiving a right to sue letter, a plaintiff filing in federal court "may bring only those claims that were included in her EEOC charge, or that are like or reasonably related to the allegations of the charge and growing out of such allegations." *Chaidez*, 937 F.3d at 1004 (quoting *Geldon v. S. Milwaukee Sch. Dist.*, 414 F.3d 817, 819 (7th Cir. 2005)); see *Riley*, 909 F.3d at 189. The exhaustion requirement serves two purposes: first, it allows the EEOC and the employer an opportunity to settle; and second, it puts the employer on notice of the conduct the employee challenges. *Chaidez*, 937 F.3d at 1004. Given these purposes, "a party not named as the respondent in the charge may not ordinarily be sued in a private civil action." *Alam v. Miller Brewing Co.*, 709 F.3d 662, 666 (7th Cir. 2013).

The Charge of Discrimination only claims that she was discriminated against because of a disability and that she was not allowed to remain on light duty, allegedly unlike a male police officer. There is nothing about retaliation or a hostile work environment and those claims cannot be said to "grow out of" the allegations in the Charge of Discrimination. Thus, these Counts should be dismissed with prejudice.

Additionally, the Chief of Police cannot be personally liable under Title VII. Seventh Circuit precedent clearly states that Title VII does not impose personal liability on agents, but rather invokes the doctrine of *respondeat superior* to make employers responsible for the actions of their agents. *Thanongsinh v. Board of Educ.*, 462 F.3d 762, 771 n.7 (7th Cir. 2006) (citing *Gastineau v. Fleet Mortg. Corp.*, 137 F.3d 490, 493 (7th Cir. 1998)). In other words, an individual cannot be held liable in their individual capacity as a supervisor for claims under Title VII—only the company can. *See Gastineau*, 137 F.3d at 494; *Williams v. Banning*, 72 F.3d 552, 555 (7th Cir. 1995) ("[A] supervisor does not ... fall within Title VII's definition of employer."). Therefore, to the extent that this Court determines the failure to mention Chief Godlewski in the Charge of Discrimination is not fatal, he still cannot be liable personally, under Title VII.

14

Additionally, Chief Godlewski is also not an "employer" under the Illinois Human Rights Act. 775 ILCS 5/2-101(B). Under Section 6-101(A), it is a civil rights violation for "a person" to retaliate against another for opposing unlawful discrimination. But in the employment context, where an official of the employer undertakes the retaliatory act in the employer's name, the charge must be against the employer, and not the official in their personal capacity. *Watkins v. Office of State Appellate Defender*, 2012 IL App (1st) 111756, ¶ 37 (citing *Anderson v. Modern Metal Prod.*, 305 Ill. App. 3d 91, 102 (2d Dist. 1999)); see also in *Request for Review by: Ingrid Gill Richards*, IHRC, ALS No. 18-0334, 2019 WL 4190033, *1 (Aug. 13, 2019).

Individuals may be held liable in retaliation claims under Section 6-101(A) of the Act. However, when the individual is a company employee or official and undertakes an action in their capacity as an employee or agent of the employer, the charge must be against the employer alone, and not against the individual. *In re Request for Review by: Guillermo Binghay*, IHRC, Charge No. 1991CN2356, 1994 ILHUM LEXIS 608, *2 (May 27, 1994); *In re Request for Review by: Jason Nieman*, IHRC, ALS No. 15-0233, 2019 ILHUM LEXIS 221, *2 (February 19, 2019) (the Petitioner's charge was dismissed for lack of jurisdiction because an agent of a company cannot be held personally liable for a retaliation charge when acting in an official capacity).Therefore, these claims should also be dismissed against him in his individual capacity.

WHEREFORE, for the above and foregoing reasons, Defendants respectfully request that this Honorable Court enter an Order granting this motion to dismiss Plaintiff's claims with prejudice, an award of fees and costs for defending this matter, and for any other relief that this Court deems necessary and just.

Respectfully submitted,

By:    */s/Dominick L. Lanzito*
          One of the Attorneys for Defendants

Dominick L. Lanzito
Peterson, Johnson & Murray LLC
200 West Adams, Suite 2125
Chicago, IL. 60606
(312) 782-7150
dlanzito@pjmlaw.com

# EXHIBIT 1

1

BEFORE THE BOARD OF TRUSTEES OF THE

LAKEMOOR POLICE PENSION FUND


                            )
IN THE MATTER OF THE        )
DISABILITY APPLICATION      )
OF:                         )
                            )
   BRIANNA TEDESCO,         )
                            )
        Applicant.          )


        REPORT OF PROCEEDINGS had at the Public
Hearing of the above-entitled matter, commencing at
1:00 P.M., on March 17, 2021, at before the Board
of Trustees of the Lakemoor Police Pension Fund,
reported by GLORIA APOSTOLOS SIOLIDIS, CSR License
No. 084-001205, duly qualified and commissioned for
the State of Illinois.


BOARD MEMBERS PRESENT:
   WENDELL RUSSELL, President.
   KEVIN LYONS, Trustee.
   RICKY WESTCOTT, Trustee.

Brianna Tedesco Disability Application
March 17, 2021

2

1  ATTORNEYS PRESENT:

2

3      PUCHALSKI, GOODLOE, MARZULLO, by
       MS. LAURA GOODLOE

4      2100 Sanders Road
       Suite 110

5      Northbrook, IL   60062
       (847)666-5680

6      info@pgm-law.com

7          appeared on behalf of the Board of
           Trustees.

8

9      KARLSON, GARZA, MC QUEARY, LLC, by
       MR. KEITH A. KARLSON

10     12413 South Harlem Avenue
       Suite 1SE

11     Palos Heights, IL   60463
       (708)761-9030

12     kkarlson@karlsongarza.com

13         appeared on behalf of the Applicant.

14

15

16

17

18

19

20

21

22

Brianna Tedesco Disability Application
March 17, 2021

3

1        PRESIDENT RUSSELL:  The time is now 1:23 on

2   Wednesday, March 17th, 2021.  I'm calling this

3   meeting to order.

4             Any public comment?  Is there public

5   comment?  There is no public comment.  I'll accept

6   a motion from the Board to appoint a Hearing

7   Officer at this time.

8        MR. LYONS:  I move to appoint Laura Goodloe

9   as the Hearing Officer for this hearing.

10       MR. WESTCOTT:  Second.

11       MS. GOODLOE:  Okay.  I'm going to do a roll

12   call.  Rocky Westcott?

13       MR. WESTCOTT:  Here.

14       PRESIDENT RUSSELL:  Kevin Lyons?

15       MR. LYONS:  Here.

16       PRESIDENT RUSSELL:  Wendell Russell?  Here.

17             It's been voted and it's now affirmed

18   that Laura will be the Hearing Officer for this

19   hearing.  Laura, you can go ahead and start.

20       MS. GOODLOE:  Thank you, Wendell.

21             This is a hearing that's being

22   conducted pursuant to Article 3 of the Illinois

Brianna Tedesco Disability Application
March 17, 2021

4

1  Pension Code to adjudicate the disability claim of

2  Brianna Tedesco, the applicant in this case.

3          The applicant was previously notified

4  of these proceedings on this date, as well as the

5  right to be represented by legal counsel, to

6  present evidence, and to respond to any evidence

7  before the Lakemoor Police Pension Board.

8          Will the applicant and her attorney

9  please identify themselves for the record and

10 acknowledge their willingness to proceed today?

11     MR. KARLSON:  Keith Karlson on behalf of

12 the applicant.  The applicant is also present on

13 the Zoom call.  Yes, we're ready to roll today.

14         Brianna, do you want to identify

15 yourself for the record, please?

16     OFFICER TEDESCO:  Brianna Tedesco.  Yes,

17 I'm ready.

18     MR. KARLSON:  Okay.

19     MS. GOODLOE:  It should be noted at the

20 outset that by stipulation, we have agreed to allow

21 Miss Tedesco and her legal counsel to appear by

22 Zoom.  This is, again, based upon stipulation and

Brianna Tedesco Disability Application
March 17, 2021

5

1  due to the ongoing COVID pandemic.

2          They are not to be construed in any

3  way, shape or form as not participating or being

4  uncooperative in this proceeding.

5      MR. KARLSON:  Thank you for that.

6      MS. GOODLOE:  Moving forward.

7          The procedures to be utilized in this

8  case are as follows:

9          Number one.  Under the law, the

10  applicant bears the burden of proving her

11  entitlement to the disability pension.

12          Number two.  The Board will read into

13  the record certain documentation that it intends on

14  introducing into evidence in this proceeding.

15          Number three.  The applicant and her

16  attorney may then present any objections to the

17  Pension Board's proposed exhibits.

18          Number four.  The Pension Board, upon

19  advice of the Hearing Officer, may then rule on

20  those objections.

21          Number five.  The applicant may then

22  proceed with entering additional evidence into the

Brianna Tedesco Disability Application
March 17, 2021

6

1   record and continue with an opening statement,

2   followed by witness testimony in support of her

3   disability claim.

4           Number six.  The Board and/or its legal

5   counsel may then ask applicant questions, and

6   thereafter may be afforded the opportunity to call

7   witnesses on its own behalf.

8           Number seven.  Once again, rulings and

9   all legal matters will be made by the Pension Board

10  President on the advice of the Hearing Officer in

11  this matter.

12          Number eight.  In the event that this

13  hearing cannot be completed on this date, the

14  matter shall be continued from time to time to

15  dates agreeable to all the parties until it is

16  completed.  If the hearing is continued to a later

17  date and time, the Board has a right to call any

18  further witnesses for further testimony.

19          Number nine.  At the conclusion of the

20  hearing, the applicant's attorney may make a

21  closing argument.

22          Number ten.  The Board may, pursuant to

7

1    either 2(c)(4) or 2(c)(11) of the Open Meetings

2    Act, adjourn into executive session.

3            Number eleven.  The Board will render a

4    written decision that will become the final and

5    appealable decision as this disability claim before

6    it.

7            And finally, number 12.  Under the

8    Appellate Court case Howe, the decision will be

9    accepted and approved by a formal vote at a

10   subsequent meeting.

11            As a reminder for the Trustees today,

12   during this hearing it's important for all

13   attorneys to keep in mind that an administrative

14   proceeding is not a partisan proceeding with the

15   agency on one side or the applicant on the other.

16   Rather, it should be considered an administrative

17   investigation instituted for the purposes of

18   ascertaining and making findings of fact.

19            The Rules of Evidence are to be relaxed

20   in this setting, with the exception of the Hearsay

21   Rule.  But the Rules of Fundamental Fairness shall

22   remain strictly intact.

Brianna Tedesco Disability Application
March 17, 2021

8

1          Furthermore, it shall be noted that all

2    Trustees of Article 3 Pension Funds are presumed to

3    be objective and capable of fairly judging any

4    particular disability claim before it.

5          Any Trustee who feels incapable of

6    performing his duties in an objective manner today

7    should respectfully recuse himself.

8          At this time I'd like to insure on the

9    record that all the Trustees feel that they can be

10   unbiased and partial and capable of fairly judging

11   this case today.  Trustee Russell?

12        PRESIDENT RUSSELL:  I do feel that I can be

13   impartial.

14        MS. GOODLOE:  Trustee Lyons?

15        MR. LYONS:  I feel that I can be impartial.

16        MS. GOODLOE:  And finally, Trustee Westcott?

17        MR. WESTCOTT:  I feel that I can be

18   impartial.

19        MS. GOODLOE:  Okay.  Thank you, gentlemen.

20        We will now move on to the entry of

21   evidence into the administrative record.

22   Previously tendered to counsel for the applicant,

County Court Reporters, Inc.
630.653.1622

Brianna Tedesco Disability Application
March 17, 2021

9

1   as well as the Pension Board, were Pension Board

2   proposed Exhibits No. 1 through 15.  Counsel, do

3   you have any objection with respect to the entry of

4   those exhibits into the record?

5           MR. KARLSON:  I do not.

6           MS. GOODLOE:  Okay.  Therefore, Exhibits

7   No. 1 through 15 are therefore entered into the

8   administrative record.  We also want to make note

9   that there would be an additional Pension Board

10  exhibit labeled Pension Board Exhibit No. 16 which

11  is reference to a video clip that pertains to the

12  incident in question which is the 7/26/18 shooting

13  incident.  Previously we discussed this.  Attorney

14  Karlson, I do not believe you have any objection

15  with respect to this.

16          MR. KARLSON:  I do not.

17          MS. GOODLOE:  Therefore, that video clip is

18  being entered as Pension Board Exhibit No. 16.

19              Counsel, would you like to make an

20  opening statement?

21          MR. KARLSON:  Briefly.

22          MS. GOODLOE:  Certainly.

County Court Reporters, Inc.
630.653.1622

Brianna Tedesco Disability Application
March 17, 2021

10

1        MR. KARLSON:  Thanks everyone for trying to

2   make this work by Zoom.  I hope the technology

3   doesn't get in our way of doing the justice

4   everybody here is to do.

5            My name is Keith Karlson.  It's my

6   pleasure to represent Brianna Tedesco, now Brianna

7   McCarty.  She's gotten married since the

8   application was filed.  So we're certainly happy to

9   represent her in this process.

10           July 26th, 2018 is a date that I'm sure

11  all of you at that table are familiar with.  It was

12  the worse day of Brianna Tedesco's life.  She was

13  confronted by a known murderer who tried to kill

14  her.  She was saved by a co-worker who was murdered

15  within a foot or two of her.  That traumatic

16  incident has forever changed her life.  She will

17  never be able to return to work in her chosen dream

18  profession of being a Police Officer because of

19  what happened on July 26th, 2018.

20           Toward that end, I think the evidence

21  overwhelmingly supports that position that

22  July 26th, 2018 changed then Officer Tedesco's life

Brianna Tedesco Disability Application
March 17, 2021

11

1  to a point where she will never be able to return

2  to work because of it.  And as long as we keep our

3  eye on that general principle, I think that

4  overwhelmingly, at the end of the hearing, the

5  evidence demonstrates she's entitled to a

6  line-of-duty disability pension; and as such, I

7  keep my opening remarks brief in that regard out of

8  respect for your time, and that I know that you've

9  done the due diligence, reading all the exhibits.

10              So that's all I have.  And I'll ask you

11  to certainly award a line-of-duty disability

12  pension at the end of the evidence.

13        MS. GOODLOE:  Thank you, counsel.  Now you

14  can call your first witness.

15        MR. KARLSON:  Sure.  The applicant calls

16  Brianna McCarty.  The court reporter is going to

17  swear you in.

18        THE COURT REPORTER:  Raise your right hand,

19  please.

20                    (The oath was thereupon duly

21                     administered to the witness by

22                     the Notary.)

County Court Reporters, Inc.
630.653.1622

Brianna Tedesco Disability Application
March 17, 2021

12

1                    BRIANNA      MC CARTY,

2    Called as a witness herein, having been first duly

3    sworn, was examined and testified as follows:

4           DIRECT EXAMINATION

5           By:  Mr. Karlson

6      Q   Brianna, at any point if you can't hear me

7    or anything else, just hold your hand up and we'll

8    try to get turn our attention.

9      **A   Okay.**

10     Q   Please state and spell your current name

11   for the record.

12     **A   Brianna McCarty.  B-r-i-a-n-n-a**

13   **M-c-C-a-r-t-y.**

14     Q   And before you were married, what was your

15   name?

16     **A   Tedesco, T-e-d-e-s-c-o.**

17     Q   And when did you get married?

18     **A   In July.**

19     Q   Okay.  Congratulations.

20           We talked a fair amount about the

21   thrust of what this is about is July 26th, 2018.

22   Do you remember that date?

Brianna Tedesco Disability Application
March 17, 2021

13

1     **A   I do.**

2       Q   On that date were you working as a

3   full-time member of the Lakemoor Police Department?

4     **A   Yes.**

5       Q   At some point or another did you review a

6   video of the incidents that night?

7     **A   I have.**

8       Q   Do you believe that that video accurately

9   reflects the events of that night?

10    **A   Yes.**

11      Q   That includes body camera footage as well

12  as footage from your squad car?

13    **A   I have not seen body cam footage, but I can**

14  **say that the vehicle camera depicted it very well.**

15      Q   Certainly.  After that event occurred, at

16  any point did you meet with any -- when was the

17  first time, if you met with any psychotherapists?

18    **A   I met with Dr. Carrie Steiner on August 9th**

19  **of that year.**

20      Q   And why did you go to see Dr. Steiner?

21    **A   It was mandated by the Police Department.**

22      Q   Okay.  Did you continue to go to therapy or

County Court Reporters, Inc.
630.653.1622

Brianna Tedesco Disability Application
March 17, 2021

14

1   other treatment with Dr. Steiner?

2       A  I did.

3       Q  Okay.  You were given a copy of the records

4   in this case; is that right?

5       A  Correct.

6       Q  Is it fair to say that you remember some of

7   the therapy sessions, but not all of them?

8       A  That's correct.

9       Q  Do you have any reason to believe that the

10  dates and activities documented in Dr. Steiner's

11  notes are inaccurate for any reason?

12      A  No.

13      Q  If you could, after July 26th, 2018, after

14  that incident, when is the first time, if you had

15  any sort of psychological or mental reactions?

16      A  It was that night, that Friday morning, I

17  suppose, around 3:00 A.M. or so.  I went to use the

18  washroom and I couldn't see behind the shower

19  curtain, which my mind told me there was someone

20  there hiding and waiting.  And it was one of my

21  first triggers which caused me to have an anxiety

22  attack.

Brianna Tedesco Disability Application
March 17, 2021

15

1    Q   And if you could explain for the benefit of

2    the Board, what is your experience of an anxiety

3    attack like?

4    **A   I stop breathing for a second until I can**

5    **finally catch my breath.  My limbs go numb.  My**

6    **stomach knots up.  My heart races.  And when I**

7    **finally do catch my breath, I'm sobbing.**

8    Q   Prior to the July 26th, 2018 incident, had

9    you had any anxiety attacks before that?

10   **A   No.**

11   Q   After that anxiety attack, did you have any

12   other sort of reactions following the July 26th

13   incident?

14   **A   Yes.  It didn't take long for me to realize**

15   **I could not function in the darkness at night.  At**

16   **night, obviously it's dark, but even in a dark**

17   **room.  Loud noises would trigger me.  Vehicles that**

18   **were parked in a strange location, a field, so not**

19   **a parking lot, somewhere where they seemed out of**

20   **place, that would trigger me.**

21   **Driving past a Police Officer doing a**

22   **traffic stop, that would trigger me.  Male drivers**

Brianna Tedesco Disability Application
March 17, 2021

16

1    triggered me.

2          When I returned to work, if I tried to

3    do a traffic stop, that would trigger me.  Trying

4    to clear a building would trigger me.

5          Any anticipation where I don't know

6    what could happen next.  Asking someone for their

7    insurance card and them digging in their glove box

8    would trigger me.

9    Q  Okay.  So you go through some treatment

10   with Dr. Steiner for a period of time.  You

11   remember that?

12   A  I do.

13   Q  And while you were going through that,

14   several times she makes notes in her records about

15   you minimizing your symptoms.  Could you explain

16   why you believe she may have reached that

17   conclusion?

18   A  Because it was completely accurate.  I

19   believe that with law enforcement, you had to be

20   stronger and not let these things hold you down and

21   not let your mental thinking abilities stop you.

22         And I also believe that I had to get back

17

1 **to the street because that's who I was, and it was**

2 **everything I wanted to do, and I believed that it**

3 **would make me feel whole again and normal.**

4     Q  And at some point Dr. Steiner did release

5 you to go back to work with some restrictions.  Is

6 that fair?

7     **A  Yes.**

8     Q  At some point you did go back out on patrol?

9     **A  I did.**

10     Q  Can you walk through -- at some point or

11 another did you realize that that was not a good

12 idea?

13     **A  On many occasions.**

14     Q  Okay.  Can you walk, for the Board's

15 benefit, through some of the occasions that led you

16 to believe that perhaps returning to work was not a

17 good idea for you and why?

18     **A  Well, given that Lakemoor runs on 12-hour**

19 **shifts, the darkness was unavoidable.  So I would**

20 **find myself parked at a Speedway gas station where**

21 **it was well lit, almost paralyzed because I was too**

22 **afraid to move into the darkness.**

Brianna Tedesco Disability Application
March 17, 2021

18

1          I had a traffic stop where a male

2   driver was looking for his insurance in his glove

3   box and I let him go because I couldn't handle not

4   knowing what he might pull out from that glove box.

5   And I believe I noted it as a verbal warning at

6   that point.  I didn't even conclude the traffic

7   stop in any professional kind of way.

8          There was a female that had an

9   overdose, and that's when I learned that an

10  unconscious body was a trigger for me.  The last

11  body that I had seen tried to kill me, and that's

12  what I anticipated her doing.  And I administered

13  my Narcan incorrectly because I was so the

14  flustered thinking she's going to wake up and choke

15  me.

16          Trying to clear a building, I just

17  didn't function well.

18     Q  What does clearing a building mean, just so

19  we can make it clear for the record?

20     A  Making sure that there's no suspects inside.

21     Q  And so were you called upon to do that at

22  some point?

Brianna Tedesco Disability Application
March 17, 2021

19

1      **A   Yes.**

2      Q   And can you explain to the Board what

3  happened during that process?

4      **A   It was just very difficult for me to get**

5  **through.   My partner wasn't immediately next to me.**

6  **So being alone is also a trigger.   And I just moved**

7  **a lot slower.   I was shaking the whole time.   I**

8  **don't know what the outcome would have been, had I**

9  **run into a suspect.**

10     Q   Are there any other specific examples you

11  can think of, of times where -- well, actually,

12  while you were doing that search of the building

13  and trying to clear it, what sort of symptoms did

14  you experience?

15     **A   My stomach was knotted.   I felt like I**

16  **couldn't breathe.   My heart was racing.   I was**

17  **shaking, which made just all of my limbs feel**

18  **extremely weak.   My mind was racing, wondering what**

19  **I'm going to face.**

20     Q   At any of these times did you feel like you

21  were putting either a member of the public, yourself

22  or a co-worker at risk?

Brianna Tedesco Disability Application
March 17, 2021

20

     1       A   Absolutely.

     2       Q   Can you explain how?

     3       A   So specifically with the overdose, you

     4   know, she had passed around Midnight, and we got

     5   the call around 1:00 P.M.  So the Narcan would not

     6   have saved her life, but had she been freshly

     7   overdosed, it could have saved her life.  I could

     8   have saved her life.  And because I administered

     9   the Narcan wrong, it could have led to her death.

    10           In the case with the traffic stop, I

    11   let that person go before I ran his information,

    12   and he could have very well been a murderer, just

    13   like in July.

    14           If I'm not able to respond

    15   appropriately or keep my body in control and my

    16   mind in control during all these activities, that

    17   certainly puts my partners at risk, because then I

    18   can't do what I need to do for them and for the

    19   community.

