## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

BRIANNA MCCARTY,

Plaintiff,

v.

VILLAGE OF LAKEMOOR

Defendant.

Case No. 22-cv-05751

Judge Mary M. Rowland

## <u>MEMORANDUM OPINION AND ORDER</u>

Plaintiff Brianna McCarty ("McCarty") sues her former employer, the Village of Lakemoor ("the Village"), alleging that the Village discriminated against her and allowed a hostile work environment in violation of the Americans with Disabilities Act ("ADA"), Title VII, and the Illinois Human Rights Act [13]. Defendants move for summary judgment [61]. The Village filed a counterclaim [37], and McCarty moves to dismiss [40]. McCarty has also filed a motion for sanctions [42]. For the reasons explained below, this Court grants the Village's motion for summary judgment [61] on all counts, denies the motion to dismiss the counterclaim without prejudice as moot [40], and denies the motion for sanctions [42].

## LEGAL STANDARDS

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317,

322 (1986). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The substantive law controls which facts are material. *Id.* After a "properly supported motion for summary judgment is made, the adverse party 'must set forth specific facts showing that there is a genuine issue for trial.'" *Id.* at 250 (quoting Fed. R. Civ. P. 56(e)).

The Court "consider[s] all of the evidence in the record in the light most favorable to the non-moving party, and [ ] draw[s] all reasonable inferences from that evidence in favor of the party opposing summary judgment." *Logan v. City of Chicago*, 4 F.4th 529, 536 (7th Cir. 2021) (quotation omitted). The Court "must refrain from making credibility determinations or weighing evidence." *Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 467 (7th Cir. 2020) (citing *Anderson*, 477 U.S. at 255). In ruling on summary judgment, the Court gives the non-moving party "the benefit of reasonable inferences from the evidence, but not speculative inferences in [its] favor." *White v. City of Chicago*, 829 F.3d 837, 841 (7th Cir. 2016) (internal citations omitted). "The controlling question is whether a reasonable trier of fact could find in favor of the non-moving party on the evidence submitted in support of and opposition to the motion for summary judgment." *Id.*

A motion to dismiss under Rule 12(b)(6) tests the sufficiency of a complaint, not the merits of the case. *Gibson v. City of Chi.*, 910 F.2d 1510, 1520 (7th Cir. 1990). "To survive a motion to dismiss under Rule 12(b)(6), the complaint must provide enough factual information to state a claim to relief that is plausible on its face and

2

raise a right to relief above the speculative level." *Haywood v. Massage Envy Franchising, LLC*, 887 F.3d 329, 333 (7th Cir. 2018) (quotations and citation omitted). *See also* Fed. R. Civ. P. 8(a)(2) (requiring a complaint to contain a "short and plain statement of the claim showing that the pleader is entitled to relief."). A court deciding a Rule 12(b)(6) motion accepts plaintiff's well-pleaded factual allegations as true and draws all permissible inferences in plaintiff's favor. *Fortres Grand Corp. v. Warner Bros. Entm't Inc.,* 763 F.3d 696, 700 (7th Cir. 2014). A plaintiff need not plead "detailed factual allegations", but "still must provide more than mere labels and conclusions or a formulaic recitation of the elements of a cause of action for her complaint to be considered adequate under Federal Rule of Civil Procedure 8." *Bell v. City of Chi.*, 835 F.3d 736, 738 (7th Cir. 2016) (citation and internal quotation marks omitted).

Dismissal for failure to state a claim is proper "when the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 558, 127 S. Ct. 1955, 1966 (2007). Deciding the plausibility of the claim is "'a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'" *McCauley v. City of Chi.*, 671 F.3d 611, 616 (7th Cir. 2011) (quoting *Ashcroft v. Iqbal,* 556 U.S. 662, 679, 129 S. Ct. 1937, 1950 (2009)).

## BACKGROUND

The Court takes the following background facts from the Village's statement of facts [62]; McCarty's response to the Village's statement of facts and her additional

statements of facts [70], and the Village's response to McCarty's statement of additional facts [85].[1] The Court notes where material facts are disputed.

### *McCarty is involved in a work-related shooting.*

Plaintiff Brianna McCarty is a former police officer of the Village of Lakemoor Police Department. [70] ¶ 1. At all relevant times, David Godlewski was the Chief of the Lakemoor Police Department ("the Department"). *Id.* ¶ 3. On June 18, 2018, McCarty was appointed as a full-time probationary police officer at the Department with a probationary period of eighteen months. *Id.* ¶ 5. On July 26, 2018, McCarty was involved in an officer-involved shooting incident and was placed on administrative leave. *Id.* ¶ 6. Shortly after, on August 9, 2018, McCarty began treatment with licensed clinical psychologist Dr. Carrie Steiner ("Dr. Steiner"). *Id.* ¶ 7.