    20       Q   At what point do you believe you learned

    21   that it was no longer safe for you to try to work

    22   as a Lakemoor Police Officer?

Brianna Tedesco Disability Application
March 17, 2021

21

1    **A   I can't put a date to it.  It was very**

2    **early when I returned to work.**

3    Q   So at some point or another, you came off

4    the street; is that right?

5    **A   Correct.**

6    Q   And how did that come about?

7    **A   In September, I think it was September 22nd**

8    **or so, we had a debriefing for the shooting, and at**

9    **that point my doctor, Carrie Steiner, had realized**

10   **that I maybe was not ready to return to the street,**

11   **and so at that time she decided to put me back on**

12   **light duty.**

13   Q   Okay.  And then you returned to light duty

14   for a while?

15   **A   Correct.**

16   Q   Okay.  At some point or another you stopped

17   being treated by Dr. Steiner?

18   **A   That's correct.**

19   Q   And then was there a process by which you

20   started being treated by somebody else?

21   **A   Yes.  I had been looking for some kind of**

22   **help, which led me to a McHenry County Lieutenant**

Brianna Tedesco Disability Application
March 17, 2021

22

1   **who had been in shootings who I reached out to, to**

2   **kind of understand what was happening with my body,**

3   **and he referred me to Dr. Robin Kroll.**

4       Q   And her records are also in the record for

5   the Board's notes.

6               So you began treatment with Dr. Kroll?

7       **A   Correct.**

8       Q   And do you continue to treat with Dr. Kroll

9   today?

10      **A   I do.**

11      Q   What is the nature of your treatment with

12  Dr. Kroll?

13      **A   It's PTSD related.**

14      Q   And is it psychotherapy?

15      **A   Yes.   We do a lot of EMDR and relaxation**

16  **techniques.**

17      Q   Can you explain to the Board, what is EMDR?

18  Because we see it a lot in the medical records.

19      **A   It's eye motion desensitization.   So you**

20  **can either watch a dot move back and forth while**

21  **you have zappers in your hand that will rotate**

22  **zapping in your hand, not zapping, but vibrating in**

Brianna Tedesco Disability Application
March 17, 2021

23

1   your hand.  Or there's goggles that do the same

2   thing with light, rotating from eye to eye.  And

3   you process.  We process the shooting a lot.  You

4   break down an incident to try to understand it

5   better.

6        Q  Okay.  Has that helped you?

7        A  It has.

8        Q  Okay.  Now, going through, you've discussed

9   the word triggers.  For the benefit of the Board,

10  when you use the word trigger, what does that mean?

11       A  That means something or someone, an

12  incident, anything that would provoke a response in

13  my body.

14       Q  Would the word stimulus be comparable?

15       A  Yes.

16       Q  Okay.  And then when a trigger occurs, what

17  happens?

18       A  Well, my triggers differ in response and

19  how intense they are.

20            At the least, my breathing is affected.

21  At the most, I'm having a panic attack.

22       Q  A panic attack and an anxiety attack are

Brianna Tedesco Disability Application
March 17, 2021

24

1   the same thing?

2       **A  Or an anxiety attack, yeah.**

3       Q  Sure.  Go ahead.  I'm sorry to interrupt

4   you.

5       **A  But they are most like when I explained**

6   **when I was trying to clear the building.  My limbs**

7   **can go weak.  My breathing is always in some form**

8   **of way affected.  I typically find myself holding**

9   **my breath a lot until I can finally catch my**

10  **breath.  I shake sometimes.  My stomach will get**

11  **knotted.  My limbs will go weak.  And again, my**

12  **mind just races, and it's just, it feels out of**

13  **control of your body.**

14      Q  Not every time you receive a trigger or

15  some sort of stimulus does it result in a panic

16  attack, right?

17      **A  Correct.**

18      Q  How often today do you still experience

19  anxiety or panic attacks?

20      **A  Every day.  I experience anxiety every day.**

21  **Panic attacks, they are not every day.  It just**

22  **depends on what I expose myself to.**

Brianna Tedesco Disability Application
March 17, 2021

25

1    Q  So how frequently would you say you have an

2  anxiety attack, though?  Is it weekly, is it every

3  day, is it monthly?

4    **A  It could be weekly.**

5    Q  Okay.  One term that came up in some of the

6  medical records is a night terror.  Are you

7  familiar with that term?

8    **A  Yes.**

9    Q  What's a night terror?

10   **A  When I have a night terror, I'm having some**

11 **sort of nightmare.  I'm in danger in some sort of**

12 **way.  It's typically a shooting or something where**

13 **someone is trying to kill me, or I will die at the**

14 **end of this nightmare.**

15       **So what happens with me is I'll wake up**

16 **drenched in sweat because my body is trying to**

17 **fight that nightmare, and I will wake up out of**

18 **breath.  It's almost like I don't know -- the**

19 **moment I wake up, I don't know where I am until I**

20 **realize that I'm at home, or wherever I am.**

21   Q  Had you had any night terrors of that

22 extent prior to July 26th of 2018?

County Court Reporters, Inc.
630.653.1622

Brianna Tedesco Disability Application
March 17, 2021

26

1      **A   No.**

2      Q   After July 26th, 2018, when was the first

3   time you had a night terror?

4      **A   I want to say it was within the first week.**

5   **I wasn't able to sleep immediately following the**

6   **shooting.   But I know every time I closed my eyes,**

7   **I replayed the shooting.   And so that just kind of**

8   **naturally happened when I did fall asleep.**

9      Q   How often do you have night terrors now?

10     **A   About once a week.**

11     Q   Okay.   You said that when you would close

12   your eyes, even when you're awake, sometimes you

13   would see the incident kind of replay.   Have you

14   learned any term to associate with that sort of

15   experience?

16     **A   Flashbacks.**

17     Q   Okay.   And so when you have a flashback, if

18   you could explain for the benefit of the Board,

19   what sort of experience is that?   What happens?

20     **A   For me, there's a few specific moments from**

21   **the shooting that replay non-stop.**

22            **The moment he opened his eyes and I saw**

Brianna Tedesco Disability Application
March 17, 2021

27

1   **that he had no soul, that replays a lot.  And the**

2   **moment that the gun came to my forehead, that**

3   **replays a lot.  That one is the most frequent.**

4      Q  When you say you saw his eyes and he had no

5   soul, explain to the Board what you mean by that.

6      **A  They were empty.  You could see through**

7   **them.  There was nothing there, there was no life**

8   **there.  I don't know how else to explain that.**

9      Q  Certainly.  How often do you experience

10  flashbacks today?

11     **A  At a minimum, five times a week.  But when**

12  **I say five times a week, that's just the days.  It**

13  **could be multiple times within that day.**

14     Q  Is it certain things that you see, or

15  triggers that cause the flashback, or it just

16  happens?

17     **A  It just happens.**

18     Q  And did that begin almost immediately after

19  the shooting?

20     **A  It did, that night.**

21     Q  We talked about some of your triggers so

22  far.  What are they, in general, that seem to

County Court Reporters, Inc.
630.653.1622

Brianna Tedesco Disability Application
March 17, 2021

28

1   trigger these -- not necessarily the flashbacks,

2   but the various sort of physiological and other

3   symptoms that you have?  Are there other specific

4   triggers or general triggers that seem to start it?

5       **A  Loud noises.  Vehicles that are out of**

6   **place.  Being alone is a trigger for me.  The**

7   **nighttime is a big trigger for me.  Like I said,**

8   **seeing a police vehicle or a Police Officer engaged**

9   **in an official duty, that's a trigger.  If I see**

10  **someone that looks like Kenneth Martel, that will**

11  **be a trigger.  Someone's eyes can be a trigger for**

12  **me.**

13      Q  Let's go with darkness.  How is your life

14  different now because of the darkness trigger?

15      **A  Unless I'm with my husband or a friend**

16  **maybe comes to pick me up, I don't go out at night.**

17  **I won't go in my basement at night.  My blinds have**

18  **to be closed at night.  My alarm has to be on.  My**

19  **doors obviously have to be locked.  My camera has**

20  **to be fully charged and ready to go every night.**

21  **It's just a lot of avoidance with that trigger.**

22      Q  Okay.  If you could also go through, how

Brianna Tedesco Disability Application
March 17, 2021

29

1  about being alone, that trigger?  Can you talk

2  about how that impacts your life?

3      **A   Yeah.   So when I'm alone, it's much like**

4  **when I was that night.   Obviously, I would like to**

5  **believe that at some point I would have taken the**

6  **appropriate action, but I did have to rely on**

7  **Anthony that night.   And so that's kind of where**

8  **that resulted.**

9              **Can I do what's necessary when I'm**

10 **alone?   And I also feel just more vulnerable when**

11 **I'm alone, and I feel like people outside of my**

12 **home know that, and it makes me more vulnerable for**

13 **an attack when I'm alone.**

14     Q   Okay.   So between darkness and being alone

15 being things that obviously cause problems for you

16 and are triggers, are there any sort of -- if you

17 could explain for the benefit of the Board some of

18 the means by which you avoid those?

19     **A   Well, I don't go out at night, again,**

20 **unless I'm with my husband.   I will avoid certain**

21 **parts of my house when I'm alone.   I have to sleep**

22 **with lights on.**

Brianna Tedesco Disability Application
March 17, 2021

30

1    Q   What about is there anything you have to do

2  to make sure that you can hear something or

3  anything like that?

4    **A   Yeah.  If I'm home alone, I won't have**

5  **headphones in or blow dry my hair or vacuum or do**

6  **any kind of loud noises that will distract me from**

7  **hearing if someone is entering my home.**

8    Q   In addition, you said that loud noises in

9  and of themselves are a trigger.  Are they sudden

10  loud noises, or does the vacuum do the job?

11    **A   No, there's sudden loud noises.**

12    Q   If you could explain examples of that?

13    **A   So I was redoing my floors and I was**

14  **removing quarter round, my husband was.  We were**

15  **doing it together.  And he started to peel back the**

16  **quarter round, and I could see that he was losing**

17  **grip of it and it snapped, which led me to have a**

18  **full-blown anxiety attack.  That noise just**

19  **triggered me.  The fireworks on 4th of July trigger**

20  **me.**

21    Q   What do you do on 4th of July?

22    **A   I sit at home and I have my range**

Brianna Tedesco Disability Application
March 17, 2021

31

1    **headphones on.**

2        Q   The ones you would wear when you would go

3    shooting, for ear protection?

4        **A   Correct.**

5        Q   How are you in dealing with crowds nowadays?

6        **A   With concerts and bigger crowds like that,**

7    **if I can avoid them, I will.  Like they are not**

8    **enjoyable for me.**

9        Q   You can go out to a restaurant though?

10   You're not saying you can't do that, right?

11       **A   Right.**

12       Q   Just to make clear for the record, you and

13   I are not in the same room; is that correct?

14       **A   That's correct.**

15       Q   And you have no notes or anything in front

16   of you; is that correct?

17       **A   That's correct.**

18       Q   And if the Board wants you to, you'll move

19   your camera around and show you've got no notes

20   around you, you're not reading from anything?

21       **A   I'm not.**

22           MR. KARLSON:  All right.  Just so you guys

Brianna Tedesco Disability Application
March 17, 2021

32

1   can take a record.

2   BY MR. KARLSON:

3       Q   Okay.  At some point or another, do you

4   believe you can be a Police Officer in full and

5   unrestricted duty today?

6       **A   I don't.**

7       Q   Can you explain to the Board why not?

8       **A   With my triggers, I don't know that I could**

9   **safely be a Police Officer, and effectively.   I**

10  **feel like I would put my partners at risk, and I**

11  **would put the community at risk.**

12      Q   You submitted an application that's

13  included in the packet as Exhibit 1; is that right?

14      **A   Yes.**

15      Q   And when you completed that, you believed

16  it was true and accurate, to the best of your

17  ability?

18      **A   Yes.**

19      Q   Currently, are you going to school or doing

20  anything?

21      **A   I am in school.**

22      Q   And what are you going to school to do?

Brianna Tedesco Disability Application
March 17, 2021

33

1    **A  Psychology.**

2    Q  And why did you choose that?

3    **A  Given the path that my life has taken, I**

4    **feel that I could help other people.**

5    Q  All right, Brianna, I don't have any other

6    questions for you.  Ms. Goodloe and the Board may

7    ask you some more questions now, okay?

8    **A  Okay.**

9         MS. GOODLOE:  Thank you, counsel.  I'll get

10   the ball rolling.

11              CROSS EXAMINATION

12              By:  Ms. Goodloe

13   Q  I only have a couple questions, Brianna.

14   And I apologize; I have had your case so long, I

15   continue to call you Tedesco.  It's just a simple

16   mistake.

17              None of the questions I'm going to be

18   asking you are trick questions.  I'm not the dragon

19   lady.  I just need to get a full record, especially

20   with some background questions.  Okay?

21   **A  Okay.**

22   Q  Your current age is 29; is that correct?

Brianna Tedesco Disability Application
March 17, 2021

34

1      **A   That's correct.**

2      Q   And your rank when you were serving with

3   the Lakemoor Police Department, was that a Patrol

4   Officer; is that correct?

5      **A   That's correct.**

6      Q   And you indicated that you got married in

7   July of 2020.  You do not have any prior marriages,

8   correct?

9      **A   Correct.**

10      Q   And do you have any dependent children or

11   parents?

12      **A   I don't have any children.**

13      Q   Okay.  And with respect to your employment

14   history, on your disability application, I just

15   want to clarify something.  You noted that your

16   date of probationary employment was June 18th of

17   2018, but then you noted your date of regular

18   employment was June 15th of 2017, which is obviously

19   a year before.  Did you maybe accidentally

20   transpose those two?

21      **A   I put the date that I started part-time.**

22   **That would be the 2017 date.**

Brianna Tedesco Disability Application
March 17, 2021

35

1    Q  Okay.  And so then your initial full-time

2  date was June 18th of 2018?

3    **A  I would assume so.  I don't recall what**

4  **date I started full-time.**

5    Q  Okay.  And when you began full-time, did

6  you undergo a fitness-for-duty evaluation?

7    **A  No.**

8    Q  So you weren't required to take any

9  pre-physical fitness exam?

10   **A  To become a Police Officer I was, not for**

11  **the Village of Lakemoor.**

12   Q  And from the time you were full-time

13  appointed as a Patrol Officer up through the date

14  of incident, which was July 26th of 2018, do you

15  recall having any large gaps in service time where

16  you had a suspension, or you had to take a medical

17  leave of any sort?

18   **A  I had no suspension or medical -- from when**

19  **I started Lakemoor?**

20   Q  Correct.

21   **A  I had six weeks off for a car accident.**

22   Q  And when about was that?

Brianna Tedesco Disability Application
March 17, 2021

36

1     **A   That was April 21st of '18.**

2     Q   Okay.  And then you returned to full duty

3   after that, correct?

4     **A   Correct.**

5     Q   And you have never been in the military; is

6   that correct?

7     **A   That's correct.**

8     Q   And your current employment status, I

9   believe there's evidence in the record to suggest

10  that you were terminated in August of 2019; is that

11  correct?

12    **A   That's correct.**

13    Q   Just so I can get kind of a broad stroke

14  view of what transpired, can you tell me from the

15  date of the shooting, which again was July 26th of

16  2018, through August of 2019, what your employment

17  status was?

18          I believe you testified earlier that

19  you went onto light duty for a period of time.  If

20  you can try to give me kind of recap, from

21  July 18th to August of 2019, what you were doing

22  with the Lakemoor Police Department in terms of

Brianna Tedesco Disability Application
March 17, 2021

37

1  your employment status?

2      A  **My employment status the entire time there**

3  **was full-time Patrol Officer.  I was on light**

4  **duty -- I was on administrative leave for I believe**

5  **six weeks immediately following the shooting.  I**

6  **returned to work in the beginning of September or**

7  **end of August.  I don't remember the date.  In**

8  **September I went to light duty.  At some point I**

9  **tried to return to day shift, and then returned to**

10 **light duty after that, and remained on light duty**

11 **until August of 2019.**

12     Q  And are you aware of any full-time light

13 duty positions within the Lakemoor Police

14 Department?

15     A  **Currently, no.**

16     Q  And were you ever offered a full-time light

17 duty position with Lakemoor?

18     A  **I was never offered, no.**

19     Q  And do you know what your salary was as of

20 your date of termination?

21     A  **I believe it was around 60.**

22     Q  We can definitely obviously look for that.

Brianna Tedesco Disability Application
March 17, 2021

38

1   It might be in the record already.

2           And have you filed a Workers'

3   Compensation claim with respect to the July, 2018

4   incident?

5   **A  I have.**

6   Q  And what's the status of that?

7   **A  Pending.**

8   Q  And you indicated on your application that

9   you never received PEDA, Public Employee Disability

10  Act benefits; is that correct?

11  **A  That is not.  At the time of my application**

12  **I was light duty.  When I got terminated I was put**

13  **then onto PEDA.**

14  Q  And did those benefits expire around August

15  of 2020?

16  **A  Correct.**

17  Q  And have you been receiving TTD benefits,

18  or temporary total disability pay, after that?

19  **A  I have.**

20  Q  And so you currently are receiving that

21  66 2/3 percent of your salary still?

22  **A  Correct.**

Brianna Tedesco Disability Application
March 17, 2021

39

1    Q   And I believe the record will indicate that

2  you did work for the Darien Police Department for a

3  short period of time?

4    **A   That's correct.**

5    Q   And that was for less than two years, correct?

6    **A   Correct.**

7    Q   Was there any other outside employment

8  prior to your tenure as a Lakemoor Police Officer?

9    **A   I've had jobs before Lakemoor and Darien,**

10  **yes.**

11   Q   Any related to a police force?

12   **A   I initially got hired and sponsored through**

13  **the Police Academy through the South Holland Police**

14  **Department.   When I graduated the academy, I**

15  **transferred to Darien.**

16   Q   And with respect to your disability

17  application, I just want to confirm for the record

18  that your date of application is April 15th of

19  2019; is that correct?

20   **A   Yes.**

21   Q   And that you are requesting a line-of-duty,

22  or in the alternative, a non-duty disability pension?

Brianna Tedesco Disability Application
March 17, 2021

40

1    **A   Correct.**

2      Q   And you can confer with your legal counsel.

3    If you were to be awarded a disability pension

4    today, what would the effective date of that

5    pension be if you had to choose?

6    **A   I would say --**

7          MR. KARLSON:  It would probably be -- we're

8    willing to wait until TTD is running out, I mean if

9    it's 100 percent offset anyway, setoff.  But I can

10   certainly work with the Board on that.

11         MS. GOODLOE:  Okay, great.

12         MR. KARLSON:  And also, toward the end, if

13   it helps, Laura, we're willing to stipulate, should

14   you want to amend the record to add as Exhibit 17

15   the Collective Bargaining Agreement in effect

16   during that time that she was a member of the MAP

17   chapter there, and that the Collective Bargaining

18   Agreement would have covered her compensation

19   during the relevant period of time.

20         MS. GOODLOE:  Yes, I have no objection to

21   that.  We'll enter that into the record just to

22   make sure we have salary information, whatnot.

Brianna Tedesco Disability Application
March 17, 2021

41

BY MS. GOODLOE:

   Q   And you have no prior medical history for
the psychological condition; is that correct?

   **A   That's correct.**

   Q   And obviously I've seen all the video
footage and reviewed all the documentation that
goes over the 7/26/18 incident, but I think it
would be suitable for the Board to kind of hear
from your standpoint what occurred that day and get
an idea as to what was going through your mind on
the date of incident.

   **A   I was working the overnight shift on**
**patrol, trying to complete my subdivision checks,**
**when I saw a vehicle backed into that gravel road**
**up to the gate.  It had no front license plate, so**
**I called out the location and the description of**
**the vehicle, and that it was occupied by one male**
**who was sleeping at the time I approached the**
**vehicle.  My flashlight had woken him up.**

           **He rolled down his window about halfway**
**or so.  We began speaking.  He had liquor in the**
**front seat, a case of beer in the back seat, or**

Brianna Tedesco Disability Application
March 17, 2021

42

1   vice versa.  And he was telling me that he was

2   traveling to visit family.

3             Like I stated earlier, immediately I

4   saw something wrong with his eyes, though I gave my

5   partner, Anthony Loiacono, a better description of

6   where I was, because I wasn't sure that dispatch

7   had properly marked it or understood where I was,

8   given that it was an unmarked gravel road.

9             I asked him for his name.  He told me

10  James Duncan and gave me his real date of birth.

11            I then walked to the back of his

12  vehicle to get his license plate, which was from

13  Pennsylvania.  I wrote it down in my notebook

14  because he was watching me the whole time through

15  the side mirrors, and something told me there

16  wasn't something right with him.

17            And so I returned to the vehicle.  I

18  ran his name that he gave me.  Dispatch advised me

19  nothing was coming back.

20            I asked him if he had anything in his

21  vehicle that would identify who he was.  I asked

22  him for a registration, something with his name on

Brianna Tedesco Disability Application
March 17, 2021

43

1   it.  So he started digging through the glove box

2   and he handed out, it looked like some legal

3   document.  I don't know what it was at that point.

4              While I was looking at that paper that

5   he handed me, he was digging through the door, the

6   packet in the door.  And I heard clinking and I

7   looked up and there was a revolver to my forehead.

8              I screamed and I grabbed the gun and I

9   tried to shove it back into the vehicle as much as

10  I could, and we fought for the gun.  He was pulling

11  the trigger the entire time.

12             I looked at him and I said, "I'll

13  leave."  He said, "Okay.  Let go of the gun."  And

14  I told him I couldn't, and we continued to fight

15  for the gun.  And that's when Anthony arrived.  As

16  Anthony was walking up, he pulled out a second

17  revolver from the door.  And that's when Anthony

18  shot him.

19     Q   Thank you.  And I know that's difficult,

20  and I sincerely appreciate you being forthcoming

21  with respect to that incident.

22             In terms of the medical treatment you

Brianna Tedesco Disability Application
March 17, 2021

44

1  received in response, we obviously have Dr. Carrie

2  Steiner, as well as Dr. Kroll.  You received

3  earlier that you continue to see Dr. Kroll.  How

4  often are you seeking treatment from Dr. Kroll?

5      **A  Right now it's once a week, and I am**

6  **involved in a trauma track once a week.  So right**

7  **now it's twice a week.**

8      Q  Are you seeking treatment from anybody

9  else, aside from Dr. Kroll and what you just

10 testified to?

11     **A  No.**

12     Q  And have you ever sought treatment from a

13 psychiatrist with respect to the condition that

14 you're suffering from?