On August 16, 2018, McCarty informed Dr. Steiner that she feared the dark, someone approaching her from behind, and being alone. *Id.* ¶ 8. She reported that she felt supported by the Department and Chief Godlewski. *Id.* On McCarty's behalf,

---

[1] The Village challenges McCarty's Local Rule 56.1 statement [70] and has moved to strike nearly 20 of her additional statement of facts. *See* [86] at 1-4. The Court maintains broad discretion to enforce the local rules governing summary judgment motions. *Petty v. City of Chicago*, 754 F.3d 416, 420 (7th Cir. 2014). The Court declines to strike facts outright but will address relevant facts as they are pertinent to the issues herein. The Court will only consider factual material supported by the record. *See Cady v. Sheahan*, 467 F.3d 1057, 1060 (7th Cir. 2006) (A party's statement of facts does not comply with Rule 56.1 if "it fail[s] to adequately cite the record [or is] filled with irrelevant information, legal arguments, and conjecture."). Further, the Court may deem a statement of fact admitted where the non-moving party fails to rebut the evidence to create a genuine material dispute of fact. *See e.g. Ciomber v. Cooperative Plus, Inc.,* 527 F.3d 635, 639 (7th Cir. 2008) (affirming the district court's grant of summary judgment where the non-moving party proffered no evidence to rebut the moving party's evidence on causation).

Dr. Steiner requested McCarty not return to work and diagnosed McCarty with acute stress reaction, which occurs when a person in a dangerous situation will have recurring memories and difficulties. *Id*. ¶ 9. At that time (in August of 2018), Chief Godlewski did not pressure McCarty to return to work and told her to take as much time as needed.[2] *Id*. ¶ 10.

On August 23, 2018, McCarty requested a letter to return to work, but Dr. Steiner encouraged McCarty to stay off work to reassess her for light duty before returning to full duty. *Id*. ¶ 11. On September 4, 2018, McCarty indicated to Dr. Steiner that she had improved—namely she denied trauma symptoms, was socializing more, seemed happier, and communicated minimal difficulties with the dark and fear of someone behind her. *Id*. ¶ 12. Dr. Steiner initially wanted to recommended light duty for McCarty. However, because McCarty wanted a return to full duty and she was not presenting psychological symptoms, Dr. Steiner wrote the requested letter recommending return to full duty. *Id*. McCarty returned to full duty on September 10, 2018. *Id*.

Dr. Steiner conducted a department wide debriefing on September 28, 2018, at Village Hall. *Id*. ¶ 13. At the debriefing, McCarty shared her difficulties returning to work, stating that she was paranoid at night, and she was scared someone was behind her or hiding in the squad car. *Id*. ¶ 14. Dr. Steiner testified at her deposition that McCarty exhibited symptoms of anxiousness at the debriefing. *Id*. After the

---

[2] McCarty testified that later, in February 2019, Chief Godlewski told her to consider disability because she was unable to work nights, and he would not accommodate her. [70] at ¶ 10.

debriefing concluded, Chief Godlewski called Dr. Steiner expressing his concern for McCarty because of her statements. *Id.* ¶ 15. He expressed that others in the Department had concerns about McCarty's delayed responses to calls, and he wanted Dr. Steiner to reassess McCarty. *Id.* ¶ 16.

That same day, Dr. Steiner reassessed McCarty and expressed her concerns that McCarty returned to work too soon. *Id.* ¶ 18. McCarty was upset and told Dr. Steiner that: (1) Dr. Steiner had crossed her boundaries and should have spoken to McCarty first, (2) she should not be taken off work, (3) she felt she was doing a great job, (4) nothing was wrong with her, and (5) she was going to get a lawyer and she was considering a lawsuit against Dr. Steiner and a complaint to the Fraternal Order of Police. *Id.* ¶ 19. Dr. Steiner recommended McCarty see another psychologist. *Id.* Shortly after McCarty's call with Dr. Steiner, McCarty was told of the Department's decision to place her back on light duty and was sent home. *Id.* ¶ 20.

On October 4, 2018, McCarty met with Dr. Steiner and told her she had no symptoms at all and no issues with socializing or working. Dr. Steiner did not diagnose McCarty with PTSD. *Id.* ¶ 21. A week later, McCarty met with Dr. Steiner and told her she was unhappy being on light duty and that not responding to emergency calls or being able to be dispatched made her feel like she was not doing real police work, and sitting behind a desk was not what she wanted to do. *Id.* ¶ 22.[3]

On October 15, 2018, McCarty met with Dr. Steiner and told her that she was not having significant issues on light duty. *Id.* ¶ 23. Shortly after, Dr. Steiner emailed

---

[3] McCarty did not recall this conversation when questioned about it at her deposition. *Id.*

Chief Godlewski stating she [Dr. Steiner] is "okay with having [McCarty] with someone (2-man car), or with someone that can watch her and report if there are any issues." [62] ¶ 23. Three days later, Dr. Steiner met with McCarty. McCarty told her she was not having thoughts about darkness or people coming from behind. [70] ¶ 24. Dr. Steiner then wrote Chief Godlewski a letter stating Officer McCarty can return to full active duty provided "she works with an 'FTO' (field training officer) for one week to assess her police skills and response for reintegration working independently." *Id*. That same day, October 18, 2018, Chief Godlewski informed McCarty that she would be required to ride with an FTO. [62] ¶ 25. Chief Godlewski testified at his deposition that he felt an FTO could help McCarty with any patrol issues and report her progress back to her doctor through the eyes of an officer who is trained in observing and training other police officers. *Id*.