15     **A  I have.**

16     Q  You have or have not?

17     **A  I have.**

18     Q  And who was that?

19     **A  His name is Raphael.  I don't remember his**

20 **last name.  I saw him I think twice.**

21     Q  And around what time period was that?

22     **A  Last year.**

Brianna Tedesco Disability Application
March 17, 2021

45

1    Q  And did he prescribe you any sort of

2  medications?

3    **A  He did.  It started with a D.  I don't**

4  **remember.  I'm not very good with prescription**

5  **names.  That's something I can certainly provide to**

6  **Keith, but I don't remember the name off the top of**

7  **my head right now.**

8    Q  And you testified earlier that you continue

9  to suffer, obviously, from panic attacks, anxiety.

10  Are you on any medication for those conditions?

11    **A  Currently, no, because I am pregnant.**

12    Q  Oh, okay.

13        And I would assume that you went off of

14  those when you became pregnant?

15    **A  That's correct.**

16    Q  Okay.  And due to your pregnancy, are you

17  on anything that would treat depression or any of

18  the other psychological conditions you filed

19  disability for?

20    **A  I am not.**

21    Q  And you testified that you're currently

22  going to school to become a psychologist.  Are you

Brianna Tedesco Disability Application
March 17, 2021

46

1  employed in any other capacity right now?

2      **A   I am not employed.**

3      Q   Okay.  And do you still continue to carry a

4  weapon and shoot a weapon ever?

5      **A   I have shot my firearm several times since**

6  **the incident.   I do not carry one.   I have one with**

7  **me in my home, but I do not carry one outside of my**

8  **home.**

9      Q   And so have you gone to a gun range with it?

10     **A   I have.**

11     Q   And does that impact you in any way?

12     **A   It does when there are other people in the**

13 **range next to me.**

14     Q   And you did testify earlier that you feel

15 like some of your symptoms are getting a little

16 better.  I mean overall, you testified that you

17 have flashbacks, panic attacks, anxiety, there's a

18 lot of nightmares and triggers.  I believe you

19 testified that your anxiety seems to be getting a

20 little better.  What about with respect to the

21 other claimed conditions such as flashbacks and

22 nightmares; is there any sort of positive recovery

Brianna Tedesco Disability Application
March 17, 2021

47

1  in that front?

2  **A  I don't know that I would say my anxiety**

3  **has gotten better.  I don't remember saying that.**

4  **When I say that my symptoms have gotten better, I**

5  **mean the frequency has gone down.  It used to be**

6  **every day; now it's maybe five, six times a week.**

7  Q  Okay.  And you can confirm for the record

8  that you attended psychological testing before Dr.

9  Fletcher, as well as Independent Medical

10 Evaluations before Drs. Dinwiddie, Conroe and

11 Obolsky; is that correct?

12 **A  Yes.**

13 Q  And with respect to Dr. Dinwiddie's IME, he

14 had indicated that there's some sort of work

15 relationship issues that had been going on between

16 yourself and the Village of Lakemoor.  Can you

17 please expound on that note?

18 **A  My relationships with my co-workers have no**

19 **bearing on my PTSD.**

20 Q  Okay.  So you disagree with Dr. Dinwiddie's

21 opinion as to any sort of connection between the

22 conditions that you've applied for and them being

Brianna Tedesco Disability Application
March 17, 2021

48

1  related in any way, shape or form to your work

2  environment in relationship to your co-workers?

3      **A   Yes.   My relationship with co-workers does**

4  **not have any effect on the PTSD as a result of the**

5  **July shooting.**

6      Q   Okay, fair enough.

7          You know, with respect to our

8  obligations under the Pension Code, pursuant to

9  Section 115, if we were to adjudicate this

10  disability claim favorably, you would be subject to

11  annual reevaluations for purposes of verifying the

12  continuance of your disability.  Do you agree to

13  cooperate with the Pension Board up until age 50

14  with respect to going through the same?

15     **A   I do.**

16     Q   And just so you know, I just want to put on

17  the record right now, we do have an administrative

18  rule that if you were to move out-of-state, you may

19  be required to come back into the State of Illinois

20  for those evaluations.  Do you understand that?

21     **A   I understand.**

22         MS. GOODLOE:  Okay.  I have no further

Brianna Tedesco Disability Application
March 17, 2021

49

1   questions.  I'd like to open up the floor to the

2   Pension Board Trustees.   Perhaps Board President

3   Russell can begin.

4                EXAMINATION

5                By:  President Russell

6     Q  Good afternoon, Brianna.  First of all,

7   congratulations on your wedding nuptials.

8                I just wanted to know if you needed a

9   few more minutes so we can ask some questions, or

10  did you want to continue at this point?  We can

11  take a five, ten-minute break to give you a little

12  time.  Or do you want to proceed?

13    **A  I would like to continue.**

14    Q  Okay.  I just have a few questions, and I'm

15  going to try to be brief, regarding your triggers

16  and flashbacks.

17                Right after this incident on 7/26 '18,

18  did you attend the Lakemoor Fest?

19    **A  I did.**

20    Q  Were you there for the fireworks as well?

21    **A  I was, and they triggered me.**

22                **If you can recall, Resident Missy, I**

Brianna Tedesco Disability Application
March 17, 2021

50

1  don't remember her last name, she's married to

2  Brian who owns the gun shop?

3    Q  Right.

4    A  She had to walk me out where I collapsed on

5  the street because of the fireworks.

6    Q  I'm sorry, I didn't see that.  That's why

7  I'm asking.  I just wanted to get a little bit more

8  information.

9         And talking more about the triggers and

10  flashbacks.  At the awards presentation in

11  Pennsylvania, the one you attended, do you remember

12  that one?

13    A  I do.

14    Q  I know that at that awards banquet because

15  it was in Pennsylvania, you guys had separate

16  rooms.  How was it sleeping by yourself in that

17  room that night when you were there?

18    A  I didn't, really.  I kept the TV on and the

19  lights on.  And I didn't receive much sleep that

20  trying.

21    Q  Okay.  On that same year, we'll go 2019,

22  did you attend any of the St. Patrick's Day

Brianna Tedesco Disability Application
March 17, 2021

51

1  celebrations in Chicago overnight?

2  **A  Overnight?  No.  I went to the river dye**

3  **one year, but I never did anything overnight.**

4  Q  What about any 4th of July celebrations

5  since the 2018 incident?

6  **A  There was that next summer, Mike McCarty**

7  **tried to take me on the boat for McHenry's**

8  **fireworks, which was unsuccessful.**

9  Q  Okay.  And right now your husband works

10  midnights?

11  **A  Correct.**

12  Q  And how is it your being alone at night by

13  yourself?  Are you having issues with that?

14  **A  Again, I have to make sure my cameras are**

15  **on, my alarms are set.  I sleep with the lights on.**

16  **I sleep with the TV on but no noise, because it**

17  **will distract me if I hear someone trying to intrude.**

18  **My sleep is very choppy.  I can't sleep**

19  **with my back to my bedroom door because I have to**

20  **see, if that light breaks, I have to see if someone**

21  **is coming through that doorway.  My blinds have to**

22  **be closed.  It's just like a state of paranoia.**

Brianna Tedesco Disability Application
March 17, 2021

52

1      Q   Do you guys currently have any animals or

2   any dogs?

3      **A   We have two dogs.**

4      Q   Okay.  So do the dogs sleep in your room

5   with you?

6      **A   My dogs do sleep with me.**

7      Q   So they would obviously let you know if

8   someone was coming in the house?

9      **A   Right.**

10     Q   The driving at night, do you currently

11  drive at night by yourself, or you just wait for

12  your husband to come and take you places?

13     **A   I will wait for my husband.**

14          **I think there has been two or three**

15  **incidents since the shooting where I just have been**

16  **caught in a situation where I had to drive at**

17  **night, and it is extremely difficult for me to do.**

18  **I have to drive with my dome lights on, and I have**

19  **to have someone on the phone with me the entire**

20  **drive.**

21          **And that heightened anxiety that that**

22  **puts my body in, my body will stay that heightened**

County Court Reporters, Inc.
630.653.1622

Brianna Tedesco Disability Application
March 17, 2021

53

1  **for two to three days after I drive at night, which**

2  **is another reason I won't do it.**

3  Q  Do you think that the fact of -- and

4  congratulations on the upcoming baby, but do you

5  think the fact that you're not taking any of your

6  medicines at this time contributes to the worsening

7  of your condition?

8  **A  I'm sorry, I didn't hear you.**

9  Q  I said do you think that not taking any

10  medications at this time contributes to the

11  worsening of your condition?

12  **A  Well, they are not worsening.  Do I think**

13  **that the medications would help?  Absolutely.**

14  **Which is why I went on them the first time, and I**

15  **intend to return to them when I am no longer**

16  **carrying a child.  But it's not something that I'm**

17  **willing to subject my child to right now, because I**

18  **do have the choice to avoid a lot of things and**

19  **stay home.**

20  Q  Okay.  And I get it.  I truly get it, and I

21  understand that.  Thank you very much for answering

22  those questions.  I have nothing else at this time.

Brianna Tedesco Disability Application
March 17, 2021

54

1          MS. GOODLOE:  Trustee Lyons, any questions?

2          MR. LYONS:  I just have a question about

3  the --  we have three different doctor's opinions.

4  One of them stated the diagnosis is not PTSD, other

5  specified trauma or stress-related disorder.  I

6  read the definition of that, and I guess I'm just

7  wondering what the actual diagnosis is then?

8          MS. GOODLOE:  That is the actual diagnosis?

9          MR. LYONS:  That is the actual diagnosis?

10         MS. GOODLOE:  Yes.

11         MR. LYONS:  Based on his opinion?

12         MS. GOODLOE:  Yes.  That's from my reading.

13 And we can talk further, but that's his diagnosis.

14 It's separate from full-fledged PTSD.

15         MR. LYONS:  Okay.

16         MS. GOODLOE:  Any questions for Ms. McCarty?

17         MR. LYONS:  No, thank you.

18         MS. GOODLOE:  Trustee Westcott, any

19 questions?

20         MR. WESTCOTT:  No questions for me.

21             Although I would like to wish Brianna

22 congratulations on her marriage.  And I know you're

Brianna Tedesco Disability Application
March 17, 2021

55

1  going to be a great mom.

2          And just going through your notes and

3  everything, you say that you didn't feel worthy,

4  that you didn't have any support from this

5  department.  Well, all I have to say is that you

6  are one of the bravest people I've ever known.

7          Keep your head up, enjoy life, and

8  congratulations on your marriage, Brianna.

9      MS. MC CARTY:  Thank you.

10     MS. GOODLOE:  Thank you.  Any redirect,

11  Keith?

12     MR. KARLSON:  Yes, a little bit.

13         REDIRECT EXAMINATION

14         By:  Mr. Karlson

15   Q  You know, I think President Russell had

16  asked you some questions about the impact of your

17  pregnancy on taking the drugs and everything else.

18  Has any doctor told you that the medication will

19  put you in a position to return to work any time

20  soon?

21   **A  No.**

22   Q  With regard to the pregnancy, since it's

Brianna Tedesco Disability Application
March 17, 2021

56

1  been brought up, how do you feel that the pregnancy

2  has impacted the manner by which you perceive your

3  disease and how you deal with it?

4      **A  It has kind of given me a new purpose.  It**

5  **was obviously never my hope to stop being law**

6  **enforcement.  And so this is just kind of teaching**

7  **me that there is life outside of that.**

8      Q  Counsel for the Board had asked you a

9  question about whether or not you had any

10  pre-existing mental conditions.  Do you remember

11  talking about that?

12     **A  Yes.**

13     Q  The records indicate you had some

14  psychological trauma following the car wreck.  Did

15  you mean prior to the car wreck, you had no

16  pre-existing conditions?

17     **A  Oh, yeah.**

18     Q  I just want to make clear, you're not

19  trying to mislead anybody?

20     **A  No, no, no.**

21     Q  If you could talk about, to the extent you

22  had anxiety or any other mental condition following

Brianna Tedesco Disability Application
March 17, 2021

57

1  the car wreck before the shooting, how were those

2  symptoms different than what you experienced after

3  July 26th, 2018?

4  **A  They were mild.  They mostly involved the**

5  **back seat of my squad car with fear of being**

6  **rear-ended.  But it's nothing to the extreme that**

7  **the July incident had put me in.  It was just**

8  **something that I was very conscious of when I got**

9  **in my squad car.**

10  Q  Is driving at night a requirement for a

11  Lakemoor Police Officer?

12  **A  Yes.**

13  Q  And in fact, at any point did you ever

14  request to work just during the day?

15  **A  I did.**

16  Q  And was that allowed?

17  **A  It was not.  I was on light duty for a**

18  **short period of time, but was told that that was**

19  **temporary and would not be allowed to continue.**

20  Q  You were asked about -- just to help the

21  court reporter, can you spell Anthony's last name?

22  It's not an easy one.

Brianna Tedesco Disability Application
March 17, 2021

58

1    **A   Perhaps one of the members of the Lakemoor**
2    **Police Department who have quick access to that**
3    **information could do it, because I don't know that**
4    **I could any more.**
5        Q   Fair enough.
6            PRESIDENT RUSSELL:  It's L-o-i-a-c-o-n-o.
7            MR. KARLSON:  That's all I have.  Thanks.
8            MS. GOODLOE:  Any additional witnesses,
9    Mr. Karlson?
10           MR. KARLSON:  I have none.
11           MS. GOODLOE:  I don't believe the Pension
12   Board has any witnesses at this time.
13               At this time you have the opportunity
14   to make a closing argument, if you so choose.
15           MR. KARLSON:  Certainly.
16               Again, thank you all for taking this as
17   seriously as you have, and reviewing the records,
18   and listening to our perspective on this matter.
19               It seems that all of the doctors who
20   have offered opinions in this case have agreed that
21   Brianna is unable to serve as a Police Officer.
22               I think it's uncontested that she was a

Brianna Tedesco Disability Application
March 17, 2021

59

1  Police Officer on the date this occurred, and she

2  was still employed as a Police Officer on the date

3  that she applied for a disability application.

4          So just with the last answers, was she

5  engaged in -- or one of the next questions would be

6  was she engaged in an act of duty.  I know that

7  that's a heavily-litigated subject.

8          I don't think that this is at all a

9  question that a Police Officer who responds to a

10  suspicious situation and ends up in a wrestling

11  match over a gun where the offender tries to

12  patently murder her is something that's not an act

13  of duty that involves special risk not normally

14  encountered by an ordinary citizen.

15          So it leads us to a causation issue.

16  It is our position, and I know Laura, we talk at

17  the same conferences, so I would say that the

18  causation issue on psychiatric cases is an

19   interesting, developing area of the law, shall we

20  say.

21          It is certainly our position that we

22  believe you should adopt the Sardo reasoning out of

Brianna Tedesco Disability Application
March 17, 2021

60

1   the First District which also seems to be quite in

2   line with what the Statute says.

3           There is no causation distinction in

4   the Statute between physical and mental disabilities.

5   As such, we believe they should be treated the

6   same.  So the question then becomes is the July 26th,

7   2018 standard a contributing factor to the

8   disability?  And I think that's undeniable.

9           I think as we sit here today, even if

10  the Board were to adopt the largely abandoned

11  but-for causation standard, no one in the room I

12  don't think with good conscious could conclude that

13  if she wasn't in that wrestling match where a man

14  tried to kill her with two different guns, pulled

15  the trigger multiple times.  And if you've ever

16  seen that video, it's horrifying.

17          I had the privilege of representing her

18  throughout the shooting process.  This is the first

19  applicant case I've done in many years.

20          The fact is here that I think you're in

21  a position to help somebody who really needs it,

22  and I think you're in a position to do the right

Brianna Tedesco Disability Application
March 17, 2021

61

1   thing and follow the law.

2           I believe that there is no evidence,

3   even Dr. Dinwiddie's -- Trustee Lyons, you're not

4   alone in trying to discern what his opinion is,

5   because he doesn't clearly answer it.  But I

6   believe it's certainly the case that she's not able

7   to go back to work.

8           There's no contrary evidence saying

9   that there's a full-time day position available.

10  The evidence seems to conclusively establish that

11  that's not an option.

12          So if driving at night is required,

13  which it is, even Dr. Dinwiddie agrees that she's

14  not fit for that.

15          So she's clearly disabled.  So then the

16  question is, there is no evidence demonstrating

17  that but for the July 26th, 2018 shooting incident,

18  she wouldn't still be working.  That's the reality

19  of the situation.  And due to the overwhelming and

20  unanimous evidence in that regard, it's certainly

21  our position that you should award of line-of-duty

22  disability benefit.

Brianna Tedesco Disability Application
March 17, 2021

62

1          And due to the Workers' Comp issue,

2    Laura, I'm certainly willing to work with you after

3    this to work on an effective date.

4          Certainly I have no problem if the

5    check keeps coming from TTD for a while and saves

6    the Pension Fund some money, but that's certainly

7    our position.

8          And obviously, Brianna has been

9    informed that should you make an award of any sort

10   in this case, that she'll have to cooperate with

11   you to be able to set up direct deposit and all

12   those sort of things as well.  So please know that

13   she's been counseled on that.

14          I appreciate you taking the time and

15   listen to our perspective.  And again, I'll just

16   ask that you do the right thing here and to award a

17   line-of-duty disability benefit to Brianna McCarty

18   at an effective date to be determined between

19   counsel.

20       MS. GOODLOE:  Thank you, Mr. Karlson.

21          At this time the Board has the option

22   to do one of three things.  We can deliberate in

Brianna Tedesco Disability Application
March 17, 2021

63

1   open session and potentially rule on the case as

2   is.  We can, pursuant to 2(c)(4) of the Open

3   Meetings Act, adjourn to executive session to

4   deliberate as to the evidence and testimony received

5   thus far.  Or, if the Board needs additional time

6   to review the evidence and transcript, we could

7   always adjourn the hearing for today and reconvene

8   at a date and time that's agreeable amongst all

9   parties.

10        PRESIDENT RUSSELL:  At this time I'd like

11  to -- I have a few questions just of our attorney.

12  I'd like to ask that we just go into executive

13  session so we can talk about those issues, and then

14  we can come out of the executive session and go

15  from there.  I just have some questions.

16        MS. GOODLOE:  Sure.  You would need to make

17  a notion to adjourn into executive session pursuant

18  to 2(c)(4) of the Open Meetings Act.

19        PRESIDENT RUSSELL:  I'd like to make a

20  motion to go into executive session pursuant to

21  Section 2(c)(4) of the Open Meetings Act.

22        MR. LYONS:  I'll second.

Brianna Tedesco Disability Application
March 17, 2021

64

1      PRESIDENT RUSSELL:  Let's do a roll call.
2  Trustee Westcott?
3      MR. WESTCOTT:  Here.
4      PRESIDENT RUSSELL:  Trustee Lyons?
5      MR. LYONS:  Yes.
6      PRESIDENT RUSSELL:  Trustee Russell, yes.
7      MS. GOODLOE:  Okay.  We'll go ahead and go
8  into executive session.  I'm just making a note of
9  who made the motion and seconded it.
10          What I'm going to try to do is go ahead
11  and turn off our video and mute.  I respectfully
12  request Keith and Brianna, you guys to do the same,
13  just to insure nobody can hear anything.
14          Keith, what is your cell number?
15      MR. KARLSON:  My cell is (312)372-6651.  If
16  you want, I'll log off.
17      MS. GOODLOE:  If you both could log off?
18      MR. KARLSON:  We'll log off, and that way
19  you can do whatever you want.  And then just call
20  me when you're ready to.
21      MS. GOODLOE:  And we're going off at 2:33.
22      MR. KARLSON:  Thank you.

County Court Reporters, Inc.
630.653.1622

Brianna Tedesco Disability Application
March 17, 2021

65

1                    (There was a break taken, after

2                    which the hearing was resumed as

3                    follows:)

4         MR. LYONS:  I'll make a motion to resume

5    open session.

6         MS. GOODLOE:  You need a second.

7         MR. WESTCOTT:  I'll second.

8         PRESIDENT RUSSELL:  I'll take a roll call

9    vote.  Trustee Westcott?

10        MR. WESTCOTT:  Here.

11        PRESIDENT RUSSELL:  Trustee Lyons.

12        TRUSTEE LYONS:  Yes.

13        PRESIDENT RUSSELL:  Trustee Russell, here.

14        MS. GOODLOE:  Okay.  We're back in open

15   session.

16             The Board had adjourned pursuant to

17   2(c)(4) of the Open Meetings Act to deliberate as

18   to the disability matter before it.  The Board is

19   in a position to make a determination at this time.

20        MR. WESTCOTT:  I make a motion to confirm

21   and acknowledge and grant the pension for Brianna

22   Tedesco, the disability benefit.

Brianna Tedesco Disability Application
March 17, 2021

66

1        MR. LYONS:  I'll second.

2        MR. KARLSON:  Can I confirm for the Board,

3   is that a line-of-duty?

4        MS. GOODLOE:  Yes.

5        MR. LYONS:  Yes.

6        MR. KARLSON:  Okay, thank you.

7        PRESIDENT RUSSELL:  We'll have a vote on

8   that.  Trustee Lyons?

9        MR. LYONS:  Yes.

10       PRESIDENT RUSSELL:  Trustee Westcott?

11       MR. WESTCOTT:  Yes.

12       PRESIDENT RUSSELL:  Trustee Russell, yes.

13       MR. KARLSON:  Thank you.

14       MS. GOODLOE:  It's hard to say

15   congratulations, but we are appreciative of being

16   able to favorably adjudicate this claim today on

17   behalf of Ms. McCarty.

18            What's going to happen now is I'm going

19   to be in communications with the Board's

20   accountants, Lauterbach and Amen, as well as the

21   municipality, to confirm salary and her benefit

22   information.  I will advise them of the decision

County Court Reporters, Inc.
630.653.1622

Brianna Tedesco Disability Application
March 17, 2021

67

1  that we made today.  And I'm sure that they'll be

2  in too much with respect to what they are going to

3  do with respect to the TTD benefits.

4          I'll be in communications with you

5  Keith to make sure we continue to get the balling

6  rolling.

7          Obviously, Brianna is going to have to

8  fill out some paperwork from Lauterbach and Amen.

9  It will take us a couple weeks' time to get her

10 into pay status.  We'll work as expeditiously as

11 possible to do so.

12         There will be some level of retroactive

13 benefit time or pension payments going back to her.

14 We'll make those calculations and get those signed

15 off on.

16         Obviously, we discussed earlier that

17 Brianna is obligated up until age 50 to undergo

18 annual physical retention reevaluations.

19         Are there any additional questions at

20 this time?

21     MR. KARLSON:  The only thing I'll say is

22 while I'm still representing her, you can have

Brianna Tedesco Disability Application
March 17, 2021

68

1   Lauterbach and Amen directly contact her.  I want

2   that on the record.  So they don't need to be going

3   through me to do that.  All I'm going to do is slow

4   things down as far as that goes.