On October 26, 2018, McCarty met with Dr. Steiner and reported that she enjoyed being back at work, she had no significant issues while at work, she was making traffic stops, people at work were praising her, and she was not showing symptoms of PTSD, anxiety or depression. [70] ¶ 26. On November 8, 2018, McCarty and Dr. Steiner had their last visit together. McCarty requested an end to their therapy sessions because she no longer needed them. Dr. Steiner released McCarty to full active duty and gave McCarty Dr. Robin Kroll's contact information. *Id*. ¶ 27. Once McCarty returned to full duty, she expressed her thanks to Chief Godlewski for his support while she was on light duty. *Id*. ¶ 28.

### *McCarty Begins Treatment with Dr. Kroll.*

On November 26, 2018, McCarty began treatment with Dr. Kroll, a licensed psychologist. *Id*. ¶ 29. On February 15, 2019, McCarty reported to Dr. Kroll that she was struggling with being productive at work, she was avoiding conducting traffic stops, and she instead sat in well-lit parking lots during her shift. *Id*. ¶ 31. Four days later, Dr. Kroll informed Chief Godlewski that McCarty was struggling psychologically with performing her job duties, struggling with traffic stops, was afraid to work evening hours, and lacked confidence in drawing her weapons. *Id*. ¶ 32. Dr. Kroll requested that McCarty be placed on day shift, and Chief Godlewski granted that request. *Id*.

McCarty told Dr. Kroll that she had heard Sgt. Rodney Erb (Sgt. Erb) had concerns about McCarty's mental health, and Dr. Kroll told McCarty that she had nothing to worry about. *Id*. ¶ 33. Chief Godlewski learned through Dr. Kroll that McCarty told her that Sgt. Erb threatened to revoke McCarty's Firearms Owner Identification Card (FOID) because of her PTSD. [62] ¶ 34; [70] ¶ 18 (Plaintiff's additional statement of facts). In response, Chief Godlewski testified he emailed Sgt. Erb and Sgt. Bryan Maculitis inquiring about the rumor, and both denied making any such statements. [62] ¶ 34. McCarty disputes that this was a meaningful investigation, but the record supports the fact that Chief Godlewski emailed both officers regarding "mention[ing] anything to [McCarty] about her FOID card". *Id*.

On March 19, 2019, Dr. Kroll informed Chief Godlewski that McCarty was still struggling psychologically. *Id*. ¶ 35. She recommended McCarty go back on light duty

8

during therapy, which Chief Godlewski accommodated. *Id*. That same day, Chief Godlewski told McCarty not to go to court because light duty officers were restricted from attending offsite training or court appearances. [62] ¶ 36. McCarty disputes the alleged policy because discovery was silent on the issue. [70] ¶ 36. The next day, March 20, 2019, and again on April 2, 2019, Chief Godlewski denied McCarty's requests for days off to complete two offsite training classes because of her light duty status. *Id*. ¶ 37.

On March 25, 2019, McCarty told Dr. Kroll that she was "zero percent ready to return to work" and perform her duties, she could not drive at night, and she feared returning to work. The two ultimately worked towards the decision for McCarty to file for disability and request an accommodation with a ride along officer. *Id*. ¶ 38. On April 2, 2019, Dr. Kroll requested that McCarty remain on light duty. Defendant asserts that Chief Godlewski accommodated that request. *Id*. ¶ 39. McCarty disputes this as she testified that several months prior, Dr. Kroll asked for a ride along accommodation for McCarty, which he never answered. [70] ¶ 39. McCarty further disputes the ride along accommodation request was for an FTO ("field training officer") to ride along with her. *Id*.

Dr. Kroll understood that light duty was a position to help an officer work through distorted beliefs and PTSD triggers, with the goal of transitioning to performing police officer duties. *Id*. ¶ 40. Dr. Kroll testified that her goal was working with McCarty towards filing for disability and talking to the Chief by April 15, 2019. *Id*.