5         MR. LYONS:  There will be a lot of

6   paperwork.

7         MR. KARLSON:  Yes.  It's not too bad, but

8   it's very manageable.  And Lauterbach does a nice

9   job at making it very user friendly.

10              Other than that, on behalf of Brianna

11   and I, thank you very much for your thoughtful

12   consideration and doing the right thing, like we

13   said before.

14              I don't think we have anything else for

15   you, unless you have something for us.

16              I'm also, just to make your life

17   easier, on the record, willing to accept a copy of

18   the final Decision and Order via email so you don't

19   have to send Certified Mail and do all that, unless

20   you feel like you need to.  But other than that, I

21   don't think we have gone else.

22         MS. GOODLOE:  Is there a motion to adjourn?

County Court Reporters, Inc.
630.653.1622

Brianna Tedesco Disability Application
March 17, 2021

69

1      MR. WESTCOTT:  I make a motion to adjourn.

2      MR. LYONS:  I'll second.

3      PRESIDENT RUSSELL:  We'll do a vote.  Trustee

4  Lyons?

5      MR. LYONS:  Yes.

6      PRESIDENT RUSSELL:  Trustee Westcott?

7      MR. WESTCOTT:  Yes.

8      PRESIDENT RUSSELL:  Trustee Russell?  Yes.

9      MS. GOODLOE:  Okay.  We're off the record

10 at 3:07.  Thank you everyone.

11

12                  (Which were all the proceedings

13                   had and testimony taken at the

14                   hearing of the above-entitled

15                   cause.)

16

17

18

19

20

21

22

Brianna Tedesco Disability Application
March 17, 2021

70

1   STATE OF ILLINOIS)
                    )   SS.
2   COUNTY OF DU PAGE)

3

4       I, GLORIA APOSTOLOS SIOLIDIS, C.S.R., duly

5   qualified and commissioned for the State of Illinois,

6   County of DuPage, do hereby certify that I reported

7   in shorthand the proceedings had and testimony

8   taken at the Hearing of the above-entitled cause,

9   and that the foregoing transcript is a true, correct,

10  and complete report of the entire testimony so

11  taken at the time and place hereinabove set forth.

12

13

14

15  _____

        GLORIA APOSTOLOS SIOLIDIS
16          CSR License #084-001205

17

18

19

20

21

22

Brianna Tedesco Disability Application
March 17, 2021

71

**A**

A.M 14:17
abandoned
    60:10
abilities 16:21
ability 32:17
able 10:17 11:1
    20:14 26:5
    61:6 62:11
    66:16
above-entitled
    1:10 69:14
    70:8
Absolutely 20:1
    53:13
academy 39:13
    39:14
accept 3:5 68:17
accepted 7:9
access 58:2
accident 35:21
accidentally
    34:19
accountants
    66:20
accurate 16:18
    32:16
accurately 13:8
acknowledge
    4:10 65:21
act 7:2 38:10
    59:6,12 63:3
    63:18,21 65:17
action 29:6
activities 14:10
    20:16
actual 54:7,8,9
add 40:14
addition 30:8
additional 5:22
    9:9 58:8 63:5
    67:19
adjourn 7:2 63:3

63:7,17 68:22
    69:1
adjourned 65:16
adjudicate 4:1
    48:9 66:16
administered
    11:21 18:12
    20:8
administrative
    7:13,16 8:21
    9:8 37:4 48:17
adopt 59:22
    60:10
advice 5:19 6:10
advise 66:22
advised 42:18
affirmed 3:17
afforded 6:6
afraid 17:22
afternoon 49:6
age 33:22 48:13
    67:17
agency 7:15
agree 48:12
agreeable 6:15
    63:8
agreed 4:20
    58:20
Agreement
    40:15,18
agrees 61:13
ahead 3:19 24:3
    64:7,10
alarm 28:18
alarms 51:15
allow 4:20
allowed 57:16,19
alternative
    39:22
Amen 66:20 67:8
    68:1
amend 40:14
amount 12:20
and/or 6:4

animals 52:1
annual 48:11
    67:18
answer 61:5
answering 53:21
answers 59:4
Anthony 29:7
    42:5 43:15,16
    43:17
Anthony's 57:21
anticipated
    18:12
anticipation
    16:5
anxiety 14:21
    15:2,9,11
    23:22 24:2,19
    24:20 25:2
    30:18 45:9
    46:17,19 47:2
    52:21 56:22
anybody 44:8
    56:19
anyway 40:9
apologize 33:14
APOSTOLOS
    1:13 70:4,15
appealable 7:5
appear 4:21
appeared 2:7,13
Appellate 7:8
applicant 1:6
    2:13 4:2,3,8,12
    4:12 5:10,15
    5:21 6:5 7:15
    8:22 11:15
    60:19
applicant's 6:20
application 1:3
    10:8 32:12
    34:14 38:8,11
    39:17,18 59:3
applied 47:22
    59:3

appoint 3:6,8
appointed 35:13
appreciate 43:20
    62:14
appreciative
    66:15
approached
    41:18
appropriate
    29:6
appropriately
    20:15
approved 7:9
April 36:1 39:18
area 59:19
argument 6:21
    58:14
arrived 43:15
Article 3:22 8:2
ascertaining
    7:18
aside 44:9
asked 42:9,20,21
    55:16 56:8
    57:20
asking 16:6
    33:18 50:7
asleep 26:8
associate 26:14
assume 35:3
    45:13
attack 14:22
    15:3,11 23:21
    23:22,22 24:2
    24:16 25:2
    29:13 30:18
attacks 15:9
    24:19,21 45:9
    46:17
attend 49:18
    50:22
attended 47:8
    50:11
attention 12:8

attorney 4:8
    5:16 6:20 9:13
    63:11
attorneys 2:1
    7:13
August 13:18
    36:10,16,21
    37:7,11 38:14
available 61:9
Avenue 2:10
avoid 29:18,20
    31:7 53:18
avoidance 28:21
awake 26:12
award 11:11
    61:21 62:9,16
awarded 40:3
awards 50:10,14
aware 37:12

**B**

B-r-i-a-n-n-a
    12:12
baby 53:4
back 16:22 17:5
    17:8 21:11
    22:20 30:15
    41:22 42:11,19
    43:9 48:19
    51:19 57:5
    61:7 65:14
    67:13
backed 41:14
background
    33:20
bad 68:7
ball 33:10
balling 67:5
banquet 50:14
Bargaining
    40:15,17
based 4:22 54:11
basement 28:17
bearing 47:19

County Court Reporters, Inc.
630.653.1622

Brianna Tedesco Disability Application
March 17, 2021

bears 5:10
bedroom 51:19
beer 41:22
began 22:6 35:5
41:21
beginning 37:6
behalf 2:7,13
4:11 6:7 66:17
68:10
believe 9:14 13:8
14:9 16:16,19
16:22 17:16
18:5 20:20
29:5 32:4 36:9
36:18 37:4,21
39:1 46:18
58:11 59:22
60:5 61:2,6
believed 17:2
32:15
benefit 15:1
17:15 23:9
26:18 29:17
61:22 62:17
65:22 66:21
67:13
benefits 38:10
38:14,17 67:3
best 32:16
better 23:5 42:5
46:16,20 47:3
47:4
big 28:7
bigger 31:6
birth 42:10
bit 50:7 55:12
blinds 28:17
51:21
blow 30:5
Board 1:1,11,17
2:7 3:6 4:7
5:12,18 6:4,9
6:17,22 7:3 9:1
9:1,9,10,18

15:2 19:2
22:17 23:9
26:18 27:5
29:17 31:18
32:7 33:6
40:10 41:8
48:13 49:2,2
56:8 58:12
60:10 62:21
63:5 65:16,18
66:2
Board's 5:17
17:14 22:5
66:19
boat 51:7
body 13:11,13
18:10,11 20:15
22:2 23:13
24:13 25:16
52:22,22
box 16:7 18:3,4
43:1
bravest 55:6
break 23:4 49:11
65:1
breaks 51:20
breath 15:5,7
24:9,10 25:18
breathe 19:16
breathing 15:4
23:20 24:7
Brian 50:2
Brianna 1:5 4:2
4:14,16 10:6,6
10:12 11:16
12:1,6,12 33:5
33:13 49:6
54:21 55:8
58:21 62:8,17
64:12 65:21
67:7,17 68:10
brief 11:7 49:15
Briefly 9:21
broad 36:13

brought 56:1
building 16:4
18:16,18 19:12
24:6
burden 5:10
but-for 60:11
_____

### C

C.S.R 70:4
calculations
67:14
call 3:12 4:13 6:6
6:17 11:14
20:5 33:15
64:1,19 65:8
called 12:2 18:21
41:16
calling 3:2
calls 11:15
cam 13:13
camera 13:11,14
28:19 31:19
cameras 51:14
capable 8:3,10
capacity 46:1
car 13:12 35:21
56:14,15 57:1
57:5,9
card 16:7
Carrie 13:18
21:9 44:1
carry 46:3,6,7
carrying 53:16
CARTY 12:1
55:9
case 4:2 5:8 7:8
8:11 14:4
20:10 33:14
41:22 58:20
60:19 61:6
62:10 63:1
cases 59:18
catch 15:5,7 24:9
caught 52:16

causation 59:15
59:18 60:3,11
cause 27:15
29:15 69:15
70:8
caused 14:21
celebrations
51:1,4
cell 64:14,15
certain 5:13
27:14 29:20
certainly 9:22
10:8 11:11
13:15 20:17
27:9 40:10
45:5 58:15
59:21 61:6,20
62:2,4,6
Certified 68:19
certify 70:6
changed 10:16
10:22
chapter 40:17
charged 28:20
check 62:5
checks 41:13
Chicago 51:1
child 53:16,17
children 34:10
34:12
choice 53:18
choke 18:14
choose 33:2 40:5
58:14
choppy 51:18
chosen 10:17
citizen 59:14
claim 4:1 6:3 7:5
8:4 38:3 48:10
66:16
claimed 46:21
clarify 34:15
clear 16:4 18:16
18:19 19:13

24:6 31:12
56:18
clearing 18:18
clearly 61:5,15
clinking 43:6
clip 9:11,17
close 26:11
closed 26:6
28:18 51:22
closing 6:21
58:14
co-worker 10:14
19:22
co-workers
47:18 48:2,3
Code 4:1 48:8
collapsed 50:4
Collective 40:15
40:17
come 21:6 48:19
52:12 63:14
comes 28:16
coming 42:19
51:21 52:8
62:5
commencing
1:10
comment 3:4,5,5
commissioned
1:14 70:5
communications
66:19 67:4
community
20:19 32:11
Comp 62:1
comparable
23:14
compensation
38:3 40:18
complete 41:13
70:10
completed 6:13
6:16 32:15
completely

Brianna Tedesco Disability Application
March 17, 2021

73

16:18
concerts 31:6
conclude 18:6
60:12
conclusion 6:19
16:17
conclusively
61:10
condition 41:3
44:13 53:7,11
56:22
conditions 45:10
45:18 46:21
47:22 56:10,16
conducted 3:22
confer 40:2
conferences
59:17
confirm 39:17
47:7 65:20
66:2,21
confronted
10:13
congratulations
12:19 49:7
53:4 54:22
55:8 66:15
connection
47:21
Conroe 47:10
conscious 57:8
60:12
consideration
68:12
considered 7:16
construed 5:2
contact 68:1
continuance
48:12
continue 6:1
13:22 22:8
33:15 44:3
45:8 46:3
49:10,13 57:19

67:5
continued 6:14
6:16 43:14
contrary 61:8
contributes 53:6
53:10
contributing
60:7
control 20:15,16
24:13
cooperate 48:13
62:10
copy 14:3 68:17
correct 14:5,8
21:5,15,18
22:7 24:17
31:4,13,14,16
31:17 33:22
34:1,4,5,8,9
35:20 36:3,4,6
36:7,11,12
38:10,16,22
39:4,5,6,19
40:1 41:3,4
45:15 47:11
51:11 70:9
counsel 4:5,21
6:5 8:22 9:2,19
11:13 33:9
40:2 56:8
62:19
counseled 62:13
County 21:22
70:2,6
couple 33:13
67:9
court 7:8 11:16
11:18 57:21
covered 40:18
COVID 5:1
CROSS 33:11
crowds 31:5,6
CSR 1:13 70:16
current 12:10

33:22 36:8
currently 32:19
37:15 38:20
45:11,21 52:1
52:10
curtain 14:19

**D**

D 45:3
danger 25:11
Darien 39:2,9,15
dark 15:16,16
darkness 15:15
17:19,22 28:13
28:14 29:14
date 4:4 6:13,17
10:10 12:22
13:2 21:1
34:16,17,21,22
35:2,4,13
36:15 37:7,20
39:18 40:4
41:11 42:10
59:1,2 62:3,18
63:8
dates 6:15 14:10
day 10:12 24:20
24:20,21 25:3
27:13 37:9
41:9 47:6
50:22 57:14
61:9
days 27:12 53:1
deal 56:3
dealing 31:5
death 20:9
debriefing 21:8
decided 21:11
decision 7:4,5,8
66:22 68:18
definitely 37:22
definition 54:6
deliberate 62:22
63:4 65:17

demonstrates
11:5
demonstrating
61:16
department 13:3
13:21 34:3
36:22 37:14
39:2,14 55:5
58:2
dependent 34:10
depends 24:22
depicted 13:14
deposit 62:11
depression 45:17
description
41:16 42:5
desensitization
22:19
determination
65:19
determined
62:18
developing
59:19
diagnosis 54:4,7
54:8,9,13
die 25:13
differ 23:18
different 28:14
54:3 57:2
60:14
difficult 19:4
43:19 52:17
digging 16:7
43:1,5
diligence 11:9
Dinwiddie 47:10
61:13
Dinwiddie's
47:13,20 61:3
direct 12:4 62:11
directly 68:1
disabilities 60:4
disability 1:3 4:1

5:11 6:3 7:5
8:4 11:6,11
34:14 38:9,18
39:16,22 40:3
45:19 48:10,12
59:3 60:8
61:22 62:17
65:18,22
disabled 61:15
disagree 47:20
discern 61:4
discussed 9:13
23:8 67:16
disease 56:3
disorder 54:5
dispatch 42:6,18
distinction 60:3
distract 30:6
51:17
District 60:1
doctor 21:9
55:18
doctor's 54:3
doctors 58:19
document 43:3
documentation
5:13 41:6
documented
14:10
dogs 52:2,3,4,6
doing 10:3 15:21
18:12 19:12
30:15 32:19
36:21 68:12
dome 52:18
door 43:5,6,17
51:19
doors 28:19
doorway 51:21
dot 22:20
Dr 13:18,20 14:1
14:10 16:10
17:4 21:17
22:3,6,8,12

Brianna Tedesco Disability Application
March 17, 2021

74

| | | | | |
|---|---|---|---|---|
| 44:1,2,3,4,9 | effectively 32:9 | 5:14,22 7:19 | 23:2,2 | fireworks 30:19 |
| 47:8,13,20 | eight 6:12 | 8:21 10:20 | eyes 26:6,12,22 | 49:20 50:5 |
| 61:3,13 | either 7:1 19:21 | 11:5,12 36:9 | 27:4 28:11 | 51:8 |
| dragon 33:18 | 22:20 | 61:2,8,10,16 | 42:4 | first 11:14 12:2 |
| dream 10:17 | eleven 7:3 | 61:20 63:4,6 | | 13:17 14:14,21 |
| drenched 25:16 | email 68:18 | exam 35:9 | **F** | 26:2,4 49:6 |
| drive 52:11,16 | EMDR 22:15,17 | EXAMINATI... | face 19:19 | 53:14 60:1,18 |
| 52:18,20 53:1 | employed 46:1,2 | 12:4 33:11 | fact 7:18 53:3,5 | fit 61:14 |
| driver 18:2 | 59:2 | 49:4 55:13 | 57:13 60:20 | fitness 35:9 |
| drivers 15:22 | Employee 38:9 | examined 12:3 | factor 60:7 | fitness-for-duty |
| driving 15:21 | employment | examples 19:10 | fair 12:20 14:6 | 35:6 |
| 52:10 57:10 | 34:13,16,18 | 30:12 | 17:6 48:6 58:5 | five 5:21 27:11 |
| 61:12 | 36:8,16 37:1,2 | exception 7:20 | fairly 8:3,10 | 27:12 47:6 |
| Drs 47:10 | 39:7 | executive 7:2 | Fairness 7:21 | 49:11 |
| drugs 55:17 | empty 27:6 | 63:3,12,14,17 | fall 26:8 | flashback 26:17 |
| dry 30:5 | encountered | 63:20 64:8 | familiar 10:11 | 27:15 |
| DU 70:2 | 59:14 | exhibit 9:10,10 | 25:7 | flashbacks 26:16 |
| due 5:1 11:9 | ends 59:10 | 9:18 32:13 | family 42:2 | 27:10 28:1 |
| 45:16 61:19 | enforcement | 40:14 | far 27:22 63:5 | 46:17,21 49:16 |
| 62:1 | 16:19 56:6 | exhibits 5:17 9:2 | 68:4 | 50:10 |
| duly 1:14 11:20 | engaged 28:8 | 9:4,6 11:9 | favorably 48:10 | flashlight 41:19 |
| 12:2 70:4 | 59:5,6 | expeditiously | 66:16 | Fletcher 47:9 |
| Duncan 42:10 | enjoy 55:7 | 67:10 | fear 57:5 | floor 49:1 |
| DuPage 70:6 | enjoyable 31:8 | experience 15:2 | feel 8:9,12,15,17 | floors 30:13 |
| duties 8:6 | enter 40:21 | 19:14 24:18,20 | 17:3 19:17,20 | flustered 18:14 |
| duty 21:12,13 | entered 9:7,18 | 26:15,19 27:9 | 29:10,11 32:10 | follow 61:1 |
| 28:9 32:5 36:2 | entering 5:22 | experienced | 33:4 46:14 | followed 6:2 |
| 36:19 37:4,8 | 30:7 | 57:2 | 55:3 56:1 | following 15:12 |
| 37:10,10,13,17 | entire 37:2 43:11 | expire 38:14 | 68:20 | 26:5 37:5 |
| 38:12 57:17 | 52:19 70:10 | explain 15:1 | feels 8:5 24:12 | 56:14,22 |
| 59:6,13 | entitled 11:5 | 16:15 19:2 | felt 19:15 | follows 5:8 12:3 |
| dye 51:2 | entitlement 5:11 | 20:2 22:17 | female 18:8 | 65:3 |
| | entry 8:20 9:3 | 26:18 27:5,8 | Fest 49:18 | foot 10:15 |
| **E** | environment | 29:17 30:12 | field 15:18 | footage 13:11,12 |
| ear 31:3 | 48:2 | 32:7 | fight 25:17 43:14 | 13:13 41:6 |
| earlier 36:18 | especially 33:19 | explained 24:5 | filed 10:8 38:2 | force 39:11 |
| 42:3 44:3 45:8 | establish 61:10 | expose 24:22 | 45:18 | foregoing 70:9 |
| 46:14 67:16 | evaluation 35:6 | expound 47:17 | fill 67:8 | forehead 27:2 |
| early 21:2 | evaluations | extent 25:22 | final 7:4 68:18 | 43:7 |
| easier 68:17 | 47:10 48:20 | 56:21 | finally 7:7 8:16 | forever 10:16 |
| easy 57:22 | event 6:12 13:15 | extreme 57:6 | 15:5,7 24:9 | form 5:3 24:7 |
| effect 40:15 48:4 | events 13:9 | extremely 19:18 | find 17:20 24:8 | 48:1 |
| effective 40:4 | everybody 10:4 | 52:17 | findings 7:18 | formal 7:9 |
| 62:3,18 | evidence 4:6,6 | eye 11:3 22:19 | firearm 46:5 | forth 22:20 |

County Court Reporters, Inc.
630.653.1622

Brianna Tedesco Disability Application
March 17, 2021

75

| | | | | |
|---|---|---|---|---|
| 70:11 | getting 46:15,19 | 63:16 64:7,17 | 53:8 64:13 | 41:10 |
| **forthcoming** | **give** 36:20 49:11 | 64:21 65:6,14 | **heard** 43:6 | **identify** 4:9,14 |
| 43:20 | **given** 14:3 17:18 | 66:4,14 68:22 | **hearing** 1:10 3:6 | 42:21 |
| **forward** 5:6 | 33:3 42:8 56:4 | 69:9 | 3:9,9,18,19,21 | **IL** 2:5,11 |
| **fought** 43:10 | **GLORIA** 1:13 | **gotten** 10:7 47:3 | 5:19 6:10,13 | **Illinois** 1:15 3:22 |
| **four** 5:18 | 70:4,15 | 47:4 | 6:16,20 7:12 | 48:19 70:1,5 |
| **frequency** 47:5 | **glove** 16:7 18:2,4 | **grabbed** 43:8 | 11:4 30:7 63:7 | **IME** 47:13 |
| **frequent** 27:3 | 43:1 | **graduated** 39:14 | 65:2 69:14 | **immediately** |
| **frequently** 25:1 | **go** 3:19 13:20,22 | **grant** 65:21 | 70:8 | 19:5 26:5 |
| **freshly** 20:6 | 15:5 16:9 17:5 | **gravel** 41:14 | **Hearsay** 7:20 | 27:18 37:5 |
| **Friday** 14:16 | 17:8 18:3 | 42:8 | **heart** 15:6 19:16 | 42:3 |
| **friend** 28:15 | 20:11 24:3,7 | **great** 40:11 55:1 | **heavily-litigated** | **impact** 46:11 |
| **friendly** 68:9 | 24:11 28:13,16 | **grip** 30:17 | 59:7 | 55:16 |
| **front** 31:15 | 28:17,20,22 | **guess** 54:6 | **heightened** | **impacted** 56:2 |
| 41:15,22 47:1 | 29:19 31:2,9 | **gun** 27:2 43:8,10 | 52:21,22 | **impacts** 29:2 |
| **full** 32:4 33:19 | 43:13 50:21 | 43:13,15 46:9 | **Heights** 2:11 | **impartial** 8:13 |
| 36:2 | 61:7 63:12,14 | 50:2 59:11 | **help** 21:22 33:4 | 8:15,18 |
| **full-blown** 30:18 | 63:20 64:7,7 | **guns** 60:14 | 53:13 57:20 | **important** 7:12 |
| **full-fledged** | 64:10 | **guys** 31:22 50:15 | 60:21 | **inaccurate** 14:11 |
| 54:14 | **goes** 41:7 68:4 | 52:1 64:12 | **helped** 23:6 | **incapable** 8:5 |
| **full-time** 13:3 | **goggles** 23:1 | | **helps** 40:13 | **incident** 9:12,13 |
| 35:1,4,5,12 | **going** 3:11 11:16 | **H** | **hereinabove** | 10:16 14:14 |
| 37:3,12,16 | 16:13 18:14 | **hair** 30:5 | 70:11 | 15:8,13 23:4 |
| 61:9 | 19:19 23:8 | **halfway** 41:20 | **hiding** 14:20 | 23:12 26:13 |
| **fully** 28:20 | 32:19,22 33:17 | **hand** 11:18 12:7 | **hired** 39:12 | 35:14 38:4 |
| **function** 15:15 | 41:10 45:22 | 22:21,22 23:1 | **history** 34:14 | 41:7,11 43:21 |
| 18:17 | 47:15 48:14 | **handed** 43:2,5 | 41:2 | 46:6 49:17 |
| **Fund** 1:1,12 62:6 | 49:15 55:1,2 | **handle** 18:3 | **hold** 12:7 16:20 | 51:5 57:7 |
| **Fundamental** | 64:10,21 66:18 | **happen** 16:6 | **holding** 24:8 | 61:17 |
| 7:21 | 66:18 67:2,7 | 66:18 | **Holland** 39:13 | **incidents** 13:6 |
| **Funds** 8:2 | 67:13 68:2,3 | **happened** 10:19 | **home** 25:20 | 52:15 |
| **further** 6:18,18 | **good** 17:11,17 | 19:3 26:8 | 29:12 30:4,7 | **included** 32:13 |
| 48:22 54:13 | 45:4 49:6 | **happening** 22:2 | 30:22 46:7,8 | **includes** 13:11 |
| **Furthermore** | 60:12 | **happens** 23:17 | 53:19 | **incorrectly** |
| 8:1 | **Goodloe** 2:3,3 | 25:15 26:19 | **hope** 10:2 56:5 | 18:13 |
| | 3:8,11,20 4:19 | 27:16,17 | **horrifying** 60:16 | **Independent** |
| **G** | 5:6 8:14,16,19 | **happy** 10:8 | **house** 29:21 52:8 | 47:9 |
| **gaps** 35:15 | 9:6,17,22 | **hard** 66:14 | **Howe** 7:8 | **indicate** 39:1 |
| **GARZA** 2:9 | 11:13 33:6,9 | **Harlem** 2:10 | **husband** 28:15 | 56:13 |
| **gas** 17:20 | 33:12 40:11,20 | **head** 45:7 55:7 | 29:20 30:14 | **indicated** 34:6 |
| **gate** 41:15 | 41:1 48:22 | **headphones** 30:5 | 51:9 52:12,13 | 38:8 47:14 |
| **general** 11:3 | 54:1,8,10,12 | 31:1 | | **info@pgm-la...** |
| 27:22 28:4 | 54:16,18 55:10 | **hear** 12:6 30:2 | **I** | 2:6 |
| **gentlemen** 8:19 | 58:8,11 62:20 | 41:8 51:17 | **idea** 17:12,17 | **information** |