### *McCarty's Requests and Decision to Apply for Disability Pension.*

On Friday, April 12, 2019, Dr. Kroll requested a ride along accommodation for McCarty. *Id.* ¶ 41. On Monday, April 15, 2019, McCarty met with Dr. Kroll for a morning session and informed Dr. Kroll that she did not have the confidence to go back to work, she was concerned she was a risk to her fellow officers, and she thought it best if she went on disability. Dr. Kroll and McCarty decided together that McCarty would go on disability. *Id.* ¶ 42. Dr. Kroll testified that McCarty told her it had become apparent that she could not go back to patrolling the streets, and McCarty wrote Dr. Kroll a letter further explaining her reasons. *Id.* ¶ 43. The letter stated it was in McCarty's "best interest not to return to active patrol at this time, including both day shift and night shift", and that for "four months [she] worked day shift at the hours of 7 am to 7 pm and [she] continued to have the same problems, despite [her] low productivity." *Id.* McCarty further stated it is most appropriate for her overall health and wellbeing not to return to active duty, either day or night shift. *Id.* Dr. Kroll testified that she agreed with McCarty, and she recommended duty-disability when she believed an officer cannot return to duty in any capacity. *Id.* ¶ 44.

That same day, April 15, 2019, Chief Godlewski emailed Dr. Kroll at 10:50 a.m., confirming the Department would accommodate McCarty with a dayshift and FTO ("field training officer") ride along for one month.[4] *Id.* ¶ 45. Less than one hour later, McCarty went to see Chief Godlewski in his office. *Id.* ¶ 46. He told McCarty that he had "good news"—the department would provide the latest requested

---

[4] McCarty disputes throughout her responses that Dr. Kroll specifically requested an FTO ("field training officer") as part of the ride along accommodation request.

accommodation with a sworn FTO ride along to work towards McCarty returning to solo patrol. *Id*. McCarty rejected the accommodation and stated it was not in her best interest, but she instead intended to file for a disability pension. [62] ¶ 47. McCarty disputes that she rejected accommodations recommended by Dr. Kroll because Dr. Kroll did not request the ride along be with an FTO. [70] ¶ 47. An FTO ("field training officer") is trained to observe an officer's job performance, and "the field training program" is a program in which an officer is subjected to determinations of passing or failing and ultimate termination. *Id*. ¶ 48. McCarty testified that she believed placing her with an FTO meant she "would not pass". [62] ¶ 49; [70] ¶ 32 (Plaintiff's additional statement of facts).

After McCarty left Chief Godlewski's office, he emailed Dr. Kroll informing her that McCarty rejected the accommodations he had offered to her, and that McCarty had asked for a disability pension, which she said was her best option. [62] ¶ 50. McCarty disputes that Chief Godlewski offered the accommodation requested by Dr. Kroll. [70] ¶ 50. Chief Godlewski testified he asked Dr. Kroll if the ride along accommodation was off the table. *Id*. Dr. Kroll responded minutes later that she had seen McCarty that morning, and she would call in the afternoon. *Id*. After April 15, 2019, Dr. Kroll did not make any more requests for accommodations on McCarty's behalf. *Id*. ¶ 51.

### *Duty Disability Proceedings and Disability Pension*

According to the Village's ordinances, the Village did not have any permanent light duty positions available for McCarty, and in 2018, the Village had also

eliminated desk positions for redlight ticket violations and hearings via Village ordinances. [62] ¶ 54. McCarty disputes that Village policy set a time limit on light duty. [70] ¶ 54.

Regardless, on April 24, 2019, McCarty submitted her duty disability application and did not make any other requests for an accommodation to allow her to return to work. *Id*. ¶ 52. It is undisputed that as of May 30, 2019, McCarty could not perform the duties of a patrol officer. *Id*. ¶ 53. However, McCarty contends that she could perform the duties of her light duty job and there were never suggestions otherwise. *Id*.

McCarty worked on light duty from April 15, 2019, until her termination on August 6, 2019. [62] ¶ 55. According to the Village (disputed by McCarty), the Village terminated McCarty because (1) according to Dr. Kroll, McCarty was "unable to perform the essential functions of the patrol officer job and will be unable to return to work as a patrol officer", (2) McCarty was no longer working towards returning to the role of patrol officer, and (3) she had refused recent accommodation.[5] *Id*. It is undisputed that a patrol officer's job duties with the Village includes "patrolling the city in a patrol car on assignment for the purpose of observing [the] area for possible criminal activity or other conditions that might endanger public safety, investigating complaints, enforcing laws", and officers "must be able to handle stress, noise, crowds, fights, gunfire, and disciplinary action without emotional interference." [70] ¶ 59.

---

[5] McCarty objects to several of the Village's statement of facts [62] on the basis that McCarty had no issues working light duty. *See e.g.* [70] at ¶¶ 54-55. As discussed *infra*, permanent light duty is not a reasonable accommodation under the ADA.

McCarty contends that the Village began discussing her termination months before she was terminated and months before Dr. Kroll requested accommodations. [70] ¶ 23 (Plaintiff's additional statement of facts). The record supports that discussions regarding McCarty's termination did not occur until April 15, 2019, when she stated she could not return to active duty. [85] at ¶ 23.