County Court Reporters, Inc.
630.653.1622

Brianna Tedesco Disability Application
March 17, 2021

76

20:11 40:22
50:8 58:3
66:22
informed 62:9
initial 35:1
initially 39:12
inside 18:20
instituted 7:17
insurance 16:7
18:2
insure 8:8 64:13
intact 7:22
intend 53:15
intends 5:13
intense 23:19
interesting
59:19
interrupt 24:3
introducing 5:14
intrude 51:17
investigation
7:17
involved 44:6
57:4
involves 59:13
issue 59:15,18
62:1
issues 47:15
51:13 63:13

**J**

James 42:10
job 30:10 68:9
jobs 39:9
judging 8:3,10
July 10:10,19,22
12:18,21 14:13
15:8,12 20:13
25:22 26:2
30:19,21 34:7
35:14 36:15,21
38:3 48:5 51:4
57:3,7 60:6
61:17

June 34:16,18
35:2
justice 10:3

**K**

Karlson 2:9,9
4:11,11,18 5:5
9:5,14,16,21
10:1,5 11:15
12:5 31:22
32:2 40:7,12
55:12,14 58:7
58:9,10,15
62:20 64:15,18
64:22 66:2,6
66:13 67:21
68:7
keep 7:13 11:2,7
20:15 55:7
keeps 62:5
Keith 2:9 4:11
10:5 45:6
55:11 64:12,14
67:5
Kenneth 28:10
kept 50:18
Kevin 1:19 3:14
kill 10:13 18:11
25:13 60:14
kind 18:7 21:21
22:2 26:7,13
29:7 30:6
36:13,20 41:8
56:4,6
kkarlson@kar...
2:12
knots 15:6
knotted 19:15
24:11
know 11:8 16:5
19:8 20:4
25:18,19 26:6
27:8 29:12
32:8 37:19

43:3,19 47:2
48:7,16 49:8
50:14 52:7
54:22 55:15
58:3 59:6,16
62:12
knowing 18:4
known 10:13
55:6
Kroll 22:3,6,8,12
44:2,3,4,9

**L**

L-o-i-a-c-o-n-o
58:6
labeled 9:10
lady 33:19
Lakemoor 1:1
1:12 4:7 13:3
17:18 20:22
34:3 35:11,19
36:22 37:13,17
39:8,9 47:16
49:18 57:11
58:1
large 35:15
largely 60:10
Laura 2:3 3:8,18
3:19 40:13
59:16 62:2
Lauterbach
66:20 67:8
68:1,8
law 5:9 16:19
56:5 59:19
61:1
leads 59:15
learned 18:9
20:20 26:14
leave 35:17 37:4
43:13
led 17:15 20:9
21:22 30:17
legal 4:5,21 6:4,9

40:2 43:2
Let's 28:13 64:1
level 67:12
license 1:13
41:15 42:12
70:16
Lieutenant
21:22
life 10:12,16,22
20:6,7,8 27:7
28:13 29:2
33:3 55:7 56:7
68:16
light 21:12,13
23:2 36:19
37:3,8,10,10
37:12,16 38:12
51:20 57:17
lights 29:22
50:19 51:15
52:18
limbs 15:5 19:17
24:6,11
line 60:2
line-of-duty 11:6
11:11 39:21
61:21 62:17
66:3
liquor 41:21
listen 62:15
listening 58:18
lit 17:21
little 46:15,20
49:11 50:7
55:12
LLC 2:9
location 15:18
41:16
locked 28:19
log 64:16,17,18
Loiacono 42:5
long 11:2 15:14
33:14
longer 20:21

53:15
look 37:22
looked 43:2,7,12
looking 18:2
21:21 43:4
looks 28:10
losing 30:16
lot 15:19 19:7
22:15,18 23:3
24:9 27:1,3
28:21 46:18
53:18 68:5
loud 15:17 28:5
30:6,8,10,11
Lyons 1:19 3:8
3:14,15 8:14
8:15 54:1,2,9
54:11,15,17
61:3 63:22
64:4,5 65:4,11
65:12 66:1,5,8
66:9 68:5 69:2
69:4,5

**M**

M-c-C-a-r-t-y
12:13
Mail 68:19
making 7:18
18:20 64:8
68:9
male 15:22 18:1
41:17
man 60:13
manageable
68:8
mandated 13:21
manner 8:6 56:2
MAP 40:16
March 1:11 3:2
marked 42:7
marriage 54:22
55:8
marriages 34:7

Brianna Tedesco Disability Application
March 17, 2021

77

| | | | | |
|---|---|---|---|---|
| **married** 10:7 | **mental** 14:15 | **mute** 64:11 | 30:6,8,10,11 | **occurred** 13:15 |
| 12:14,17 34:6 | 16:21 56:10,22 | | **non-duty** 39:22 | 41:9 59:1 |
| 50:1 | 60:4 | **N** | **non-stop** 26:21 | **occurs** 23:16 |
| **Martel** 28:10 | **met** 13:17,18 | **name** 10:5 12:10 | **normal** 17:3 | **offender** 59:11 |
| **MARZULLO** | **Midnight** 20:4 | 12:15 42:9,18 | **normally** 59:13 | **offered** 37:16,18 |
| 2:3 | **midnights** 51:10 | 42:22 44:19,20 | **Northbrook** 2:5 | 58:20 |
| **match** 59:11 | **Mike** 51:6 | 45:6 50:1 | **Notary** 11:22 | **Officer** 3:7,9,18 |
| 60:13 | **mild** 57:4 | 57:21 | **note** 9:8 47:17 | 4:16 5:19 6:10 |
| **matter** 1:3,10 | **military** 36:5 | **names** 45:5 | 64:8 | 10:18,22 15:21 |
| 6:11,14 58:18 | **mind** 7:13 14:19 | **Narcan** 18:13 | **notebook** 42:13 | 20:22 28:8 |
| 65:18 | 19:18 20:16 | 20:5,9 | **noted** 4:19 8:1 | 32:4,9 34:4 |
| **matters** 6:9 | 24:12 41:10 | **naturally** 26:8 | 18:5 34:15,17 | 35:10,13 37:3 |
| **MC** 2:9 12:1 | **minimizing** | **nature** 22:11 | **notes** 14:11 | 39:8 57:11 |
| 55:9 | 16:15 | **necessarily** 28:1 | 16:14 22:5 | 58:21 59:1,2,9 |
| **McCarty** 10:7 | **minimum** 27:11 | **necessary** 29:9 | 31:15,19 55:2 | **official** 28:9 |
| 11:16 12:12 | **minutes** 49:9 | **need** 20:18 33:19 | **notified** 4:3 | **offset** 40:9 |
| 51:6 54:16 | **mirrors** 42:15 | 63:16 65:6 | **notion** 63:17 | **Oh** 45:12 56:17 |
| 62:17 66:17 | **mislead** 56:19 | 68:2,20 | **nowadays** 31:5 | **okay** 3:11 4:18 |
| **McHenry** 21:22 | **Missy** 49:22 | **needed** 49:8 | **numb** 15:5 | 8:19 9:6 12:9 |
| **McHenry's** 51:7 | **mistake** 33:16 | **needs** 60:21 63:5 | **number** 5:9,12 | 12:19 13:22 |
| **mean** 18:18 | **mom** 55:1 | **never** 10:17 11:1 | 5:15,18,21 6:4 | 14:3 16:9 |
| 23:10 27:5 | **moment** 25:19 | 36:5 37:18 | 6:8,12,19,22 | 17:14 21:13,16 |
| 40:8 46:16 | 26:22 27:2 | 38:9 51:3 56:5 | 7:3,7 64:14 | 23:6,8,16 25:5 |
| 47:5 56:15 | **moments** 26:20 | **new** 56:4 | **nuptials** 49:7 | 26:11,17 28:22 |
| **means** 23:11 | **money** 62:6 | **nice** 68:8 | | 29:14 32:3 |
| 29:18 | **monthly** 25:3 | **night** 13:6,9 | **O** | 33:7,8,20,21 |
| **medical** 22:18 | **morning** 14:16 | 14:16 15:15,16 | **oath** 11:20 | 34:13 35:1,5 |
| 25:6 35:16,18 | **motion** 3:6 22:19 | 25:6,9,10,21 | **objection** 9:3,14 | 36:2 40:11 |
| 41:2 43:22 | 63:20 64:9 | 26:3,9 27:20 | 40:20 | 43:13 45:12,16 |
| 47:9 | 65:4,20 68:22 | 28:16,17,18,20 | **objections** 5:16 | 46:3 47:7,20 |
| **medication** | 69:1 | 29:4,7,19 | 5:20 | 48:6,22 49:14 |
| 45:10 55:18 | **move** 3:8 8:20 | 50:17 51:12 | **objective** 8:3,6 | 50:21 51:9 |
| **medications** | 17:22 22:20 | 52:10,11,17 | **obligated** 67:17 | 52:4 53:20 |
| 45:2 53:10,13 | 31:18 48:18 | 53:1 57:10 | **obligations** 48:8 | 54:15 64:7 |
| **medicines** 53:6 | **moved** 19:6 | 61:12 | **Obolsky** 47:11 | 65:14 66:6 |
| **meet** 13:16 | **Moving** 5:6 | **nightmare** 25:11 | **obviously** 15:16 | 69:9 |
| **meeting** 3:3 7:10 | **multiple** 27:13 | 25:14,17 | 28:19 29:4,15 | **once** 6:8 26:10 |
| **Meetings** 7:1 | 60:15 | **nightmares** | 34:18 37:22 | 44:5,6 |
| 63:3,18,21 | **municipality** | 46:18,22 | 41:5 44:1 45:9 | **ones** 31:2 |
| 65:17 | 66:21 | **nighttime** 28:7 | 52:7 56:5 62:8 | **ongoing** 5:1 |
| **member** 13:3 | **murder** 59:12 | **nine** 6:19 | 67:7,16 | **open** 7:1 49:1 |
| 19:21 40:16 | **murdered** 10:14 | **noise** 30:18 | **occasions** 17:13 | 63:1,2,18,21 |
| **members** 1:17 | **murderer** 10:13 | 51:16 | 17:15 | 65:5,14,17 |
| 58:1 | 20:12 | **noises** 15:17 28:5 | **occupied** 41:17 | **opened** 26:22 |

County Court Reporters, Inc.
630.653.1622

Brianna Tedesco Disability Application
March 17, 2021

78

| | | | | |
|---|---|---|---|---|
| **opening** 6:1 9:20 11:7 | **paranoia** 51:22 | 40:9 | 59:16,21 60:21 60:22 61:9,21 62:7 65:19 | **proceed** 4:10 5:22 49:12 |
| **opinion** 47:21 54:11 61:4 | **parents** 34:11 | **performing** 8:6 | **positions** 37:13 | **proceeding** 5:4 5:14 7:14,14 |
| **opinions** 54:3 58:20 | **parked** 15:18 17:20 | **period** 16:10 36:19 39:3 40:19 44:21 57:18 | **positive** 46:22 | **proceedings** 1:9 4:4 69:12 70:7 |
| **opportunity** 6:6 58:13 | **parking** 15:19 | **person** 20:11 | **possible** 67:11 | **process** 10:9 19:3 21:19 23:3,3 60:18 |
| **option** 61:11 62:21 | **part-time** 34:21 | **perspective** 58:18 62:15 | **potentially** 63:1 | **profession** 10:18 |
| **order** 3:3 68:18 | **partial** 8:10 | **pertains** 9:11 | **pre-existing** 56:10,16 | **professional** 18:7 |
| **ordinary** 59:14 | **participating** 5:3 | **phone** 52:19 | **pre-physical** 35:9 | **properly** 42:7 |
| **out-of-state** 48:18 | **particular** 8:4 | **physical** 60:4 67:18 | **pregnancy** 45:16 55:17,22 56:1 | **proposed** 5:17 9:2 |
| **outcome** 19:8 | **parties** 6:15 63:9 | **physiological** 28:2 | **pregnant** 45:11 45:14 | **protection** 31:3 |
| **outset** 4:20 | **partisan** 7:14 | **pick** 28:16 | **prescribe** 45:1 | **provide** 45:5 |
| **outside** 29:11 39:7 46:7 56:7 | **partner** 19:5 42:5 | **place** 15:20 28:6 70:11 | **prescription** 45:4 | **proving** 5:10 |
| **overall** 46:16 | **partners** 20:17 32:10 | **places** 52:12 | **present** 1:17 2:1 4:6,12 5:16 | **provoke** 23:12 |
| **overdose** 18:9 20:3 | **parts** 29:21 | **plate** 41:15 42:12 | **presentation** 50:10 | **psychiatric** 59:18 |
| **overdosed** 20:7 | **passed** 20:4 | **please** 4:9,15 11:19 12:10 47:17 62:12 | **President** 1:18 3:1,14,16 6:10 8:12 49:2,5 55:15 58:6 63:10,19 64:1 64:4,6 65:8,11 65:13 66:7,10 66:12 69:3,6,8 | **psychiatrist** 44:13 |
| **overnight** 41:12 51:1,2,3 | **patently** 59:12 | **pleasure** 10:6 | | **psychological** 14:15 41:3 45:18 47:8 56:14 |
| **overwhelming** 61:19 | **path** 33:3 | **point** 11:1 12:6 13:5,16 17:4,8 17:10 18:6,22 20:20 21:3,9 21:16 29:5 32:3 37:8 43:3 49:10 57:13 | | **psychologist** 45:22 |
| **overwhelmingly** 10:21 11:4 | **Patrick's** 50:22 | | **presumed** 8:2 | **Psychology** 33:1 |
| **owns** 50:2 | **patrol** 17:8 34:3 35:13 37:3 41:13 | **police** 1:1,12 4:7 10:18 13:3,21 15:21 20:22 28:8,8 32:4,9 34:3 35:10 36:22 37:13 39:2,8,11,13 39:13 57:11 58:2,21 59:1,2 59:9 | **previously** 4:3 8:22 9:13 | **psychotherapi...** 13:17 |
| | **pay** 38:18 67:10 | | **principle** 11:3 | **psychotherapy** 22:14 |
| **P** | **payments** 67:13 | | **prior** 15:8 25:22 34:7 39:8 41:2 56:15 | **PTSD** 22:13 47:19 48:4 54:4,14 |
| **P.M** 1:11 20:5 | **PEDA** 38:9,13 | | **privilege** 60:17 | **public** 1:9 3:4,4 3:5 19:21 38:9 |
| **packet** 32:13 43:6 | **peel** 30:15 | | **probably** 40:7 | **PUCHALSKI** 2:3 |
| **PAGE** 70:2 | **Pending** 38:7 | | **probationary** 34:16 | **pull** 18:4 |
| **Palos** 2:11 | **Pennsylvania** 42:13 50:11,15 | **position** 10:21 37:17 55:19 | **problem** 62:4 | **pulled** 43:16 60:14 |
| **pandemic** 5:1 | **pension** 1:1,12 4:1,7 5:11,17 5:18 6:9 8:2 9:1,1,9,10,18 11:6,12 39:22 40:3,5 48:8,13 49:2 58:11 62:6 65:21 67:13 | | **problems** 29:15 | |
| **panic** 23:21,22 24:15,19,21 45:9 46:17 | | | **procedures** 5:7 | |
| **paper** 43:4 | **people** 29:11 33:4 46:12 55:6 | | | |
| **paperwork** 67:8 68:6 | **perceive** 56:2 | | | |
| **paralyzed** 17:21 | **percent** 38:21 | | | |

Brianna Tedesco Disability Application
March 17, 2021

79

pulling 43:10
purpose 56:4
purposes 7:17
  48:11
pursuant 3:22
  6:22 48:8 63:2
  63:17,20 65:16
put 21:1,11
  32:10,11 34:21
  38:12 48:16
  55:19 57:7
puts 20:17 52:22
putting 19:21

**Q**

qualified 1:14
  70:5
quarter 30:14,16
QUEARY 2:9
question 9:12
  54:2 56:9 59:9
  60:6 61:16
questions 6:5
  33:6,7,13,17
  33:18,20 49:1
  49:9,14 53:22
  54:1,16,19,20
  55:16 59:5
  63:11,15 67:19
quick 58:2
quite 60:1

**R**

races 15:6 24:12
racing 19:16,18
Raise 11:18
ran 20:11 42:18
range 30:22 46:9
  46:13
rank 34:2
Raphael 44:19
reached 16:16
  22:1
reactions 14:15

15:12
read 5:12 54:6
reading 11:9
  31:20 54:12
ready 4:13,17
  21:10 28:20
  64:20
real 42:10
reality 61:18
realize 15:14
  17:11 25:20
realized 21:9
really 50:18
  60:21
rear-ended 57:6
reason 14:9,11
  53:2
reasoning 59:22
recall 35:3,15
  49:22
recap 36:20
receive 24:14
  50:19
received 38:9
  44:1,2 63:4
receiving 38:17
  38:20
reconvene 63:7
record 4:9,15
  5:13 6:1 8:9,21
  9:4,8 12:11
  18:19 22:4
  31:12 32:1
  33:19 36:9
  38:1 39:1,17
  40:14,21 47:7
  48:17 68:2,17
  69:9
records 14:3
  16:14 22:4,18
  25:6 56:13
  58:17
recovery 46:22
recuse 8:7

redirect 55:10
  55:13
redoing 30:13
reevaluations
  48:11 67:18
reference 9:11
referred 22:3
reflects 13:9
regard 11:7
  55:22 61:20
regarding 49:15
registration
  42:22
regular 34:17
related 22:13
  39:11 48:1
relationship
  47:15 48:2,3
relationships
  47:18
relaxation 22:15
relaxed 7:19
release 17:4
relevant 40:19
rely 29:6
remain 7:22
remained 37:10
remarks 11:7
remember 12:22
  14:6 16:11
  37:7 44:19
  45:4,6 47:3
  50:1,11 56:10
reminder 7:11
removing 30:14
render 7:3
replay 26:13,21
replayed 26:7
replays 27:1,3
report 1:9 70:10
reported 1:13
  70:6
reporter 11:16
  11:18 57:21

represent 10:6,9
represented 4:5
representing
  60:17 67:22
request 57:14
  64:12
requesting 39:21
required 35:8
  48:19 61:12
requirement
  57:10
Resident 49:22
respect 9:3,15
  11:8 34:13
  38:3 39:16
  43:21 44:13
  46:20 47:13
  48:7,14 67:2,3
respectfully 8:7
  64:11
respond 4:6
  20:14
responds 59:9
response 23:12
  23:18 44:1
restaurant 31:9
restrictions 17:5
result 24:15 48:4
resulted 29:8
resume 65:4
resumed 65:2
retention 67:18
retroactive
  67:12
return 10:17
  11:1 21:10
  37:9 53:15
  55:19
returned 16:2
  21:2,13 36:2
  37:6,9 42:17
returning 17:16
review 13:5 63:6
reviewed 41:6

reviewing 58:17
revolver 43:7,17
RICKY 1:20
right 4:5 6:17
  11:18 14:4
  21:4 24:16
  31:10,11,22
  32:13 33:5
  42:16 44:5,6
  45:7 46:1
  48:17 49:17
  50:3 51:9 52:9
  53:17 60:22
  62:16 68:12
risk 19:22 20:17
  32:10,11 59:13
river 51:2
road 2:4 41:14
  42:8
Robin 22:3
Rocky 3:12
roll 3:11 4:13
  64:1 65:8
rolled 41:20
rolling 33:10
  67:6
room 15:17
  31:13 50:17
  52:4 60:11
rooms 50:16
rotate 22:21
rotating 23:2
round 30:14,16
rule 5:19 7:21
  48:18 63:1
Rules 7:19,21
rulings 6:8
run 19:9
running 40:8
runs 17:18
Russell 1:18 3:1
  3:14,16,16
  8:11,12 49:3,5
  55:15 58:6