On August 4, 2021, McCarty was granted and accepted a full duty disability pension from the Lakemoor Police Pension Fund, following a hearing where her attorney established that she "will never be able to return to work" because of the July 2018 officer-involved shooting she experienced. [62] ¶ 60. On September 20, 2022, Dr. Kroll, under oath, in a signed and notarized certification to the Pension Board, certified that McCarty was unable to go out alone after sunset, unable to approach cars, and lacked confidence in carrying firearms and ammunition. [70] ¶ 61. As recently as 2024, Dr. Kroll has maintained that nothing has changed since the Village awarded McCarty a disability pension. *Id.* ¶ 62. Dr. Kroll stated in her deposition that McCarty can't return to work right now, and that she cannot perform the essential job functions of a police officer, *even with* a reasonable accommodation. *Id.* ¶ 63. McCarty does not dispute the contents of that testimony. *Id.*

### *McCarty's Experience of Harassment based on Gender.*

In support of her claim of harassment, McCarty testified at her deposition that: (1) Officer Francke suggested getting back to work was "mind over matter", (2) Sgt. Erb told her she should have remained on light duty until she was ready to work the streets, (3) Officer Wendell Russell said a gun to the head was no big deal, and (4)

13

Officer Francke told her to "pull her big girl panties up". [62] ¶¶ 76-77. Chief Godlewski agreed these comments were harassing. [70] ¶ 19 (Plaintiff's statement of additional facts). McCarty admits she did not report these comments to Human Resources, Chief Godlewski, the Village manager/administrator, the Mayor, or the Village Attorney. *Id.* ¶¶ 76-77.[6] McCarty also testified at her deposition that she reported an incident to Chief Godlewski where Sargeant Bryan Maculitis responded to her request from dispatch for a partner, but later commented that if McCarty did not require backup, his work would have been done. [70] ¶ 76. Chief Godlewski denies McCarty reported the incident to him, and testified that if he had learned of it, he would have launched an investigation. [79-2] (Godlewski Deposition) at 146: 6-24.

McCarty alleges that her fellow officers failed to provide her with back-up and submitted an electronic diary to the EEOC to support her position that Officer Eric Francke refused to back her up on September 18, 2018, and January 2, 2019. [70] ¶ 71. But time records indicate that Officer Francke was not on duty on September 18, 2018, and McCarty was not on duty on January 2, 2019. *Id.* ¶ 71. Moreover, it is uncontested that McCarty requested back up in Fall 2018, and she later stated Sgt. Maculitis provided it to her (although McCarty testified that he made the comment referenced above after providing the back-up). *Id.* ¶ 72. On November 9, 2018, McCarty and Officer Francke both responded to a suspicious vehicle incident. *Id.* ¶

---

[6] It is undisputed that McCarty received an employee handbook that explained the process for reporting harassment and discrimination, both of which were prohibited by the Department. *Id.* ¶ 75.

73. On November 15, 2018, McCarty's police report stated Officer Francke responded with her to an incident involving domestic trouble. *Id.* ¶ 74.

### *Other Officers on Light Duty.*

McCarty presents the following men who were permitted to remain on light duty as comparators. Probationary Police Officer Jack LeMaster was terminated after he sustained a toe injury preventing him from performing the essential duties of his job, and he sought a non-duty related disability pension. [62] ¶ 64. Gary Spoerry was placed on light duty at his physician's request and returned to full duty. *Id.* ¶ 65. Officer Spoerry was then placed back on light duty and has been since September 2022 and has not been replaced or terminated. *Id.* Officer Christopher Adolf was placed on light duty at his physician's request and returned to full duty. *Id.* ¶ 67. Officer Ricky Westcott was on light duty as a janitor from 2016-2020. His light duty position was eventually terminated when he applied for a disability pension and resigned from the post. [70] ¶¶ 68-69.

## ANALYSIS

McCarty alleges in Count I under the Americans with Disabilities Act, 42 U.S.C. § 12101, that the Village failed to accommodate her disability, and in Count II that the Village discriminated against her and allowed a hostile work environment because of her gender under Title VII, 42 U.S.C. § 2000(e), and in Count V that the Village violated the Illinois Human Rights Act (IHRA), 775 ILCS 5/1-101, by allowing gender discrimination and a hostile work environment. [13]. The Village moves for summary judgment on the Failure to Accommodate claim arguing: (1) McCarty is not

a qualified individual under the ADA, and (2) McCarty refused reasonable accommodations. [66] at 8-11. Next, the Village argues McCarty's Title VII claim fails as a matter of law because she cannot point to any similarly situated comparators. *Id.* at 11-14.[7] Finally, the Village argues McCarty's failure to report co-worker misconduct via required procedures discharges its liability. *Id.* at 14-16. The Court analyzes the claims in turn below.