County Court Reporters, Inc.
630.653.1622

Brianna Tedesco Disability Application
March 17, 2021

80

63:10,19 64:1
64:4,6,6 65:8
65:11,13,13
66:7,10,12,12
69:3,6,8,8

**S**

safe 20:21
safely 32:9
salary 37:19
38:21 40:22
66:21
Sanders 2:4
Sardo 59:22
saved 10:14 20:6
20:7,8
saves 62:5
saw 26:22 27:4
41:14 42:4
44:20
saying 31:10
47:3 61:8
says 60:2
school 32:19,21
32:22 45:22
screamed 43:8
search 19:12
seat 41:22,22
57:5
second 3:10 15:4
43:16 63:22
65:6,7 66:1
69:2
seconded 64:9
Section 48:9
63:21
see 13:20 14:18
22:18 26:13
27:6,14 28:9
30:16 44:3
50:6 51:20,20
seeing 28:8
seeking 44:4,8
seen 13:13 18:11

41:5 60:16
send 68:19
separate 50:15
54:14
September 21:7
21:7 37:6,8
seriously 58:17
serve 58:21
service 35:15
serving 34:2
session 7:2 63:1
63:3,13,14,17
63:20 64:8
65:5,15
sessions 14:7
set 51:15 62:11
70:11
setoff 40:9
setting 7:20
seven 6:8
shake 24:10
shaking 19:7,17
shape 5:3 48:1
she'll 62:10
shift 37:9 41:12
shifts 17:19
shoot 46:4
shooting 9:12
21:8 23:3
25:12 26:6,7
26:21 27:19
31:3 36:15
37:5 48:5
52:15 57:1
60:18 61:17
shootings 22:1
shop 50:2
short 39:3 57:18
shorthand 70:7
shot 43:18 46:5
shove 43:9
show 31:19
shower 14:18
side 7:15 42:15

signed 67:14
simple 33:15
sincerely 43:20
SIOLIDIS 1:13
70:4,15
sit 30:22 60:9
situation 52:16
59:10 61:19
six 6:4 35:21
37:5 47:6
sleep 26:5 29:21
50:19 51:15,16
51:18,18 52:4
52:6
sleeping 41:18
50:16
slow 68:3
slower 19:7
snapped 30:17
sobbing 15:7
somebody 21:20
60:21
Someone's 28:11
soon 55:20
sorry 24:3 50:6
53:8
sort 14:15 15:12
19:13 24:15
25:11,11 26:14
26:19 28:2
29:16 35:17
45:1 46:22
47:14,21 62:9
62:12
sought 44:12
soul 27:1,5
South 2:10 39:13
speaking 41:21
special 59:13
specific 19:10
26:20 28:3
specifically 20:3
specified 54:5
Speedway 17:20

spell 12:10 57:21
sponsored 39:12
squad 13:12 57:5
57:9
SS 70:1
St 50:22
standard 60:7,11
standpoint 41:9
start 3:19 28:4
started 21:20
30:15 34:21
35:4,19 43:1
45:3
state 1:15 12:10
48:19 51:22
70:1,5
stated 42:3 54:4
statement 6:1
9:20
station 17:20
status 36:8,17
37:1,2 38:6
67:10
Statute 60:2,4
stay 52:22 53:19
Steiner 13:18,20
14:1 16:10
17:4 21:9,17
44:2
Steiner's 14:10
stimulus 23:14
24:15
stipulate 40:13
stipulation 4:20
4:22
stomach 15:6
19:15 24:10
stop 15:4,22 16:3
16:21 18:1,7
20:10 56:5
stopped 21:16
strange 15:18
street 17:1 21:4
21:10 50:5

stress-related
54:5
strictly 7:22
stroke 36:13
stronger 16:20
subdivision
41:13
subject 48:10
53:17 59:7
submitted 32:12
subsequent 7:10
sudden 30:9,11
suffer 45:9
suffering 44:14
suggest 36:9
suitable 41:8
Suite 2:4,10
summer 51:6
support 6:2 55:4
supports 10:21
suppose 14:17
sure 10:10 11:15
18:20 24:3
30:2 40:22
42:6 51:14
63:16 67:1,5
suspect 19:9
suspects 18:20
suspension
35:16,18
suspicious 59:10
swear 11:17
sweat 25:16
sworn 12:3
symptoms 16:15
19:13 28:3
46:15 47:4
57:2

**T**

T-e-d-e-s-c-o
12:16
table 10:11
take 15:14 32:1

County Court Reporters, Inc.
630.653.1622

Brianna Tedesco Disability Application
March 17, 2021

81

| | | | | |
|---|---|---|---|---|
| 35:8,16 49:11 | 36:18 44:10 | 11:8 13:17 | **traveling** 42:2 | 49:15 64:10 |
| 51:7 52:12 | 45:8,21 46:16 | 14:14 16:10 | **treat** 22:8 45:17 | **trying** 10:1 16:3 |
| 65:8 67:9 | 46:19 | 19:7 21:11 | **treated** 21:17,20 | 18:16 19:13 |
| **taken** 29:5 33:3 | **testify** 46:14 | 24:14 26:3,6 | 60:5 | 24:6 25:13,16 |
| 65:1 69:13 | **testimony** 6:2,18 | 35:12,15 36:19 | **treatment** 14:1 | 41:13 50:20 |
| 70:8,11 | 63:4 69:13 | 37:2 38:11 | 16:9 22:6,11 | 51:17 56:19 |
| **talk** 29:1 54:13 | 70:7,10 | 39:3 40:16,19 | 43:22 44:4,8 | 61:4 |
| 56:21 59:16 | **testing** 47:8 | 41:18 42:14 | 44:12 | **TTD** 38:17 40:8 |
| 63:13 | **thank** 3:20 5:5 | 43:11 44:21 | **trick** 33:18 | 62:5 67:3 |
| **talked** 12:20 | 8:19 11:13 | 49:12 53:6,10 | **tried** 10:13 16:2 | **turn** 12:8 64:11 |
| 27:21 | 33:9 43:19 | 53:14,22 55:19 | 18:11 37:9 | **TV** 50:18 51:16 |
| **talking** 50:9 | 53:21 54:17 | 57:18 58:12,13 | 43:9 51:7 | **twice** 44:7,20 |
| 56:11 | 55:9,10 58:16 | 62:14,21 63:5 | 60:14 | **two** 5:12 10:15 |
| **teaching** 56:6 | 62:20 64:22 | 63:8,10 65:19 | **tries** 59:11 | 34:20 39:5 |
| **techniques** 22:16 | 66:6,13 68:11 | 67:9,13,20 | **trigger** 15:17,20 | 52:3,14 53:1 |
| **technology** 10:2 | 69:10 | 70:11 | 15:22 16:3,4,8 | 60:14 |
| **Tedesco** 1:5 4:2 | **Thanks** 10:1 | **times** 16:14 | 18:10 19:6 | **typically** 24:8 |
| 4:16,16,21 | 58:7 | 19:11,20 27:11 | 23:10,16 24:14 | 25:12 |
| 10:6 12:16 | **therapy** 13:22 | 27:12,13 46:5 | 28:1,6,7,9,11 | |
| 33:15 65:22 | 14:7 | 47:6 60:15 | 28:11,14,21 | |
| **Tedesco's** 10:12 | **thing** 23:2 24:1 | **today** 4:10,13 | 29:1 30:9,19 | **U** |
| 10:22 | 61:1 62:16 | 7:11 8:6,11 | 43:11 60:15 | **unable** 58:21 |
| **tell** 36:14 | 67:21 68:12 | 22:9 24:18 | **triggered** 16:1 | **unanimous** |
| **telling** 42:1 | **things** 16:20 | 27:10 32:5 | 30:19 49:21 | 61:20 |
| **temporary** 38:18 | 27:14 29:15 | 40:4 60:9 63:7 | **triggers** 14:21 | **unavoidable** |
| 57:19 | 53:18 62:12,22 | 66:16 67:1 | 23:9,18 27:15 | 17:19 |
| **ten** 6:22 | 68:4 | **told** 14:19 42:9 | 27:21 28:4,4 | **unbiased** 8:10 |
| **ten-minute** | **think** 10:20 11:3 | 42:15 43:14 | 29:16 32:8 | **unconscious** |
| 49:11 | 19:11 21:7 | 55:18 57:18 | 46:18 49:15 | 18:10 |
| **tendered** 8:22 | 41:7 44:20 | **top** 45:6 | 50:9 | **uncontested** |
| **tenure** 39:8 | 52:14 53:3,5,9 | **total** 38:18 | **true** 32:16 70:9 | 58:22 |
| **term** 25:5,7 | 53:12 55:15 | **track** 44:6 | **truly** 53:20 | **uncooperative** |
| 26:14 | 58:22 59:8 | **traffic** 15:22 | **Trustee** 1:19,20 | 5:4 |
| **terminated** | 60:8,9,12,20 | 16:3 18:1,6 | 8:5,11,14,16 | **undeniable** 60:8 |
| 36:10 38:12 | 60:22 68:14,21 | 20:10 | 54:1,18 61:3 | **undergo** 35:6 |
| **termination** | **thinking** 16:21 | **transcript** 63:6 | 64:2,4,6 65:9 | 67:17 |
| 37:20 | 18:14 | 70:9 | 65:11,12,13 | **understand** 22:2 |
| **terms** 36:22 | **thoughtful** 68:11 | **transferred** | 66:8,10,12 | 23:4 48:20,21 |
| 43:22 | **three** 5:15 52:14 | 39:15 | 69:3,6,8 | 53:21 |
| **terror** 25:6,9,10 | 53:1 54:3 | **transpired** 36:14 | **Trustees** 1:1,12 | **understood** 42:7 |
| 26:3 | 62:22 | **transpose** 34:20 | 2:7 7:11 8:2,9 | **unmarked** 42:8 |
| **terrors** 25:21 | **thrust** 12:21 | **trauma** 44:6 | 49:2 | **unrestricted** |
| 26:9 | **time** 3:1,7 6:14 | 54:5 56:14 | **try** 12:8 20:21 | 32:5 |
| **testified** 12:3 | 6:14,17 8:8 | **traumatic** 10:15 | 23:4 36:20 | **unsuccessful** |
| | | | | 51:8 |

Brianna Tedesco Disability Application
March 17, 2021

82

| | | | | |
|---|---|---|---|---|
| **upcoming** 53:4 | 39:17 40:14 | **Westcott** 1:20 | **written** 7:4 | **2** |
| **use** 14:17 23:10 | 48:16 49:10,12 | 3:10,12,13 | **wrong** 20:9 42:4 | **2(c)(11)** 7:1 |
| **user** 68:9 | 56:18 64:16,19 | 8:16,17 54:18 | **wrote** 42:13 | **2(c)(4)** 7:1 63:2 |
| **utilized** 5:7 | 68:1 | 54:20 64:2,3 | | 63:18,21 65:17 |
| | **wanted** 17:2 | 65:7,9,10,20 | **X** | **2/3** 38:21 |
| **V** | 49:8 50:7 | 66:10,11 69:1 | | **2:33** 64:21 |
| **vacuum** 30:5,10 | **wants** 31:18 | 69:6,7 | **Y** | **2017** 34:18,22 |
| **various** 28:2 | **warning** 18:5 | **whatnot** 40:22 | **yeah** 24:2 29:3 | **2018** 10:10,19,22 |
| **vehicle** 13:14 | **washroom** 14:18 | **willing** 40:8,13 | 30:4 56:17 | 12:21 14:13 |
| 28:8 41:14,17 | **wasn't** 19:5 26:5 | 53:17 62:2 | **year** 13:19 34:19 | 15:8 25:22 |
| 41:19 42:12,17 | 42:6,16 60:13 | 68:17 | 44:22 50:21 | 26:2 34:17 |
| 42:21 43:9 | **watch** 22:20 | **willingness** 4:10 | 51:3 | 35:2,14 36:16 |
| **Vehicles** 15:17 | **watching** 42:14 | **window** 41:20 | **years** 39:5 60:19 | 38:3 51:5 57:3 |
| 28:5 | **way** 5:3 10:3 | **wish** 54:21 | | 60:7 61:17 |
| **verbal** 18:5 | 18:7 24:8 | **witness** 6:2 | **Z** | **2019** 36:10,16,21 |
| **verifying** 48:11 | 25:12 46:11 | 11:14,21 12:2 | **zappers** 22:21 | 37:11 39:19 |
| **versa** 42:1 | 48:1 64:18 | **witnesses** 6:7,18 | **zapping** 22:22 | 50:21 |
| **vibrating** 22:22 | **we'll** 12:7 40:21 | 58:8,12 | 22:22 | **2020** 34:7 38:15 |
| **vice** 42:1 | 50:21 64:7,18 | **woken** 41:19 | **Zoom** 4:13,22 | **2021** 1:11 3:2 |
| **video** 9:11,17 | 66:7 67:10,14 | **wondering** | 10:2 | **2100** 2:4 |
| 13:6,8 41:5 | 69:3 | 19:18 54:7 | | **21st** 36:1 |
| 60:16 64:11 | **we're** 4:13 10:8 | **word** 23:9,10,14 | **0** | **22nd** 21:7 |
| **view** 36:14 | 40:7,13 64:21 | **work** 10:2,17 | **084-001205** 1:14 | **26th** 10:10,19,22 |
| **Village** 35:11 | 65:14 69:9 | 11:2 16:2 17:5 | 70:16 | 12:21 14:13 |
| 47:16 | **weak** 19:18 24:7 | 17:16 20:21 | | 15:8,12 25:22 |
| **visit** 42:2 | 24:11 | 21:2 37:6 39:2 | **1** | 26:2 35:14 |
| **vote** 7:9 65:9 | **weapon** 46:4,4 | 40:10 47:14 | **1** 9:2,7 32:13 | 36:15 57:3 |
| 66:7 69:3 | **wear** 31:2 | 48:1 55:19 | **1:00** 1:11 20:5 | 60:6 61:17 |
| **voted** 3:17 | **wedding** 49:7 | 57:14 61:7 | **1:23** 3:1 | **29** 33:22 |
| **vulnerable** | **Wednesday** 3:2 | 62:2,3 67:10 | **100** 40:9 | |
| 29:10,12 | **week** 26:4,10 | **Workers'** 38:2 | **110** 2:4 | **3** |
| | 27:11,12 44:5 | 62:1 | **115** 48:9 | **3** 3:22 8:2 |
| **W** | 44:6,7 47:6 | **working** 13:2 | **12** 7:7 | **3:00** 14:17 |
| **wait** 40:8 52:11 | **weekly** 25:2,4 | 41:12 61:18 | **12-hour** 17:18 | **3:07** 69:10 |
| 52:13 | **weeks** 35:21 | **works** 51:9 | **12413** 2:10 | **312)372-6651** |
| **waiting** 14:20 | 37:5 | **worse** 10:12 | **15** 9:2,7 | 64:15 |
| **wake** 18:14 | **weeks'** 67:9 | **worsening** 53:6 | **15th** 34:18 39:18 | |
| 25:15,17,19 | **Wendell** 1:18 | 53:11,12 | **16** 9:10,18 | **4** |
| **walk** 17:10,14 | 3:16,20 | **worthy** 55:3 | **17** 1:11 40:14 | **4th** 30:19,21 |
| 50:4 | **went** 14:17 | **wouldn't** 61:18 | **17th** 3:2 | 51:4 |
| **walked** 42:11 | 36:19 37:8 | **wreck** 56:14,15 | **18** 36:1 49:17 | |
| **walking** 43:16 | 45:13 51:2 | 57:1 | **18th** 34:16 35:2 | **5** |
| **want** 4:14 9:8 | 53:14 | **wrestling** 59:10 | 36:21 | **50** 48:13 67:17 |
| 26:4 34:15 | **weren't** 35:8 | 60:13 | **1SE** 2:10 | |

County Court Reporters, Inc.
630.653.1622

Brianna Tedesco Disability Application
March 17, 2021

83

| **6** | | | | |
|---|---|---|---|---|
| **60** 37:21 | | | | |
| **60062** 2:5 | | | | |
| **60463** 2:11 | | | | |
| **66** 38:21 | | | | |
| **7** | | | | |
| **7/26** 49:17 | | | | |
| **7/26/18** 9:12 | | | | |
| 41:7 | | | | |
| **708)761-9030** | | | | |
| 2:11 | | | | |
| **8** | | | | |
| **847)666-5680** | | | | |
| 2:5 | | | | |
| **9** | | | | |
| **9th** 13:18 | | | | |

# EXHIBIT 2

## BEFORE THE BOARD OF TRUSTEES OF
## THE LAKEMOOR POLICE PENSION FUND

IN THE MATTER OF THE      )
DISABILITY PENSION OF:     )
                           )
     BRIANNA TEDESCO,     )
                           )
     Applicant.          )

## DECISION AND ORDER

The Board of Trustees of the Lakemoor Police Pension Fund ("Pension Board"), pursuant

to the statutory authority set forth in Article 3 of the Illinois Pension Code, 40 ILCS 5/3-101, *et*

*seq.*, renders the following decision concerning the application of Patrol Officer Brianna Tedesco

(A/K/A McCarty) ("Applicant") for a disability pension.  Applicant seeks a line-of-duty

disability pension pursuant to 40 ILCS 5/3-114.1, or, in the alternative, a not-on-duty disability

pension pursuant to 40 ILCS 5/3-114.2. (Tr. p. 39-40).[1]  The Pension Board held a hearing in

this matter on March 17, 2021. (Tr. p. 1).  Applicant was represented by legal counsel

throughout the entirety of these proceedings. (Tr. p. 4).

The Pension Board has carefully considered all of the evidence that was elicited at the

hearing and has reviewed all of the exhibits that were made part of the administrative record.  All

of the arguments made by Applicant and the documentation submitted have been considered by

the Pension Board.  To the extent that any arguments, findings, and conclusions submitted by

Applicant are in accordance with the findings, conclusions, and views stated herein, they have

been accepted.  To the extent that the testimony of witnesses or documentation submitted is not

in accord with the findings herein, such testimony or documentation is not credited.

---

[1] References to testimony from the transcript of the hearing will be cited as (Tr. p. __).  References to relevant exhibits from the Administrative Record will be cited as (Bd. Ex. #__), with possible reference to the page number of each exhibit as (R __).

**A.**

## STATUTES TO BE CONSTRUED

The following provisions of the Illinois Pension Code apply in this case:

### 40 ILCS 5/3-114.1 – Disability Pension – Line of Duty

If a police officer as the result of sickness, accident or injury in or resulting from the performance of an act of duty, is found to be physically or mentally disabled of service in the police department, so as to render necessary his or her suspension or retirement from the police service, the police officer shall be entitled to a disability retirement pension equal to the greatest of (1) 65% of the salary attached to the rank on the police force held by the office rat the date of suspension of duty or retirement, (2) the retirement pension that the officer would be eligible to receive if he or she retired (but not including any automatic annual increase in that retirement pension), or (3) the pension provided under subsection (d), if applicable. A police officer shall be considered "on duty" while on any assignment approved by the chief of the police department of the municipality he or she serves, whether the assignment is within or outside the municipality.

### 40 ILCS 5/3-114.2 – Disability Pension – Not on duty

A police officer who becomes disabled as a result of any cause other than the performance of an act of duty, and who is found to be physically or mentally disabled so as to render necessary his or her suspension or retirement from police service in the police department, shall be entitled to a disability pension of 50% of the salary attached to the officer's rank on the police force at the date of suspension of duty or retirement.

### 40 ILCS 5/3-115 – Certificate of Disability

A disability pension shall not be paid unless there is filed with the board certificates of the police officer's disability subscribed and sworn to by the police officer if not under legal disability, or by a representative if the officer is under legal disability, and by the police surgeon (if there be one) and 3 practicing physicians selected by the board. The board may require other evidence of disability.

### 40 ILCS 5/5-113 – Act of Duty

"Act of duty": Any act of police duty inherently involving special risk, not ordinarily assumed by a citizen in the ordinary walks of life, imposed on a policeman by the statutes of this State or by the ordinances or police regulations of the city in which this Article is in effect or by a special assignment; or any act of heroism performed in the city having for its direct purpose the saving of the life or property of a person other than the policeman.

**B.**

## ISSUES TO BE DECIDED

In reaching its decision in the case, the Board must decide the following issues:

(A)    Is Applicant mentally disabled from service in the Lakemoor Police Department ("Department")?

(B)    If so, was her disability caused by an act of duty?

**C.**

## FINDINGS OF FACT

Based on a preponderance of the evidence, the Pension Board makes the following factual findings:

1) The Pension Board held a hearing to adjudicate Applicant's disability claim on March 17, 2021. The Pension Board convened in person with Applicant and her attorney appearing by Zoom. (Tr. p. 1, 4-5).

2) Applicant was represented by attorney Keith Karlson at the hearing. (Tr. p. 4).

3) Pension Board Exhibits one (1) through sixteen (16) were admitted into evidence at the hearing without objection. This includes, as Board Exhibit 16, a video of the July 26, 2018 officer-involved shooting ("OIS") incident involving Applicant. (Tr. p. 9).

4) Applicant entered into evidence the Collective Bargaining Agreement as Exhibit seventeen (17) at the hearing without objection. (Tr. p. 40).

5) Applicant's disability claim is based on her mental condition. (Tr. p.39).

6) Applicant asserts that she has post-traumatic stress disorder ("PTSD") and anxiety with depressive features, both of which derive from the OIS that occurred on July 26, 2018. (Tr. p. 10).

7) Applicant has treated with multiple mental health professionals. (Tr. p. 13, 22).

8) Applicant's diagnoses include, but are not limited to, PTSD, depression, panic attacks, and anxiety. (Bd. Ex. #3, 7, 11, 13).

9) Applicant filed her disability pension application on April 15, 2019. (Tr. p. 39).

**Relevant Background & Work Status Information**

10) Applicant was twenty-nine years old on the date of the hearing. (Tr. p. 33).

11) Applicant is married with no children. (Tr. p. 34).

12) Applicant received her part-time appointment to the Department on June 15, 2017. (Tr. p. 54).

13) Applicant received her probationary appointment to the Department on June 18, 2018. (Tr. p. 54).

14) Applicant was not subjected to a pre-employment fitness for duty examination or a pre-employment physical exam when she started with the Department. (Tr. p. 35).

15) Applicant's rank the last time she was on unrestricted duty was Patrol Officer. (Tr. p. 34).

16) The Department's job description requires a Patrol Officer to:

- "Patrol[] the city in a patrol car on assignment for the purpose of observing area of possible criminal activity or other conditions that might endanger public safety...."
- "[H]ave [the] ability to safely operate vehicle both day and night and observe criminal activity."
- "Apprehend[], arrest[], and detain[] criminal suspects and law violators when necessary."

4

- "[H]ave strength, coordination, and visual ability to effectively shoot a handgun and shotgun."
- "Work[] in stressful, high risk situations."
- "[B]e able to handle stress, noise, crowds, fights, gunfire, and disciplinary action without emotional interference."
- "Take[] active charge in serious or unusual situations."
- "Make[] decisions at crime scene which may be centered around life-or-death situations; decisions are based on the safest procedures to be followed to ensure safety to individuals involved and fellow officers." (Bd. Ex. #5, R 269-70).