## I. McCarty is not a qualified individual under the ADA and she refused reasonable accommodations.

To survive summary judgment on a failure to accommodate claim under the ADA, McCarty must show that (1) she is a qualified individual with a disability; (2) her employer was aware of this disability; and (3) her employer failed to reasonably accommodate her disability. *Guzman v. Brown County.,* 884 F.3d 633, 642 (7th Cir. 2018) (internal quotation marks omitted) (citing *E.E.O.C. v. Sears, Roebuck & Co.,* 417 F.3d 789, 797 (7th Cir. 2005)). McCarty has the burden of proving that she is "qualified" to perform the essential functions of the job with or without a reasonable accommodation. *Best v. Shell Oil Co.,* 107 F.3d 544, 547-48 (7th Cir. 1997). If she establishes that she requires an accommodation to perform the essential functions of her job, McCarty must also show that her requested accommodation is reasonable. The reasonable accommodation inquiry is "highly fact-specific" and "requires balancing the needs of the parties." *Babnik v. Vill. of Antioch*, No. 18-CV-04490, 2023

---

[7] Because the Court determined McCarty is not a qualified individual under the ADA, it declines to address the Village's argument that McCarty is judicially estopped from her failure to accommodate claim, or the Village's argument that the lack of a daytime desk assignment was not pretext for McCarty's Title VII claim.

WL 4817655, at *6 (N.D. Ill. July 27, 2023) (quoting *Oconomowoc Residential Programs v. City of Milwaukee*, 300 F.3d 775, 784 (7th Cir. 2002)). "It is the employer's prerogative to choose a reasonable accommodation; an employer is not required to provide the particular accommodation that an employee requests." *Jay v. Intermet Wagner, Inc.,* 233 F.3d 1014, 1017 (7th Cir.2000). A "worker has no claim under the ADA if she, even with a reasonable accommodation, cannot do the job for which she was hired." *DePaoli v. Abbott Laby's,* 140 F.3d 668, 674 (7th Cir. 1998); *Matthews v. Com. Ed. Co.*, 128 F.3d1194-95 (7th Cir.1997).

Here, the Court is persuaded that McCarty's failure to accommodate claim fails for two reasons: (1) Plaintiff is not a qualified individual under the ADA, and (2) Plaintiff rejected the Village's reasonable accommodations.

McCarty is not a qualified individual under the ADA because her own treating physician testified in 2023 and reaffirmed in 2024 that McCarty cannot perform the duties of a police officer *even with* a reasonable accommodation. It is well established that a worker has no claim under the ADA if she cannot do the job for which she was hired, even with a reasonable accommodation. *DePaoli,* 140 F.3d at 674. Since it is undisputed that McCarty cannot perform the functions of a patrol police officer even with an accommodation, she is not a qualified individual under the ADA.

To the extent McCarty suggests that permanent light duty is a reasonable accommodation, the Court disagrees. In *Babnik*, 2023 WL 48175655, at * 7, the court rejected permanent light duty as a reasonable accommodation, reasoning that the "ADA may compel an employer to offer a disabled employee a permanent-light duty

position *if* such a vacant position is available and does not prevent an undue hardship. But it *does not compel* the creation of permanent light-duty positions where none exists." *Id*. (emphasis added). So too here. The record supports that light duty was a temporary position, intended for disabled officers to occupy while they were working toward returning to their full-time duties. Once McCarty rejected the Village's accommodation of a ride along (requested by her own treating physician) in the form of an FTO and indicated she was not intending to return to patrol, the Village was not required to do more; it was not required to create a permanent light duty position. *See also Gratzl v. Office of Chief Judges of 12th, 18th, 19th, & 22nd Jud. Cir.*, 601 F.3d 674, 680 (7th Cir.2010) (an employer has no "duty to reassign an employee to a permanent light duty position.") (citing *Watson v. Lithonia Lighting,* 304 F.3d 749, 752 (7th Cir.2002)); *Swanson v. Vill. of Flossmoor*, 794 F.3d 820, 827-828 (7th Cir. 2015) ("Moreover, even if "light duty" would have been [plaintiff's] preferred accommodation, the ADA does not entitle a disabled employee to the accommodation of his choice. Rather, the law entitles him to a *reasonable* accommodation in view of his limitations and his employer's needs.").

Moreover, here McCarty's physician requested a ride along, and the Village granted that accommodation in the form of a field training officer (FTO) riding along with her. McCarty argues this was not a reasonable accommodation, as she wanted to ride with another police officer rather than an FTO. The Court rejects this argument because: (1) the record is devoid of any evidence, besides McCarty's

speculation, that riding with an FTO indicated she would be terminated,[8] and (2) an employer is required to provide a reasonable accommodation, not the specific accommodation requested. *Jay,* 233 F.3d at 1017.