17) Applicant was terminated from the Department in August of 2019. (Tr. p. 36).

18) Applicant filed a Worker's Compensation claim relating to the incident which she alleges caused her disability. The status of that claim remained pending as of the disability hearing date. (Tr. p. 38).

19) Applicant received PEDA benefits for the incident which she alleges caused her disability. Those benefits expired in August of 2020. (Tr. p. 38).

20) Applicant has been receiving temporary total disability payments representing 66 2/3 percent of her salary since August 2020. Applicant continued to receive those benefits at the time of the hearing. (Tr. p. 38).

### Applicant's April 21, 2018 Incident

21) On April 21, 2018, at approximately 9:00 pm, Applicant pulled over a vehicle that was swerving. The driver was not intoxicated but was unable to drive. The driver's husband was called to pick her up. Applicant waited in her squad car with her lights on for the husband to arrive. While waiting for the husband, Applicant's squad car was struck from behind by a drunk driver. Applicant was thrown from the car. (Bd. Ex. #5, R 284).

22) Applicant was diagnosed with a concussion and was off from work while recovering for approximately six weeks. This was the only gap in her employment with the Department prior to the OIS in July 2018. (Tr. p. 35-36).

23) Applicant was offered a full-time position with the Department upon returning. (Tr. p. 36).

24) When Applicant returned to work following the April 2018 incident, she began to experience heightened levels of anxiety and nervousness not rising to the level of PTSD. (Bd. Ex. #5, R 284).

### The July 26, 2018 Officer Involved Shooting Incident

25) The July 26, 2018, officer involved shooting is described, in pertinent part, by Chief Dave Godlewski:

"[A]t approximately 5:00 am Applicant and Officer Loiacono became involved in a deadly force encounter with a subject wanted for murder out of Pennsylvania. While on routine patrol, Applicant observed a car backed into a gravel service road leading back to the Lakemoor Golf Course. The vehicle had no front license plate, so Applicant called it in and exited her car to investigate. The offender was asleep in his car. Applicant began to question him as to why he was in this particular area. Applicant then walked to the back of the vehicle to read and call in the license plate. After a brief conversation with the offender, he produced a handgun and pushed the gun into Applicant's chest. Applicant instinctively grabbed the barrel of the handgun and pushed it away from her at which time she heard several "hammer strikes" as the offender pulled the trigger at least twice. The two continued to struggle over control of the handgun and the offender continued to attempt to fire the weapon at Applicant. Officer Loiacono arrived as Applicant and the offender were engaged in the fight over the gun and he also observed the offender raising a second weapon with his other hand. It was at that point that Officer Loiacono took one step to his right to

get a clear field of fire and discharged one round from his duty pistol which immediately killed the offender and ended the confrontation." (Bd. Ex. #4 R 53).

### Applicant's Relevant Testimony at the March 17, 2021 Hearing

26) Applicant began treatment with psychotherapist Dr. Carrie Steiner on August 9, 2018 as mandated by the Department. (Tr. p. 13).

27) Applicant continued treatment with Dr. Steiner until November 2018. (Bd. Ex. #2, R 24).

28) Applicant verifies the accuracy of Dr. Steiner's therapy notes. (Tr. p. 14); *see also* (Bd. Ex. #2).

29) Applicant testified that her post-incident anxiety attacks began the night of the incident at 3:00 am after she was back at her home. In that attack, Applicant was unable to catch her breath, her limbs went numb, her stomach knotted up, and when she finally caught her breath, she was sobbing. (Tr. p. 14-15).

30) Applicant stated that she had never had an anxiety attack prior to the July 26th, 2018 incident. (Tr. p. 15).

31) Applicant stated that her anxiety-inducing triggers include: the darkness of night, loud noises, vehicles parked in strange locations, seeing other officers perform traffic stops, male drivers, and situations in which she could not anticipate what would happen next. (Tr. p. 15).

32) Applicant testified that she was cleared by Dr. Steiner to resume unrestricted duty as a patrol officer, with some restrictions. (Tr. p. 17).

33) Applicant testified that once she was back on patrol, she could not perform traffic stops or clear buildings because she could not function in the darkness of the night. (Tr. p. 18).

34) As a result, Applicant stated that she realized returning to duty was not a good idea. She stated there were many reasons that led her to this conclusion; one such reason is that due to the

nature of the Department's 12-hour shift schedule, working in the darkness of night was unavoidable. She stated that she would park in a gas station parking lot because it was well-lit and that the darkness of the night would otherwise paralyze her in fear. (Tr. p. 17).

35) Applicant described numerous other situations in which her fear and anxiety significantly hindered her ability to perform her job. (Tr. p. 18).

36) Applicated testified that her inability to adequately perform her duties put members of the public, herself, and her co-workers at risk. Applicant stated specifically that "If I'm not able to respond appropriately or keep my body...and my mind in control during these activities, that certainly puts my partner at risk because then I can't do what I need to do for them and for the community." (Tr. p. 20).

37) On September 22, 2018, Dr. Steiner decided to put Applicant back on light duty because she realized Applicant was not ready to return to working on the street as a patrol officer. (Tr. p. 21).

38) In November 2018, Applicant discontinued seeing Dr. Steiner and began seeing Dr. Robin Kroll for psychotherapy treatment related to her PTSD. (Tr. p. 21-22).

39) Treatment with Dr. Kroll included Eye Motion Desensitization ("EMDR") and relaxation techniques. Applicant testified that these techniques have helped. (Tr. p. 22).

40) Applicant defined her "triggers" as a stimulus which provokes a physical response. She explained that these responses vary in both type and severity ranging from a change in breathing, on the mild end of the spectrum, to an anxiety or panic attack, on the extreme end. (Tr. p. 23).

41) Applicant stated that she suffers from anxiety every day and that she experiences anxiety/panic attacks less often, weekly, depending on what she is exposed to. (Tr. p. 24).

42) Applicant stated that she also suffers from "night terrors," described as nightmares in which she is in danger; a situation in which someone is trying to kill her or where she will die at the end of the nightmare. Applicant stated she wakes up from the nightmare sweating, out-of-breath, and disoriented, not knowing where she is. (Tr. p. 25).

43) Applicant testified that she had not suffered from night terrors prior to the July 26, 2018 incident. She stated these began within the first week after the incident and occur once a week. (Tr. p. 26).

44) Applicant testified that she also suffers from having flashbacks of specific moments from the shooting five days a week, multiple times throughout the day. Applicant described these as "a few specific moments from the shooting that replay non-stop" with the moment in which the suspect's gun came to her forehead being the one that occurs most frequently. (Tr. p. 26-27).

45) Applicant stated that these flashbacks "just happen" without explanation; there is no triggering event that causes them to occur. (Tr. p. 27).

46) Applicant described her other physiological symptoms and triggers which include loud noises, being alone, seeing an offer performing an act of duty, seeing someone's eyes, and seeing an individual that looks like the shooter. (Tr. p. 28).

47) Applicant described with specificity how her fear of the darkness has impacted her daily life. Applicant won't go out at night alone, she won't go in her basement at night, and her home security system has to be armed in order for her to sleep. In general, she avoids darkness. (Tr. p. 28).

48) Applicant also testified that being alone, like she was on the night of the incident, is a trigger. She stated that she feels vulnerable and that she questions her ability to be able to do what is necessary if the situation arises. (Tr. p. 29).

49) Applicant testified that she must be able to hear what is going on in case someone tries to break into her home and because of this she avoids certain parts of her home. She testified that a sudden loud noise, even when expected, has led to her having a "full-blown anxiety attack" and that she avoids loud noises altogether. (Tr. p. 30).

50) Applicant testified that she doesn't believe she can ever again perform the full and unrestricted duties of a police officer. Applicant explained that due to her triggers she could not perform the job safely and effectively and feels like she would be putting her partners and the community at risk. (Tr. p. 32).

51) Applicant continues to seek psychotherapy treatment twice a week. (Tr. p. 44).

52) Applicant is not aware of any permanent, full-time light duty positions within the Department. She had a light duty position, but she was told that it was temporary and would not be allowed to continue. No permanent, full-time light duty position was ever offered. (Tr. p. 37, 57).

53) Applicant testified that she requested to be able to work only during the daytime hours but that the Department denied this request. (Tr. p. 57).

### Medical Records of Treatment Following the July 26, 2018 Incident

#### 1. Dr. Carrie Steiner: First Responders Wellness Center

54) On August 9, 2018, Applicant began treatment with Dr. Carrie Steiner at the First Responders Wellness Center. Dr. Steiner evaluated Applicant and concluded that Applicant should not return to work at that time due to her common trauma responses. Dr. Steiner also wrote that Applicant should be re-evaluated before returning to work in the future. (Bd. Ex. #2, R 20).

55) On August 16, 2018, Applicant was again seen by Dr. Steiner. Dr. Steiner noted that Applicant had acute stress disorder due to the events that occurred on July 26, 2018. Due to Applicant's ongoing trauma symptoms, Dr. Steiner recommended that Applicant should not go back to work at that time. Dr. Steiner also encouraged Applicant to try EMDR to decrease her symptoms and educated Applicant about this technique. (Bd. Ex. #2, R 20).

56) On August 23, 2018, Applicant visited Dr. Steiner. Dr. Steiner noted that Applicant reported a decrease in the intensity and duration of her symptoms and expressed a desire to return to work. Dr. Steiner noted, however, that due to the continuation of her symptoms Applicant should not return to work. Instead, Dr. Steiner would reassess Applicant on September 4, 2018 for a possible return to light duty. (Bd. Ex. #2, R 20-21).

57) On September 4, 2018, Applicant reported to Dr. Steiner that she was feeling better and was ready to return to work. Dr. Steiner feared this was an attempt by Applicant to deny her symptoms in order to return to work. Due to Applicant's lack of reported symptoms, Dr. Steiner suggested Applicant was able to return to work light duty. However, at the urging of Applicant, Dr. Steiner wrote a letter recommending Applicant return for full duty. (Bd. Ex. #2 R 21).

58) On September 28, 2018, Dr. Steiner noted that Applicant had participated in a group debriefing. After the debriefing, the Department Chief shared concerns about Applicant to Dr. Steiner. The Chief told Dr. Steiner that unnamed coworkers of Applicant reported that Applicant was not responding to calls for service very quickly. Additionally, an unnamed male coworker reported directly to Dr. Steiner that he felt that Applicant needed help. Applicant told him "she was going to say she is fine so that she could return to work," but the male coworker felt that she was not and should not return to work. Additionally, Applicant had requested that she only work the day shift. (Bd. Ex. #2, R 21-22).

11

59) The Chief then suggested, and Dr. Steiner agreed, that Applicant be taken off of work in order to be further assessed. Dr. Steiner thus restricted Applicant from working, pending evaluation at a future visit. Applicant was very upset about this decision. (Bd. Ex. #2, R 21-22).

60) On October 4, 2018, Applicant visited Dr. Steiner, who decided that Applicant was not ready to return to full duty. However, Dr. Steiner did recommend Applicant return to light duty in order to assess her ability to return to full duty in the future. (Bd. Ex. #2, R 22).

61) On October 10, 2018, Applicant saw Dr. Steiner and reported that she had no issues working light duty. Applicant expressed a strong desire to return to full duty. Applicant underwent EMDR therapy with Dr. Steiner who noted that progress was made. Applicant remained on light duty. (Bd. Ex. #2, R 22).

62) On October 15, 2018, Applicant again received EDMR therapy from Dr. Steiner. Dr. Steiner noted progress, but Applicant remained on light duty. (Bd. Ex. #2, R 23).

63) On October 18, 2018, Applicant received EDMR therapy from Dr. Steiner who noted positive progress. Due to this continued progress, Dr. Steiner recommended that Applicant return to full and unrestricted duty. (Bd. Ex. #2, R 23).

64) November 8, 2018 was Applicant's last visit with Dr. Steiner. Dr. Steiner felt that Applicant may be underreporting symptoms, however, Dr. Steiner stated that Applicant had completed therapy at that time. (Bd. Ex. #2, R 24).

## 2. Dr. Robin Kroll Psy D BCIA

65) On November 26, 2018, Applicant began treatment with Dr. Kroll for Chronic PTSD resulting from the officer involved shooting that occurred on July 26, 2018. (Bd. Ex. #3, R 35).

66) Dr. Kroll performed an evaluation and a Quantitative Electroencephalography (qEEG). (Bd. Ex. #3, R 31).

67) Dr. Kroll diagnosed applicant with anxiety mixed with depressive features and PTSD. (Bd. Ex. #3, R 31).

68) On March 19, 2019, Dr. Kroll wrote to the Department Chief and recommended that Applicant be placed on limited/light duty while she continued her therapy. This recommendation was made due to Applicant's struggles in performing her duties, in particular, as it related to her fear of making traffic stops, working at night, and not feeling confident in drawing her weapon. (Bd. Ex. #3, R 35).

69) On April 2, 2019, Dr. Kroll provided a progress report to the Department Chief. Dr. Kroll stated that Applicant had participated in thirteen (13) individual therapy sessions and one (1) group session with an additional group session scheduled for April 12, 2019. Dr. Kroll noted that Applicant had been compliant and motivated to return to work but that she was still experiencing significant symptoms of anxiety and PTSD. Applicant remained on light duty. (Bd. Ex. #3, R 36).

70) On April 29, 2019, Applicant emailed Dr. Kroll stating that she believed it in her best interest not to return to unrestricted duty at that time. Applicant outlined her reasoning in detail: she stated that the continuation of her fear, anxiety, and PTSD from the officer involved shooting made the effective performance of her job as a patrol officer impossible. Applicant informed Dr. Kroll and the Department Chief that she would be applying for disability. (Bd. Ex. #3, R 32).

71) On May 30, 2019, Dr. Kroll provided a progress report to the Chief. Dr. Kroll stated that Applicant had been compliant with her therapy and had participated in twenty (20) individual therapy sessions and three (3) group sessions. However, due to the concerns raised by Applicant and the continuation of her symptoms, Dr. Kroll recommended that Applicant go on duty-disability. (Bd. Ex. #3, R 41).

**Independent Medical Evaluation Findings**

72) Pursuant to 40 ILCS 5/3-115, Applicant underwent independent medical evaluations

("IMEs") by four (4) independent medical examiners who were asked to certify whether she is

currently disabled from service as a police officer, and if so, the cause of her disability. Those

providers were: Dr. Tony Fletcher, Dr. Stephen Dinwiddie, Dr. Henry Conroe, and Dr.

Alexander Obolsky.

73) Applicant appeared before Dr. Tony Fletcher on January 11, 2020. Dr. Fletcher opined in

pertinent part as follows:

> "Applicant developed mild symptoms consistent with an Acute
> Stress Disorder following the April 12, 2018 incident in which she
> was struck from behind by a drunk driver while sitting in her squad
> car. However, she developed symptoms consistent with PTSD
> almost immediately after the July 26, 2018 shooting incident. The
> result of her psychological testing is consistent with individuals who
> have PTSD as well as ongoing depression and anxiety. She
> continues to experience symptomology [of PTSD] at a disabling
> level that renders her unable to currently perform her duties as a
> police officer. The cause of her PTSD is the July 26, 2018 shooting
> event." (Bd. Ex. #7, R 286).

74) Applicant appeared before Dr. Stephen Dinwiddie on February 18, 2020. Dr. Dinwiddie

opined in pertinent part as follows:

> "Her diagnosis is Other Specified Trauma – and Stressor-related
> Disorder. [T]his category applies to presentations in which
> symptoms characteristic of a trauma-and stressor-related disorder
> that cause clinically significant distress or impairment in social,
> occupational, or other important areas of functioning ... but do not
> meet the full criteria for any of the disorders of the class [e.g.,
> PTSD]. To the extent that Applicant can be considered disabled
> from working as a police officer, the officer-involved shooting of
> July 26, 2018 likely caused certain anxiety-related symptoms and
> either caused or exacerbated others, specifically, difficulty in
> driving at night and making traffic stops." (Bd. Ex. #9, R 338-44).

75) Applicant appeared before Dr. Henry Conroe on February 25, 2020. Dr. Conroe opined in pertinent part as follows:

> "[Applicant] suffers from PTSD which prevents her from performing the full and unrestricted duties of a police officer. I base this on the traumatic event that occurred on July 26, 2018 that threatened her life with death or serious injury. The PTSD affects her ability to handle stressful situations safely and effectively, to make appropriate stops of citizens, and to react without hesitance to dangerous situations or ones that are potentially so. I saw no evidence that her feelings about the department caused or contributed to her disability or caused her to magnify symptoms. In my opinion, I don't see additional treatment as likely allowing her to resume full duty as a police officer." (Bd. Ex. #11, R 383-86).

76) Applicant appeared before Dr. Alexander Obolsky on June 30, 2020. Dr. Obolsky opined in pertinent part as follows:

> "It is my opinion that Applicant exhibits the condition of PTSD. Applicant's PTSD is a disabling condition that prevents the applicant from performing the full and unrestricted duties of a police officer. The combination of the traumatic events of the April 21, 2018 motor vehicle collision and July 26, 2018 shooting incident led to Applicant's PTSD. Applicant did not experience a preexisting condition of mental ill-being. After the April 2018 motor vehicle collision, Applicant developed partial symptom of other specified trauma-related disorder. After the July 2018 shooting, Applicant developed PTSD. There is no evidence that Applicant's feelings of not being supported by her department caused or contributed to her disability." (Bd. Ex. # 13 R 400, 419-426).

77) None of these providers cited a specific future treatment that would offer a reasonable likelihood of allowing Applicant to resume unrestricted police duty.

## D.

## ANALYSIS

Initially, it must be remembered that an administrative proceeding is not a partisan proceeding with the agency on one side arrayed against the individual on the other. *Abrahamson*

*v. Illinois Department of Professional Regulation*, 153 Ill. 2d 76, 94 (1992). Rather, it is an administrative investigation instituted for the purpose of ascertaining and making findings of fact. *Id.* Due to their personal knowledge of the peculiar physical and emotional demands of being a police officer, the members of the police pension board are in the best position to determine whether an applicant is fit for duty or qualified for membership or benefits. *Sanders v. Springfield Police Pension Fund*, 112 Ill. App. 3d 1087, 1091-92 (4th Dist. 1983). Moreover, it is particularly within the province of the pension board to resolve conflicts in the evidence and to determine the credibility of witnesses. *Peterson v. Board of Trustees of the Des Plaines Fireman's Pension Fund*, 5 Ill. App. 3d 180, 185 (1st Dist. 1971). The courts do not substitute for that of the pension board in either of the above such matters. *Id.*

An applicant for a disability pension under Article 3 of the Illinois Pension Code bears the burden of proving her entitlement to a disability pension. *Marconi v. Chicago heights Police Pension Board*, 225 Ill. 2d 497, 532 (2006). In rendering its decision, pension board trustees must apply the law as set out in the Pension Code according to the statute's clear language and the legislature's intent. The elements that a police officer must prove in order to obtain a line-of-duty disability pension under Article 3 of the Illinois Pension Code are as follows:

1) The person is a police officer;

2) The police officer is physically or mentally disabled from the duties of a police officer as the result of sickness, accident or injury;

3) The sickness, accident or injury was incurred in or resulted from the performance of an act of police duty; and

4) The disability renders necessary the police officer being placed on disability pension.

*Wall v. Schaumburg Police Pension Board*, 178 Ill. App. 3d 438, 442 (1st Dist. 1988).

The Pension Board has carefully considered all of the evidence and Applicant's testimony in this matter. The Pension Board finds that Applicant has proven all of the elements necessary for a line-of-duty disability pension.

### 1. Applicant was a police officer at the time of her claim

First, there is no dispute that Applicant was a police officer as defined under Article 3 of the Pension Code at the time she submitted her disability application. Applicant submitted her application before she separated from service. Therefore, the Pension Board finds that Applicant has satisfied the first element necessary to obtain a line-of-duty disability pension.

### 2. Due to her PTSD, Applicant is mentally disabled from the duties of a police officer

Second, the Pension Board finds that Applicant has proven, by a preponderance of the evidence, that she is mentally disabled from the duties of a police officer due to her PTSD. As an initial matter, the Pension Board finds that Applicant was a credible witness. Applicant truthfully and honestly described her symptoms as she experienced them. The Pension Board does not believe she was misleading, misdescribing, or exaggerating what she had experienced and is experiencing.

*A. The evidence from medical providers supports the conclusion that Applicant is disabled*

The Pension Board's conclusion that Applicant is mentally disabled is supported by three of the four IME providers. Dr. Fletcher, Dr. Conroe, and Dr. Obolsky all concluded that Applicant continues to experience symptoms of PTSD at a disabling level. They all concluded that this level of symptoms renders Applicant unable to perform her duties as a police officer. Dr. Conroe more specifically wrote that Applicant's PTSD would affect her ability to handle stressful situations safely and effectively. The Pension Board finds these conclusions persuasive

17

and well-reasoned, and gives them great weight. The Pension Board accords less weight to the opinions in Dr. Dinwiddie's IME report. While Dr. Dinwiddie did diagnose Applicant with a mental injury – other specified trauma-and stressor-related disorder – he offered an unclear opinion as to whether this diagnosis prevented Applicant from performing her duties as a police officer. This contrasts with the clear opinions of the other three IME providers.

The Certificate of Disability provision in Article 3 of the Pension Code, 40 ILCS 5/3-115, does not require a unanimous finding of disability among the IME providers in order for an applicant to prevail on a claim for a disability pension. *Wade v. North Chicago Police Pension Board*, 226 Ill. 2d 485, 511-15 (2007). The Pension Board is persuaded by the opinions of Drs. Fletcher, Conroe, and Obolsky, who all agreed that Applicant's PTSD affects her ability to handle stressful situations safely and effectively disables her from performing unrestricted police officer duties.

The Pension Board also notes that Dr. Kroll, one of Applicant's treating providers, opined that Applicant should not return to unrestricted police duty. Dr. Steiner reached the opposite conclusion, but Applicant's treatment with Dr. Kroll is more recent. For that reason, it is a better measure of Applicant's current mental fitness for police duty. Dr. Kroll recommended duty disability for Applicant, and the Pension Board notes its agreement.

### B. Applicant's testimony supports the conclusion that Applicant is disabled

Applicant's testimony—which, again, the Pension Board credits as accurate—shows that she is disabled from unrestricted police work due to her mental condition. Unrestricted police work with the Department requires Applicant to patrol the city in a patrol car at all hours, including at night; observe criminal activity; detain criminal suspects; effectively shoot a handgun and shotgun; work in stressful and high-risk situations; and handle stress, noise, crowds,

fights, gunfire, and other occurrences without emotional interference. Applicant has described overwhelming anxiety and sensory issues that prevent her from performing the above-described duties. Applicant stated that her anxiety-inducing triggers include the darkness of night, loud noises, vehicles parked in strange locations, seeing other officers perform traffic stops, male drivers, and situations in which she could not anticipate what would happen next. Applicant would inevitably encounter these triggers on a regular basis when performing unrestricted police duty. When triggered, her reaction can be as severe as a panic attack. Suffice it to say, she could not respond appropriately while having such a reaction.