In sum, McCarty and her treating physician made clear that she is unable to resume the responsibilities of a patrol police officer for which she was hired. Her ADA claim is therefore without merit and summary judgment is granted as to Count I.

## II. McCarty's Title VII discrimination claim fails as she provides no similarly situated comparators.

A plaintiff can proceed under a Title VII discrimination claim, either under the direct method with evidence of discriminatory intent or the indirect, burden-shifting method. *Hildebrandt v. Illinois Dept. of Natural Resources,* 347 F.3d 1014, 1029 (7th Cir. 2003). Under the indirect method, a plaintiff must establish a prima facie case by showing: (1) protected class membership; (2) performance meeting the employer's legitimate expectations; (3) an adverse employment action; and (4) similarly situated employees outside of the protected class who were treated more favorably. *Hossack v. Floor Covering Associates of Joliet, Inc.*, 492 F.3d 853, 860 (7th Cir. 2007). The similarly situated standard requires "enough common features between the individuals to allow [for] a meaningful comparison." *Argyropoulos v. City of Alton*, 539 F.3d 724, 735 (7th Cir. 2008) (quoting *Humphries v. CBOCS W., Inc.*, 474 U.S. 387, 405 (7th Cir.2007), *aff'd*, 553 U.S. 442 (2008)). A meaningful comparison "eliminate[s]

---

[8] "Speculation is insufficient to defeat a summary judgment motion." *Flowers v. Kia Motors Fin.*, 105 F.4th 939, 946 (7th Cir. 2024) (citing *Herzog v. Graphic Packaging Int'l, Inc.*, 742 F.3d 802, 806 (7th Cir. 2014)).

confounding variables, such as differing roles, performance histories, or decision-making personnel, [and] helps isolate the critical independent variable: complaints about discrimination." *Humphries, F.3d 473 at 405.* McCarty must show that the comparators (1) were managed by the same supervisor; (2) were held to the same standards of performance, qualifications, and conduct; and (3) lack "differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Gates v. Caterpillar, Inc.*, 513 F.3d 680, 690 (7th Cir. 2008).

Here, it is undisputed that: (1) McCarty was a member of a protected class, (2) she met the Village's legitimate employment expectations, and (3) she suffered an adverse employment action.[9] The dispute therefore centers on the fourth prong: whether McCarty can point to any similarly situated comparators. Here, the Court finds that she cannot.

McCarty argues that several male police officers were assigned light duty, whilst she was terminated while working in the same role. She highlights that several officers were on light duty more than once, including Officer Wescott who was on light duty for several years before he was terminated after filing for disability. Although the Court finds it troubling that an officer was allowed to work in a "temporary" position for at least five years, there are two distinguishing variables between McCarty and the other officers at the time they worked light duty. First, McCarty was hired in 2018 and still a probationary employee when she was placed on light duty and filed for disability. The other officers referenced, Officers Spoerry, Adolf,

---

[9] The Village does not dispute that McCarty suffered an adverse employment action for purposes of the summary judgment motion only. [66] at 18.

and Westcott, were permanent (non-probationary) officers. The Seventh Circuit has found that at-will status can prevent one employee from being similarly situated to another. *See Monroe v. Indiana Dep't of Transportation*, 871 F.3d 495, 508 (7th Cir. 2017) (at-will plaintiff not similarly situated to employees who could only be fired for "just cause"). More importantly however, the record supports that all the officers referenced indicated to the Village that they were working towards resuming their full-time duties. McCarty indicated to the Chief and Dr. Kroll that she was no longer working to return fulltime to the duties for which she was hired (including stating she could not return to active duty in her letter), and after April 15, 2019, her treating physician did not make any more accommodation requests. At that point, Officers Spoerry, Adolf, and Westcott (before he filed for disability) were no longer appropriate comparators. The Court finds that the most appropriate comparator is Officer LeMaster, who was terminated shortly after he applied for disability and thus indicated he was no longer working towards transitioning to full-time duties. Indeed, the Village treated LeMaster and McCarty similarly, dooming her Title VII claim.

Since McCarty has failed to establish a prima facie case under *McDonnell Douglas*, the Court does not address her argument that the failure to accommodate light duty was pretext. Accordingly, the Court grants summary judgment as to Count II.

### III.  McCarty's failure to report her co-workers' harassment discharges the Village's liability.

"To establish a hostile work environment claim, a plaintiff must show: (1) the work environment was both subjectively and objectively offensive; (2) the harassment was based on membership in a protected class; (3) the conduct was severe or pervasive; and (4) there is a basis for employer liability." *Trahanas v. Nw. Univ.,* 64 F.4th 842, 853 (7th Cir. 2023) (citing *Scaife v. U.S. Dep't of Veterans Affs.*, 49 F.4th 1109, 1115–16 (7th Cir. 2022)). An employer can only be held liable based on harassment by a coworker "when the employee shows that h[er] employer has been negligent either in discovering or remedying the harassment." *Paschall v. Tube Processing Corp.*, 28 F.4th 805, 813 (7th Cir. 2022). "Generally, [a]n employer's legal duty in co-employee harassment cases will be discharged if it takes reasonable steps to discover and rectify acts of [ ] harassment of its employees." *Trahanas,* 64 F.4th at 855 (citing *Paschall* 28 F.4th at 813). An employer cannot be found liable "when a mechanism to report the harassment exists, but the victim fails to utilize it". *Durkin v. City of Chi.*, 341 F.3d 606, 612–13 (7th Cir. 2003)).