Applicant attempted to return to unrestricted duty without success. In light of her mental condition, this is not surprising. Applicant provided a detailed account of this experience and the corresponding fear and anxiety that resulted in her inability to effectively perform the job. For example, in order to avoid darkness, she often found herself parked in lighted parking lots. Additionally, Applicant testified that she could not perform traffic stops or clear buildings. If she returned to unrestricted police duty, Applicant would not always be able to avoid these triggers. Ultimately, Applicant felt that she would put the public, her partner, and herself at risk if she returned. The Pension Board agrees and finds her disabled.

### C. Conclusion on the issue of disability

Therefore, based upon the medical providers' opinions and Applicant's testimony, the Pension Board finds that Applicant's mental state could easily and foreseeably interfere with her ability to make the split-second decisions necessary to perform the duties of a police officer. As a result, Applicant is mentally disabled from unrestricted police duty. The Pension Board finds that Applicant has satisfied element #2 of a line-of-duty disability pension claim.

### 3. Applicant's PTSD was caused by an "Act of Duty" involving a "Special Risk"

Third, the Pension Board finds that Applicant's injury was caused by or resulted from an act of duty involving special risk. *Johnson v. Retirement Board of Policemen's Annuity and Benefit Fund*, 114 Ill. 2d 518, 521-22 (1986). There are two issues embedded within this third element. First, was Applicant performing an "act of duty"? Second, does a causal relationship exists between the act of duty performed and Applicant's disabling condition?

*A. The incident occurred during an act of duty*

First, the Pension Board finds that Applicant was performing an "act of duty" when she sustained her injury. Article 3 of the Pension Code provides that a police officer "shall be considered 'on duty' while on any assignment approved by the chief of the police department of the municipality he or she serves, whether the assignment is within or outside the municipality." 40 ILCS 5/3-114.1. Elsewhere, Article 5 of the Pension Code describes specific actions that are "acts of duty" by providing that an act of duty is "[a]ny act of police duty inherently involving *special risk*, not ordinarily assumed by a citizen in the ordinary walks of life ... or any act of heroism performed in the city having for its direct purpose the saving of the life or property of a person other than the policeman." 40 ILCS 5/5-113 (emphasis added). This Article 5 definition applies in Article 3 cases. *Martin v. Board of Trustees of the Police Pension Fund of the Village of Shiloh*, 2017 IL App (5th) 160344, ¶ 17. The conduct need not be an inherently dangerous activity to constitute a "special risk." *Johnson*, 114 Ill. 2d at 521.

Here, Applicant was on duty the night of the July 26, 2018 incident. Applicant was on her Department-assigned routine patrol when she came across a parked vehicle without a front license plate that she deemed suspicious. Applicant was not at liberty to ignore the vehicle; she called it in and investigated. Her investigation led to a face-to-face, armed confrontation with a wanted murder suspect in which that individual pointed a gun at Applicant and attempted to kill

her. Any time an officer must approach an unknown individual in a vehicle, that is a "special risk" that is not encountered in civilian life. In this case, that special risk manifested itself in a life-threatening encounter. Therefore, the Pension Board finds that Applicant was engaging in an act of duty when she confronted the subject on July 26, 2018 and he tried to kill her. The Pension Board finds this was an on-duty action that involved special risk. As such, the Pension Board finds that the July 26, 2018 incident was an act of duty as defined by the Pension Code.

*B. Applicant's disabling condition was caused by this act of duty*

The Pension Board also finds that Applicant's disabling condition was caused by the officer-involved shooting on July 26, 2018. In *Johnson*, the Illinois Supreme Court held that a "duty disability is awarded when an officer is disabled as the result of injury incurred in the performance of an act of duty." *Johnson*, 114 Ill. 2d at 521. That is what occurred here.

Prior to the night of July 26, 2018, Applicant was on full and unrestricted duty. Applicant credibly testified, and the Pension Board finds, that Applicant had no relevant psychological condition prior to at least the April 2018 on-duty incident. At the time just before the July 2018 officer-involved shooting, Applicant had no significant mental health symptoms. The disabling symptoms related to Applicant's PTSD began immediately after the officer-involved shooting. Applicant described an anxiety attack less than 24 hours after the OIS, which was triggered by not being able to see if anyone was waiting for her behind the shower curtain at her home. Applicant also testified that she began suffering from night terrors for the first time within the first week following the incident.

The Pension Board's finding is supported by the conclusions of Applicant's treating physicians, Dr. Carrie Steiner and Dr. Robin Kroll, as well as three of the four IMEs: Dr. Fletcher, Dr. Conroe, and Dr. Obolsky. The Pension Board gives weight to these opinions. Dr.

21

Steiner stated that Applicant had not experienced her current symptoms prior to the incident and that her disorder is a result of "witnessing a killing and directly experiencing an attempted murder of her life." Dr. Kroll repeatedly connected Applicant's PTSD to the OIS. Dr. Fletcher concluded that Applicant developed PTSD shortly after the incident and that the cause of her PTSD was the July 26, 2018 incident. Dr. Conroe reached the same conclusion stating that "the documented threat to her life was of such severity that it led to the symptoms of [PTSD]." Dr. Obolsky also concluded that the July 26, 2018 incident caused Applicant's PTSD, writing, "Applicant did not experience a pre-existing condition of mental ill-being" and that "after the [July] 2018 shooting, Applicant developed PTSD."

The Pension Board acknowledges Dr. Dinwiddie's somewhat contrary conclusion. Dr. Dinwiddie wrote, "[T]o the extent that Applicant can be considered disabled from working as a police officer, the officer-involved shooting of July 26, 2018 likely caused certain anxiety-related symptoms and either caused or exacerbated others, specifically, difficulty in driving at night and making traffic stops." Dr. Dinwiddie also wrote went on to write that "Applicant's feelings of not being supported by her department exacerbated her symptoms." This latter conclusion finds little support elsewhere in the record and is not shared by the other three IME providers. In fact, Dr. Conroe and Dr. Obolsky specifically rejected this idea. Even Dr. Dinwiddie struggled to attribute Applicant's condition to something other than the OIS. The Pension Board therefore gives his conclusion little weight.

For these reasons, the Pension Board concludes that Applicant was injured during an act of duty, and that injury medically caused her disabling PTSD.

### 4. It is necessary to place Applicant on a disability pension

22

Finally, the Pension Board finds that it is necessary to place Applicant on a disability pension. In order for a police officer to be entitled to a disability pension, there cannot be available an existing full-time light duty position that he or she could perform. *Thurow v. Police Pension Board of Village of Fox Lake*, 180 Ill. App. 3d 683 (2nd Dist. 1989). Here, for a period of time, Applicant worked a daytime only light duty assignment. However, she was informed that that position was only temporary and would not be allowed to continue. There is no evidence that there is a full-time light duty position that Applicant could perform. Moreover, additional medical and psychological care *might* allow Applicant to return to unrestricted police duty. However, no medical provider cited a specific treatment that would offer a *reasonable likelihood* of returning her to duty. Therefore, the Pension Board finds that it is necessary to place her on a disability pension.

### 5. Conclusion to Analysis

Based on the aforementioned arguments and the totality of the evidence contained in the administrative record, the Pension Board finds that Applicant is entitled to a line-of-duty disability pension. Therefore, Applicant's application for a line-of-duty disability pension is GRANTED.

## E.

## CONCLUSIONS

1.     The Board of Trustees of the Lakemoor Pension Fund has jurisdiction over this subject-matter.

2.      Applicant, Patrol Officer Brianna Tedesco (McCarty), having been found eligible to apply for a disability pension, has met her burden of proof as it relates to her "line of duty" disability claim under section 3-114.1 of the Illinois Pension Code.

3.      Her pension shall be based upon 65% of Applicant's salary attached to rank effective the date of her removal from payroll, less all applicable offsets.

IT IS THEREFORE ORDERED:

(A)      That a warrant of payment be issued to Applicant, Patrol Officer Brianna Tedesco (McCarty), pursuant to 40 ILCS 5/3-133 of the Illinois Pension Code, stating Applicant's entitlement to a line of duty disability pension, less any applicable offsets, effective the date of her removal from payroll.

(B)      The line of duty disability pension shall commence as soon as administratively possible and remain effective until further order of the Pension Board.

## A. MOTIONS:

1. On March 17, 2021, Trustee Westcott made a motion, seconded by Trustee Lyons, to grant Brianna Tedesco's application for a line of duty disability pension pursuant to 40 ILCS 5/3-114.1. **Roll Call Vote:**

   **Ayes** – Westcott, Lyons, Russell.

   **Nays** – None.

   **Abstain** – None.

   **Absent** – None.

   **Motion Carried**.

2. On _August 4, 2021_, Trustee _Lyons_ made a motion, seconded by Trustee _Westcott_, to approve this written decision and order and certificate of payment. **Roll Call Vote:**

**Ayes** – _Russell, Lyons, Westcott_

**Nays** – _____

**Abstain** – _____

**Absent** – _____

**Motion Carried.**

**BOARD OF TRUSTEES OF THE
LAKEMOOR POLICE PENSION FUND**

_W. Russell_
Wendell Russell, President

_Kevin Lyons_
Kevin Lyons, Trustee

_Rocky Westcott_
Rocky Westcott, Trustee

DATED: _8/4/21_

**THIS IS A FINAL AND APPEALABLE DECISION. THIS DECISION CAN BE REVIEWED IN THE CIRCUIT COURT BY FILING A COMPLAINT FOR ADMINISTRATIVE REVIEW AND SERVING SUMMONS WITHIN 35 DAYS FROM THE DATE THAT A COPY OF THIS DECISION WAS SERVED UPON THE PARTY AFFECTED THEREBY. THE DATE OF SERVICE IS THE DATE SET FORTH IN THE CERTIFICATE OF SERVICE THAT THE COPY OF THIS DECISION WAS MAILED.**

**BEFORE THE BOARD OF TRUSTEES OF
THE LAKEMOOR POLICE PENSION FUND**

IN THE MATTER OF THE            )
DISABILITY PENSION OF:          )
                                )
    BRIANNA TEDESCO,         )
                                )
    Applicant.               )

**CERTIFICATE OF PAYMENT**

    Pursuant to sections 3-114.1 and 3-133 of the Illinois Pension Code (40 ILCS 5/3-114.1 and 40 ILCS 5/3-133), this is to certify that Applicant, Brianna Tedesco, is entitled to payment of a "Line of Duty" Disability Pension in accordance with the findings set forth in the attached written Decision and Order and Benefit Calculator Report retroactive to the date of her removal from the payroll, until further order by the Board of Trustees of the Lakemoor Police Pension Fund.

                **LAKEMOOR POLICE PENSION BOARD**

                Wendell Russell, President

                Kevin Lyons

DATED: 8/4/21

## BEFORE THE BOARD OF TRUSTEES OF
## THE LAKEMOOR POLICE PENSION FUND

| | |
|---|---|
| IN THE MATTER OF THE | ) |
| DISABILITY PENSION OF: | ) |
| | ) |
| BRIANNA TEDESCO, | ) |
| | ) |
| Applicant. | ) |

### CERTIFICATE OF SERVICE

I, <u>LAURA J. GOODLOE</u>, on oath, swear and affirm that I served a copy of the attached "Decision and Order" and "Certificate of Payment" upon the persons whose names are listed below by FIRST-CLASS MAIL and EMAIL this _11th_ day of _August_____, 2021.

To:    Brianna Tedesco
2313 Manor Lane
McHenry, IL 60051
tedescobm@gmail.com

Keith Karlson
12413 South Harlem Ave.
Suite 1SE
Palos Heights, IL 60463
KKarlson@karlsongarza.com

Laura J. Goodloe

*[X] Under penalties as provided by law pursuant to Section 1-109 of the Code of Civil procedure, the undersigned certifies that the statements set forth in this instrument are true and correct, except as to matters therein stated to be on information and belief and as to such matters the undersigned certifies as aforesaid that he verily believes the same to be true.*

27

# EXHIBIT 3

EEOC Form 5 (11/09)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA<br>☒ EEOC | 440-2020-03105 |

| ILLINOIS DEPARTMENT OF HUMAN RIGHTS | and EEOC |
|---|---|
| *State or local Agency, if any* | |

| Name *(indicate Mr., Ms., Mrs.)* | Home Phone | Year of Birth |
|---|---|---|
| MISS BRIANNA M TEDESCO | (708) 912-4242 | 1991 |

| Street Address | City, State and ZIP Code |
|---|---|
| 2313 MANOR LN,  MCHENRY, IL 60051 | |

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. *(If more than two, list under PARTICULARS below.)*

| Name | No. Employees, Members | Phone No. |
|---|---|---|
| VILLAGE OF LAKEMOOR | 15 - 100 | |

| Street Address | City, State and ZIP Code |
|---|---|
| 28581 ILLINOIS RT 120,  LAKEMOOR,  IL 60051 | |

| Name | No. Employees, Members | Phone No. |
|---|---|---|
| | | |

| Street Address | City, State and ZIP Code |
|---|---|
| | |

| DISCRIMINATION BASED ON *(Check appropriate box(es).)* | DATE(S) DISCRIMINATION TOOK PLACE |
|---|---|
| ☐ RACE  ☐ COLOR  ☒ SEX  ☐ RELIGION  ☐ NATIONAL ORIGIN<br>☐ RETALIATION  ☐ AGE  ☒ DISABILITY  ☐ GENETIC INFORMATION<br>☐ OTHER *(Specify)* | Earliest  08-06-2019  Latest  08-06-2019<br>☐ CONTINUING ACTION |

THE PARTICULARS ARE *(If additional paper is needed, attach extra sheet(s)):*

I began my employment with Respondent in or around June 2017. My most recent position was Police Officer. During my employment, I suffered a disability. Respondent initially accommodated my disability, but then refused.  In addition, I was subjected to different terms and condition of employment when Respondent allowed a male officer to remain on light duty. On or about August 6, 2019, I was discharged.

I believe I was discriminated against because of my disability, in violation of the Americans with Disability Act of 1990, as amended.

I also believe I am being discriminated against because of my, sex, Female, in violation of Title VII of the Civil Rights Act of 1964, as amended.

| I want this charge filed with both the EEOC and the State or local Agency, if any.  I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – *When necessary for State and Local Agency Requirements* |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.<br>SIGNATURE OF COMPLAINANT |
| **Digitally signed by Brianna Tedesco on 04-22-2020 03:33 PM EDT** | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE *(month, day, year)* |

CP Enclosure with EEOC Form 5 (11/09)

**PRIVACY ACT STATEMENT:** Under the Privacy Act of 1974, Pub. Law 93-579, authority to request personal data and its uses are:

**1.    FORM NUMBER/TITLE/DATE.** EEOC Form 5, Charge of Discrimination (11/09).

**2.    AUTHORITY.** 42 U.S.C. 2000e-5(b), 29 U.S.C. 211, 29 U.S.C. 626, 42 U.S.C. 12117, 42 U.S.C. 2000ff-6.

**3.    PRINCIPAL PURPOSES.** The purposes of a charge, taken on this form or otherwise reduced to writing (whether later recorded on this form or not) are, as applicable under the EEOC anti-discrimination statutes (EEOC statutes), to preserve private suit rights under the EEOC statutes, to invoke the EEOC's jurisdiction and, where dual-filing or referral arrangements exist, to begin state or local proceedings.

**4.    ROUTINE USES.** This form is used to provide facts that may establish the existence of matters covered by the EEOC statutes (and as applicable, other federal, state or local laws). Information given will be used by staff to guide its mediation and investigation efforts and, as applicable, to determine, conciliate and litigate claims of unlawful discrimination. This form may be presented to or disclosed to other federal, state or local agencies as appropriate or necessary in carrying out EEOC's functions. A copy of this charge will ordinarily be sent to the respondent organization against which the charge is made.

**5.    WHETHER DISCLOSURE IS MANDATORY; EFFECT OF NOT GIVING INFORMATION.** Charges must be reduced to writing and should identify the charging and responding parties and the actions or policies complained of. Without a written charge, EEOC will ordinarily not act on the complaint. Charges under Title VII, the ADA or GINA must be sworn to or affirmed (either by using this form or by presenting a notarized statement or unsworn declaration under penalty of perjury); charges under the ADEA should ordinarily be signed. Charges may be clarified or amplified later by amendment. It is not mandatory that this form be used to make a charge.

### NOTICE OF RIGHT TO REQUEST SUBSTANTIAL WEIGHT REVIEW

Charges filed at a state or local Fair Employment Practices Agency (FEPA) that dual-files charges with EEOC will ordinarily be handled first by the FEPA. Some charges filed at EEOC may also be first handled by a FEPA under worksharing agreements. You will be told which agency will handle your charge. When the FEPA is the first to handle the charge, it will notify you of its final resolution of the matter. Then, if you wish EEOC to give Substantial Weight Review to the FEPA's final findings, you must ask us in writing to do so <u>within 15 days</u> of your receipt of its findings. Otherwise, we will ordinarily adopt the FEPA's finding and close our file on the charge.

### NOTICE OF NON-RETALIATION REQUIREMENTS

Please **notify** EEOC or the state or local agency where you filed your charge **if retaliation is taken against you or others** who oppose discrimination or cooperate in any investigation or lawsuit concerning this charge. Under Section 704(a) of Title VII, Section 4(d) of the ADEA, Section 503(a) of the ADA and Section 207(f) of GINA, it is unlawful for an *employer* to discriminate against present or former employees or job applicants, for an *employment agency* to discriminate against anyone, or for a *union* to discriminate against its members or membership applicants, because they have opposed any practice made unlawful by the statutes, or because they have made a charge, testified, assisted, or participated in any manner in an investigation,

proceeding, or hearing under the laws. The Equal Pay Act has similar provisions and Section 503(b) of the ADA prohibits coercion, intimidation, threats or interference with anyone for exercising or enjoying, or aiding or encouraging others in their exercise or enjoyment of, rights under the Act.

# EXHIBIT 4

IN THE MATTER OF THE        )
DISABILITY PENSION OF:      )
                                     )
    BRIANNA McCARTY,         )
                                     )
      Recipient.              )

## PHYSICIAN'S CERTIFICATE OF DISABILITY

I, _Dr. Robin Krell_, being first duly sworn on oath, state that I have re-evaluated the Pensioner, Brianna McCarty on _9/20/_ _____, 2022, pursuant to §5/3-115 of the Illinois Pension Code, 40 ILCS §5/3-101. Based upon my examination(s) and attached report/medical records/opinion, I hereby certify the following:

1.     During my evaluation of Ms. McCarty I:
    a)     Went over Ms. McCarty's medical history with her;
    b)     Asked Ms. McCarty questions about her current physical capabilities, condition and lifestyle;
    c)     Discussed with Ms. McCarty the job duties of a police officer and her perceived limitations;
    d)     Discussed with Ms. McCarty her ongoing medical treatment;
    e)     Based upon my experience and expertise, I provided a thorough medical evaluation on Ms. McCarty;
    Yes __✓__           No_____

2. Does the Pensioner remain psychologically disabled from police service with the Village of Lakemoor Police Department due to her ongoing PTSD?
    Yes __✓__           No_____

3. If "yes," please specifically describe how the Pensioner's PTSD continues to disable her from performing unrestricted police service?
_Unable to go out alone after sunsets, unable to approach cars, lack confidence to carry firearm & ammunition_

_Dr. Robin Krell_
**Physician Signature**

Date _9/21/22_

_ROBIN KRELL_
**Print Name**
_6323 N Avondale Ave #111_
**Street**
_Chicago, Il 60631_
**State**    **Zip**
_847 - 778 9322_
**Telephone**

SUBSCRIBED and sworn
to before me this _21_ day
of _September_, 2022

_Marianne Viola Nemetz_
**NOTARY PUBLIC**

Official Seal
Marianne Viola Nemetz
Notary Public State of Illinois
My Commission Expires 9/20/2026

# EXHIBIT 5

5/26/2020                              Village of Lakemoor Mail - Brianna T                    **Exhibit M**

[Quoted text hidden]

**Dr. Robin Kroll** <drrobinkroll@aol.com>                       Fri, Apr 12, 2019 at 8:02 AM
To: David Godlewski <chief@lakemoor.net>

Hi Chief
No worries when you get to researching the ride along we can discuss. I am aware of her relationship.
Maybe we can cross that bridge at another time and focus on day shift for now and we can figure out a creative alternative?

Dr K

Sent from my iPhone
[Quoted text hidden]

**David Godlewski** <chief@lakemoor.net>                     Mon, Apr 15, 2019 at 10:50 AM
To: "Dr. Robin Kroll" <drrobinkroll@aol.com>
Cc: George Manis <Gmanis@lakemoor.net>, David Alarcon <david@lakemoor.net>
Bcc: Dominick Lanzito <dlanzito@pjmchicago.com>

We will be able to accommodate a day shift patrol two-person car for one month for Brianna. She will be riding with a day shift FTO and she will work the normal day shift hours of 7AM to 7PM. I will need something in writing from you recommending this course of action for our records. She will be required to be in full uniform and will be expected to perform in the capacity of a police officer. We will then need to reassess at the end of one month to see if there has been any progress. As we talked about, the night shift presents other challenges because of her current relationship with a night shift officer. We need to keep her with an FTO and the only one available would be the other officer who was involved in the July 26th OIS. I'm not sure how that would work out. Any thoughts?
As soon as we get the release and recommendation from you we will go ahead and get it scheduled.
Let me know if you can think of anything I may be missing.

Thanks

[Quoted text hidden]

**David Godlewski** <chief@lakemoor.net>                     Mon, Apr 15, 2019 at 11:31 AM
To: "Dr. Robin Kroll" <drrobinkroll@aol.com>
Cc: David Alarcon <david@lakemoor.net>
Bcc: Dominick Lanzito <dlanzito@pjmchicago.com>

Dr. Kroll,

Apparently, the ride along accommodation is off the table? Brianna just came into my office and to my surprise asked for a disability pension application. When I told her that we would make this accommodation she said that the disability pension would be the best option at this point. She didn't seem interested in trying the day shift patrol accommodation. Any thoughts?

[Quoted text hidden]

**Drrobinkroll** <drrobinkroll@aol.com>                      Mon, Apr 15, 2019 at 11:37 AM
To: David Godlewski <chief@lakemoor.net>

I saw her this morning. Can I call on my break around 3?

Sent from my iPad
[Quoted text hidden]