Here, McCarty testified about several incidents of harassment by her fellow officers, including comments such as "pull your big girl panties up", and having a gun held to your head is "no big deal". Chief Godlewski admitted in his deposition that he considered comments of that nature to be harassing. Assuming McCarty could establish that all these harassing comments were gender based, it is undisputed that the Village distributed a handbook that instructed police officers how to report harassment or misconduct, and it is undisputed that McCarty received those policies.

22

It is also undisputed that McCarty failed to report all but one of these purportedly harassing statements to anyone, including the Chief.[10] This discharges the Village's liability. Indeed, without knowledge of what McCarty's coworkers were saying or doing, the Village cannot be liable for a hostile work environment. *Trahanas*, 64 F.4th 855. The record instead supports that where the Chief *did* learn of gender based harassing conduct (from McCarty's treating physician Dr. Kroll), he questioned the alleged harassers. Although the Court agrees with McCarty that his "investigation" could have been more comprehensive than one email inquiry, the record supports that the Chief took the necessary steps once he was aware of the harassment. Under *Trahanas*, the Village took reasonable steps to address the harassment it was alerted to.

The case McCarty cites does not change the Court's analysis. McCarty cites *Phelan v. Cook County*, 463 F.3d 773 (7th Cir. 2006) for the proposition that complaints that don't technically comply with the company's internal procedures are nonetheless sufficient to defeat summary judgment. But there, unlike here, it was undisputed that the plaintiff was not given an orientation packet or copy of the employer's harassment policies at the start of her employment. *Id*. at 776. Further, the plaintiff in *Phelan* reported the harassment to her direct supervisor, who then contacted the Human Resources department. *Id*. at 777. The plaintiff also had several conversations with Human Resources directly regarding the harassment she

---

[10] Although McCarty testified that she reported Sgt. Maculitis' comment that he would have gotten his work done sooner if she had not called for backup to Chief Godlewski, no rational jury could find that this comment, on its own, constituted severe or pervasive harassment.

experienced. *Id.* at 778. There is no indication in the record here that McCarty reported the purported gender-based harassment to *anyone* employed with the Village, despite receiving the reporting procedures.

Accordingly, the Court grants summary judgment as to Count V.

## IV. The Motion to dismiss is denied as moot.[11]

Having determined McCarty's employment claims have no merit, what remains is the Village's counterclaim brought pursuant to 725 ILCS 5/20-102, alleging that McCarty continues to receive pension benefits while asserting that she can perform the duties of a police officer with reasonable accommodation. [37] ¶¶ 41-46 (Counterclaim).

The Seventh Circuit has "acknowledge[d] the broad discretion of district judges in making judgments concerning the retention of supplemental claims." *Van Harken v. City of Chicago,* 103 F.3d 1346, 1354 (7th Cir. 1997). The "power [to adjudicate state law claims] need not be exercised in every case in which it is found to exist. [Rather] [i]t has consistently been recognized that pendent [now supplemental] jurisdiction is a doctrine of discretion, not of … right." *United Mine Workers of Am. v. Gibbs,* 383 U.S. 715, 726 (1966). 28 U.S.C. § 1367(c)(3) provides that the district court may decline to exercise supplemental jurisdiction over a claim if the district court has dismissed all claims over which it has original jurisdiction. That is the case here. The

---

[11] The Court denies McCarty's motion for sanctions [42]. To prevail on a motion for sanctions, the movant must satisfy a high burden, and sanctions must be imposed with the "utmost care and caution." *Federal Deposit Ins. Corp. v. Tekfen Cons. and Installation Co.*, 847 F.2d 440, 445 (7th Cir. 1988). The Court does not find that the Village intended to harass her, cause delay, or needlessly increase the cost of litigation by filing a counterclaim. *See* F.R.C.P. 11(B)(1).

Court therefore declines to exercise supplemental jurisdiction over the counterclaim and denies the motion to dismiss [40] as moot.

## CONCLUSION

For the reasons explained above, the Court grants the Village's motion for summary judgment [61], denies the motion to dismiss the counterclaim without prejudice because the Court declines to exercise supplemental jurisdiction [40], and denies the motion for sanctions [42]. Civil case terminated.

E N T E R:

Dated: September 23, 2024

_____
MARY M. ROWLAND
United States District Judge

25